## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------  x
In re:                                            :    Chapter 11
                                                  :
AUTOBACS STRAUSS INC.,                            :    Case No. 09-_____  (___)
a Delaware corporation,                           :
                                                  :
          Debtor.                                 :
------------------------------------------------  x
```

## DECLARATION OF GLENN R. LANGBERG
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Glenn R. Langberg, hereby certify, pursuant to 28 U.S.C. § 1746, as follows:

1.      On February 2, 2009, I was appointed the president ("President") of Autobacs Strauss Inc. (the "Debtor") to manage the turn-around of the Debtor's operations.

2.      I am a director of the Debtor and, prior to my appointment as President, I served as Chief Strategy Officer of the Debtor from May 2008 to February 1, 2009 to advise the Debtor's management[1] on matters pertaining to systems, distribution and real estate. In these capacities, I was not responsible for the day-to-day financial direction or the general strategic direction of the Debtor.

3.      Previously, I served as Chief Executive Officer and Chairman of R&S Parts and Service, Inc. (a predecessor of the Debtor) and successfully reorganized that entity through chapter 11.[2]

4.      In my capacity as President, I will be responsible for the general oversight of the Debtor's business affairs. I have reviewed and gained knowledge of the Debtor's finances and operations. I am familiar with the Debtor's day-to-day operations, business affairs, and books

---

[1]  The key members of the management team were Kenichi Takeda (Chairman and Director), Akihiro Yamada (CEO and Director), and Hiroyoshi Kojima (CFO and Director).

[2]  Case No. 06-17474 (NLW) (Bankr. D.N.J.).

and records. I have also reviewed the Debtor's "First Day Motions and Orders" and am familiar with the facts alleged therein and relief requested. Except as otherwise indicated, all facts set forth in this Declaration are based upon information provided by the Debtor's management, my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtor's operations, financial condition and the industry as a whole.

5.      In accordance with the relevant resolution filed simultaneously with the Debtor's chapter 11 petition, I have been authorized to submit this Declaration in support of the applications and motions (collectively, the "First Day Motions"), which have been or will be filed with the Court in connection with the commencement of this chapter 11 case and to assist the Court and other parties in interest in understanding the circumstances that precipitated the commencement of this chapter 11 case.

6.      I am advised by proposed bankruptcy counsel that this Court has jurisdiction over this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and that venue of this case and the First Day Motions is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      To enable the Debtor to operate effectively and to minimize the adverse effects of its chapter 11 filing, the Debtor has requested various types of relief in the First Day Motions filed with this Court.

8.      The first part of this Declaration describes the Debtor's businesses and the circumstances surrounding the filing of the Debtor's chapter 11 petition. The second part sets forth the relevant facts in support of the Debtor's various First Day Motions filed concurrently

herewith. If I were called upon to testify, I would testify competently to the facts set forth herein.[3]

## I.  BACKGROUND

### A.  The Chapter 11 Filing

9.  On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

10.  The Debtor continues to operate and manage its businesses as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

### B.  The Debtor's Business Operations

11.  The Debtor, a Delaware corporation with its headquarters located in South River, New Jersey, is a leading regional retailer of after-market automotive parts and accessories and an operator of automotive service centers located throughout New York, New Jersey, and the Philadelphia and Bethlehem, Pennsylvania areas. The Debtor currently operates a total of eighty-six (86) retail store locations, sixty-eight (68) of which also provide auto service work. Of the eighty-six (86) locations, the Debtor operates thirty-three (33) locations in New Jersey, forty (40) locations in the New York City metropolitan area, and thirteen (13) locations in Pennsylvania. The Debtor's store portfolio currently consists of four owned properties, three of which are held through the Debtor's wholly-owned, non-Debtor subsidiaries Wayne Philadelphia Associates, Inc. and 155 Route 10 Associates, Inc., and eighty-two (82) leased locations.

---

[3]  Many of the disclosures herein relate to matters within the knowledge of other employees of the Debtor and are based on information provided by those employees.

DB02:7764021.6 067920.1001

12.    As of the Petition Date, the Debtor employed approximately 1,450 employees, twenty-five percent (25%) of which are employed on a full-time salaried basis and seventy-five percent (75%) of which are employed on a part-time basis.  Approximately seventy-three percent (73%) of the Debtor's workforce is unionized.

13.    In March 2007, Autobacs Seven Co., Ltd. ("Autobacs Seven"), through its direct subsidiary Autobacs USA Inc. ("Autobacs USA"), formed the Debtor to purchase substantially all of the assets of R&S Parts and Service, Inc. and 1945 Route 23 Associates, Inc. (together, the "New Jersey Debtors"),[4] which entities were then chapter 11 debtors in Case No. 06-17474 (NLW) (Bankr. D.N.J.).  Contemporaneously with the filing of the Debtor's chapter 11 case, Autobacs USA, the direct parent of the Debtor, is commencing a chapter 11 proceeding in the United States Bankruptcy Court for the Central District of California.

14.    In the asset sale transaction (the "Asset Sale Transaction"), the Debtor purchased substantially all of the assets of the New Jersey Debtors and assumed certain of their liabilities, including the obligation to make certain installment payments due under the New Jersey Debtors' plan of reorganization to holders of general unsecured claims against the New Jersey Debtors (collectively, the "Deferred Payments").  Although the Debtor has made all required Deferred Payments to date, additional Deferred Payments in the approximate amounts of $5.2 million and $2.9 million will become due and payable in May 2009 and May 2010, respectively.

15.    The Debtor is an indirect, wholly-owned subsidiary of Autobacs Seven, a Japanese company which is a large independent retailer of auto parts and services in Japan. Established in 1948 as a wholesaler and retailer of automotive parts, Autobacs Seven pioneered

---

[4]  I served as Chief Executive Officer and Secretary of 1945 Route 23 Associates, Inc. and R&S Parts and Service, Inc.

DB02:7764021.6                    067920.1001

automotive aftermarket specialty retailing in Japan with the opening of its first store in 1974 in Osaka and its retail network has since grown to become Japan's largest nationwide chain. Autobacs Seven also has expanded internationally, having established stores in Taiwan, Singapore, Thailand, France, the United States and China.

16.     Through the formation of the Debtor and the Debtor's subsequent purchase of the New Jersey Debtors' assets, Autobacs Seven established a significant footprint on the East Coast of the United States (Autobacs Seven already operated an automotive "super store" in Stanton, California).  After the acquisition, Autobacs Seven put in place a management team (Kenichi Takeda, Akihiro Yamada, and Hiroyoshi Kojima) to direct the operations of the Debtor.  Additionally, Autobacs Seven invested significant capital to renovate and upgrade stores, and facilitate the introduction of new product categories, all in an attempt to dramatically increase sales and revenues.  Although this strategy was successful in increasing sales and revenues, there were significant costs involved in Autobacs Seven's growth strategy, and the Debtor has continuously operated at a loss since its formation.

17.     Autobacs Seven planned to continue its expansion into the U.S. by opening new stores on the East Coast and in other U.S. markets beginning in 2009.  In preparation for the U.S. organization's anticipated growth, Autobacs Seven began to build and develop the corporate and administrative infrastructure to support a much larger organization.  The significant overhead costs associated with this infrastructure development further contributed to the Debtor's operational losses.

18.     As of January 3, 2009, the Debtor's books and records reflected assets of approximately $75 million (book value) and liabilities of approximately $72 million.  For the

fiscal year ended January 3, 2009, the Debtor generated revenues of approximately $150 million, but incurred EBITDA losses of approximately $11 million.

### C. The Debtor's Prepetition Debt Structure

19.     To infuse working capital into the Debtor and enable the Debtor to satisfy its obligations arising under the Asset Sale Transaction as well as implement the new management's business strategy, the Debtor entered into a series of loan agreements (the "Loan Agreements") with Autobacs Seven. All of the Debtor's borrowings under the Loan Agreements were made on an unsecured basis.

20.     In December 2008, Autobacs Seven advised the Debtor that it was no longer willing to provide additional working capital. Further, on February 2, 2009, Autobacs Seven provided written notification to the Debtor that the Loan Agreements were in default and declared all sums under the Loan Agreements immediately due and payable. As of the Petition Date, the amount outstanding under the Loan Agreements is approximately $42.4 million.

21.     The Debtor has no secured debt[5] against its approximately $33 million in retail inventory[6] or its approximately $23 million in real estate.[7] The Debtor's unsecured debt is comprised of approximately $42.4 million owed to Autobacs Seven under the Loan Agreements, approximately $8.1 million of Deferred Payments owed to the "Class 4 Administrator" in the New Jersey Debtors' chapter 11 cases, approximately $9.6 million in outstanding trade and operational payables, including rent, and approximately $12 million in other obligations including lease liabilities and other reserves.

---

[5] The only secured debt the Debtor may have is with respect to certain equipment capital leases.

[6] The $33 million figure is based on the cost of the retail inventory.

[7] The Debtor's real estate was recently appraised by Cushman & Wakefield.

**D.    Events Leading to the Chapter 11 Filing**

22.    As discussed above, after consummating the Asset Sale Transaction, the Debtor was focused on increasing sales and revenues through the renovation and upgrading of stores, and the introduction of new product categories.  The Debtor further was developing the corporate and administrative infrastructure to support and facilitate the U.S. organization's continued expansion.  These efforts were costly and, although effective in increasing sales and revenues, led to significant operating losses.

23.    These operating losses were sustainable while the Debtor was being supported by its corporate parent, Autobacs Seven.  However, once Autobacs Seven withdrew its financial support, the business model envisioned by Autobacs Seven was no longer viable. Moreover, without the financial backing of Autobacs Seven, the Debtor does not have sufficient funds to repay the Loan Agreements, which purportedly are in default and have been declared due and payable by Autobacs Seven, or to pay the approximately $5.2 million Deferred Payment due in May 2009.  Accordingly, the Debtor determined that the best course of action would be to effectuate an orderly restructuring of its operations through a chapter 11 proceeding.

24.    Through this bankruptcy proceeding, the Debtor intends to promptly and efficiently close certain of its underperforming stores and to shift the operating focus of other locations towards a higher-margin and more profitable service-based model, retaining certain larger stores as inventory hubs that will support the smaller service only locations. Additionally, the Debtor will align its corporate and administrative support structure with the more limited needs of the going-forward organizational footprint.  Finally, the Debtor intends to use the chapter 11 process to emerge as a cash flow positive entity.

## II.    FIRST DAY MOTIONS AND ORDERS

25.    The Debtor respectfully requests that the pleadings described below (the "First Day Pleadings")[8] be granted as critical elements in successfully administering its bankruptcy estate.  I offer the following factual background in support of the First Day Pleadings:

### A.    Emergency Wage Motion

26.    In the ordinary course of business, the Debtor's weekly payroll cycle is such that Employees receive direct deposit funds on Wednesdays and the Debtor distributes live checks to certain Employees on Wednesdays and to the remaining Employees on Thursday or Friday. Consequently, certain Employees will be expecting to receive their weekly pay, either through direct deposit or live checks, prior to the time of the first day hearing.

27.    Because of the Debtor's need for the continued commitment of its Employees, the Debtor is requesting the immediate entry of an order (i) authorizing (but not directing) the Debtor to pay, in its sole discretion, the Emergency Employee Obligations as described in the Emergency Motion in an amount not to exceed $720,000 and (ii) authorizing and directing Disbursement Banks to receive, process and pay any and all checks drawn on the Debtor's payroll accounts, and automatic payroll transfers to the extent that such checks or transfers relate to the Emergency Employee Obligations.

28.    The Employees possess the institutional knowledge, experience, and skills necessary to support the Debtor's business operations during the chapter 11 process and to support a successful reorganization of the Debtor's business operations.  The Debtor must take all necessary steps to retain its Employees and bolster their morale to preserve and maximize the value of the Debtor's estate.  Absent an order granting the relief requested by the

---

[8]    Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the First Day Pleading it is then being used to describe.

DB02:7764021.6                                                                    067920.1001

Emergency Motion, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations. There is a real, immediate risk that if the Debtor is not authorized to satisfy the Emergency Employee Obligations, Employees would no longer support and maintain the operations of the Debtor, thereby crippling the Debtor's business operations and instantly destroying the prospects of a successful reorganization.

### B.    Retention of Epiq Bankruptcy Solutions, LLC

29.    The Debtor seeks to employ and retain Epiq Bankruptcy Solutions, LLC ("Epiq") as notice, claims, and balloting agent pursuant to 28 U.S.C. § 156(c).

30.    The Debtor has more than 200 potential creditors.

31.    The fees to be charged by Epiq in connection with this chapter 11 case are set forth in the Services Agreement. The Debtor respectfully submits that Epiq's rates for its services in connection with the notice and claims processing services are competitive and comparable to the rates charged by its competitors for similar services.

### C.    Account Maintenance and Cash Management Motion

32.    Prior to the Petition Date, the Debtor, in the ordinary course of its business, maintained numerous Bank Accounts.

33.    Dismantling the Debtor's cash management system would likely disrupt the Debtor's relationships with its key stakeholders and may hinder its ability to successfully reorganize.

34.    Maintenance of the Bank Accounts would facilitate greatly the Debtor's transition to postpetition operations. Closing the Bank Accounts and transferring the funds in those accounts to newly created post-petition accounts would be disruptive and time consuming. Moreover, requiring the Debtor to close or alter the Bank Accounts would greatly

9

complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtor's estates and creditors.

35.     The Debtor maintains current and accurate accounting records of daily cash transactions. Maintenance of this cash management system will prevent undue disruption to the Debtor's businesses and operations, while protecting its cash for the benefit of its estates.

36.     The Debtor's cash management system centers around a main disbursement account held at Bank of Tokyo (the "Main Account"). All funds paid to, or collected by, the Debtor, is eventually deposited into the Main Account. Cash receipts received from the Debtor's retail stores and service centers are deposited into a cash depository account held at Signature Bank. The account is swept daily via wire transfer into the Main Account.

37.     With respect to credit card sales receipts, the credit card service provider for Visa and MasterCard transactions, Heartland Payment Systems, Inc., transfers such receipts into the cash concentration account held at Bank of Tokyo (the "Cash Concentration Account"). All other credit card sales receipts are deposited directly into the Cash Concentration Account. The Cash Concentration Account is swept daily via electronic transfer into the Main Account.

38.     Funds are disbursed from the Main Account into two zero-balance accounts held at the Bank of Tokyo to satisfy payroll and accounts payable obligations, respectively. Each zero-balance account then funds a checking account held at Mellon Bank, out of which the checks for payroll and accounts payable obligations, respectively, are then processed. The Debtor has two other zero-balance accounts held at Bank of Tokyo to satisfy automatic payments and medical benefit obligations. Wire transfers to the zero-balance accounts are performed daily on an as-needed basis.

DB02:7764021.6                                                                                                           067920.1001

39. The Debtor also maintains a checking account at TD Bank to fund petty cash and receive weekly miscellaneous check deposits. Funds are transferred by wire between TD Bank and the Main Account on an as-needed basis.

40. In addition, there are two accounts at Sumitomo Mitsu Bank that the Debtor rarely uses. The money market account is used as an investment account when extra cash is available and the checking account is available for disbursements if necessary.

41. Given the corporate and financial structure of the Debtor, it would be difficult, if not impossible, for it to establish an entirely new system of accounts and a new cash management system, as of the Petition Date. For example, if the Debtor was required to open separate accounts as a debtor in possession and rearrange its cash management system, there would be delays in the Debtor's ability to operate its businesses.

**D. Employee Wages and Benefits Motion**

42. As of the Petition Date, the Debtor employed approximately 1,450 full-time and part-time hourly-wage and salaried Employees. Approximately 73% of the Employees are union Employees subject to various collective bargaining agreements. The Debtor seeks authority to pay Employees' accrued prepetition wages and other benefits in amounts up to the amounts that would otherwise be allowed as priority claims in the Debtor's chapter 11 case, to continue certain benefits programs, and to allow Employees to use accrued vacation and personal time, generally in accordance with the Debtor's prepetition policies. The Debtor seeks this relief because the continued and uninterrupted service of the Employees is essential to maximize the value of the Debtor's estates for the benefit of its creditors.

43. To minimize Employees' personal hardships and to enhance the Debtor's ability to retain Employees in this uncertain time, the Debtor seeks authority to pay certain prepetition claims arising on account of the Employees for, among other items, wages, salaries, expense

11

reimbursement, federal and state withholding taxes, payroll taxes, health claims, and many other employee benefits which the Debtor pays in the ordinary course of business (collectively, the "Employee Obligations"), including, but not limited to, the Unpaid Compensation, the Leave Obligations, the Payroll Deductions, and the Employee Benefits (collectively, with the Employee Obligations, the "Employee Payments").

44.     The Debtor requests authority:  (a) to pay to Employees, in its discretion, outstanding wages and salaries owed; (b) to allow Employees to use accrued vacation time and PTO, and to maintain paid leave policies; (c) to maintain current medical benefit policies and certain insurance plans and programs, including payment for outstanding medical expenses and related expenses; (d) to pay withheld and unremitted 401(k) and other funds; (e) to pay reimbursable employee expenses; and (f) to maintain certain benefit programs in the ordinary course of the Debtor's business.

45.     Unpaid Compensation.  In the ordinary course of business, the Debtor issues payroll checks to both hourly and salaried Employees either weekly in one week arrears or bi-monthly.

46.     The Debtor also has one outside director (the "Outside Director").  The Outside Director receives a $1,000 per month fee and the Debtor reimburses the Outside Director for expenses related to his attendance at board meetings.

47.     In total, the Debtor estimates that as of the Petition Date approximately $884,000 in prepetition wages, salaries, and other compensation is owed to Employees and $1,125, along with reimbursable expenses, is owed to the Outside Director (collectively, the "Unpaid Compensation").

48.     The Debtor's books and records indicate that in no instance should the amount of prepetition wages, salaries, and contractual compensation owing to an Employee exceed the sum of $10,950, which amount is allowable as a priority claim under § 507(a)(4) of the Bankruptcy Code.  Moreover, the Debtor only seeks authority to make Employee payments up to the statutory maximums of $10,950 (on account of wages and compensation allowed as a priority claim under § 507(a)(4) of the Bankruptcy Code) and $10,950 (on account of contributions to employee benefit plans allowed as a priority claim under § 507(a)(5) of the Bankruptcy Code).

49.     Paid Vacation and PTO.  Non-union Employees are covered by the Debtor's vacation policy.  Under the policy, Employees are eligible for up to four weeks of paid vacation annually, depending on the number of years of credited service.  Union Employees' vacation time accrues pursuant to the terms of its respective collective bargaining agreement.  Vacation time for those Employees varies from zero weeks to four weeks depending on length of service.

50.     As of the Petition Date, the Debtor estimates the unpaid vacation liability for non-union employees is $58,500 and for union employees is $592,000.

51.     The Debtor also provides its employees with sick pay benefits, paid personal days, and paid holidays (collectively, "PTO").  With respect to the union Employees, the amount of days afforded for PTO varies due to the various collective bargaining agreements.

52.     As of the Petition Date, the Debtor estimates the unpaid PTO liability for non-union employees is $78,000 and for union employees is $359,000

53.     The Debtor has established various plans and policies to provide full-time Employees with various dental, prescription drug, vision, life insurance, retirement savings, and other benefits (collectively the "Employee Benefits").

13

54.     Retirement Savings.  The Debtor offers certain union and non-union Employees the opportunity to participate in a defined savings plan qualified under § 401(k) of the Internal Revenue Code (the "Savings Plan").  Under the terms of the Savings Plan, certain Employees can elect to contribute a portion of their salary or wages to the Savings Plan.  The Debtor provides matching contributions equal to (i) 100% of each Employee's pre-tax contribution, up to 4% of the Employee's annual base salary, and (ii) 50% of each Employee's pre-tax contribution, up to an additional 2% of the Employee's base salary.

55.     As of the Petition Date, the Debtor's estimated liability for the Savings Plan is approximately $11,000, and the Debtor is in possession of approximately $19,300 of the Employee contributions.

56.     Health Benefits.  The Debtor provides certain full-time, non-union Employees— at a substantially reduced cost—with certain medical, prescription drug, dental, and vision insurance through various providers (collectively, the "Non-Union Health Benefits").  The Non-Union Health Benefits are self-insured by the Debtor.  The average monthly cost for the Non-Union Health benefits is approximately $82,000, with approximately $93,000 owing as of the Petition Date.

57.     The Debtor's union Employees are offered various health benefits through their respective unions (the "Union Health Plans").  The Debtor is billed a monthly flat rate based upon the number of employees participating in a particular Union Health Plan.  A small portion of the Union Health Plans is funded by the participating union Employees via deductions taken from their paychecks.  The Debtor's average monthly cost for the Union Health Plans is approximately $152,000, with approximately $171,000 owing as of the Petition Date.

14

58.     Life and Disability Insurance.  The Debtor provides certain active full-time union and non-union Employees with life and disability insurance programs through Hartford, Inc. at a substantially reduced cost (the "Life and Disability Insurance Program").

59.     Non-union Employees who have been employed for ninety calendar days are offered short-term disability insurance, long-term disability insurance, life insurance, supplemental life insurance, and accidental death and dismemberment insurance.  Union employees are offered short-term and long-term insurance.

60.     The Debtor's average quarterly cost for the Life and Disability Insurance Program is approximately $67,300.  As of the Petition Date, the Debtor estimates that the outstanding unpaid amount for the Life and Disability Insurance Program is approximately $92,600.

61.     Flexible Spending.  The Debtor offers non-Union Employees the ability to contribute a portion of their compensation into flexible spending accounts for health and dependent care (the "Flexible Spending Program").

62.     Eligible Employees can elect to make before-tax contributions to the Flexible Spending Program through payroll deductions.  The Debtor contributes, on an annual basis, up to a maximum of $185 per person and $555 per family, into a participating Employee's flexible spending account providing that the Employee commits to a certain monthly deduction threshold.

63.     As of the Petition Date, the Debtor's estimated liability for the Flexible Spending Program is approximately $1,700, and the Debtor is in possession of approximately $4,500 of Employee contributions.

DB02:7764021.6

067920.1001

64.     Reimbursable Business Expenses.  In the ordinary course of its business, the Debtor reimburses its Employees who incur and pay a variety of approved expenses relating to, among other things, business-related travel expenses, business meals, mileage reimbursement, delivery expenses, and miscellaneous business expenses (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred by the Employees on the Debtor's behalf and with the understanding that they would be reimbursed.

65.     The Debtor averages $14,500 monthly in Reimbursable Expenses.

66.     Leased Car Program.  The Debtor provides a car to approximately 34 executive and key employees who, as a regular part of their responsibilities must travel between the Debtor's stores (the "Leased Car Program").

67.     The Debtor's estimated monthly cost for the Leased Car Program is $11,000. As of the Petition Date, the amount of unpaid liability based on the remaining months on the leases under the Leased Car Program is approximately $340,000.

68.     Employee Payroll Garnishments/Other Payroll Deductions.  The Debtor deducts from its Employees' paychecks certain taxes, such as payroll and social security taxes, required to be withheld by certain federal, state, and local taxing authorities. The Debtor also is presented with garnishment or child support orders requiring the withholding of Employee wages to satisfy such Employee obligations. Additionally, certain Employees have voluntary deductions for items such as optional health coverage for dependents, optional dental or vision care, and optional insurance coverage. Dues owed to the various unions by the union Employees also are deducted from their wages. Payments of these obligations are made from amounts otherwise payable to the Employees and are not an incremental cost obligation of the Debtor's estates.

DB02:7764021.6                                                                 067920.1001

### E.    Customer Programs Motion

69.    Prior to the Petition Date and in the ordinary course of its businesses, the Debtor offered its customers refunds, a gift certificate program, warranties, special promotional programs, and a price match program (each as defined below and, together, the "Customer Programs") to develop and sustain positive relationships with its customers and a good reputation in the marketplace.  The common goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtor, thereby helping the Debtor to retain current customers, attract new ones, and ultimately enhance revenue and profitability.

70.    The Debtor believes that the Customer Programs are successful business strategies and that the costs of the Customer Programs are, in the aggregate, more than offset by the revenue they generate.  The Debtor also believes that the Customer Programs play a critical role in the purchasing decisions of the Debtor's customers.  Partially as a result of the Customer Programs, the Debtor has engendered loyalty among its customers.

71.    The Debtor provides customers with a refund of the purchase price on products returned within thirty days of purchase, provided the product is accompanied by the original packing and register receipt.  The Debtor believes that the aggregate amount of prepetition General Customer Refunds that are projected to accrue and remain outstanding on the Petition Date is approximately $60,000.

72.    In addition, the Debtor utilizes a typical gift certificate program under which customers may purchase a gift certificate in various amounts.  As of the Petition Date, approximately $83,000 in value remained outstanding in customer gift certificates.

73.    The Debtor also generally provides warranties to its customers on account of labor performed in its service centers, as well as on parts sold in the retail centers (collectively,

the "Warranties"). The Debtor offers a ninety day warranty on all labor performed in its service centers. Additionally, the Debtor offers a warranty on parts, which ranges from ninety days to a lifetime (i.e. the period of time a customer owns the specific vehicle) depending on the specific part purchased. The Debtor's average monthly liability is approximately $17,000, with approximately $19,000 in outstanding liability as of the Petition Date.

74.     In the ordinary course of its businesses, the Debtor makes special promotional offers. Historically, only approximately 20% of all such offers are actually redeemed by the Debtor's customers. The Debtor's average monthly liability is $152,000, with approximately $171,000 in outstanding liability as of the Petition Date.

75.     The Debtor also offers a price matching program that guarantees if a competitor sells an item that the Debtor stocks for a lower price, the Debtor will beat the competitors price by five percent upon presentment of written, dated proof of the competitor's price.

76.     Additionally, the Debtor is also a party to certain agreements with credit card companies and processors pursuant to which the Debtor is able to accept credit card payments, subject to certain adjustments, returns, promotional fees, and refunds. The Debtor averages approximately $175,000 monthly in credit card processing and related fees. As of the Petition Date, the Debtor estimates that $197,000 is owing for credit card processing and related fees.

77.     The Debtor's businesses are dependent upon the loyalty and confidence of its customers, whose continued support is absolutely essential to maximizing the value of the Debtor's estate. Any delay in honoring or paying various obligations related to the Customer Programs will severely and irreparably impair the Debtor's customer relations at a time when the continued loyalty and support of its customers is extremely critical. Indeed, such failure to honor these obligations could destroy goodwill built over years with respect to many of the

Debtor's longstanding relationships. In addition, the failure to honor certain of these obligations would result in customers recovering these amounts in any event, or attempting to recover these amounts, through setoff or recoupment. By contrast, honoring these prepetition obligations will require a limited and reasonable expenditure of estate funds and will assist the Debtor in preserving its key customer relationships to the benefit of all stakeholders.

### F.    Prepetition Tax Motion

78.    The Debtor, in the ordinary course of its business, incurs sales, use and franchise taxes and such other personal liability and/or trust fund taxes (the "Taxes"). The process by which the Debtor remits the Taxes varies, depending on the nature of the tax at issue and Authority to which the relevant tax is paid.

79.    Some, if not all, of the Authorities may initiate an audit of the Debtor if the Taxes are not paid on time. Such audits will unnecessarily divert the Debtor's attention away from the reorganization process and result in unnecessary expenses. Moreover, if the Debtor does not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, seek payment from the Debtor's directors and officers and pursue other remedies that will materially and immediately harm the estates. Moreover, many of the outstanding tax liabilities are for trust fund taxes that the Debtor has collected and holds in trust for the benefit of the Authorities.

80.    As of the Petition Date, the Debtor is current with regard to the Taxes and estimates that outstanding prepetition liabilities owing to the various Authorities for Taxes will not exceed approximately $676,000, exclusive of any Taxes that may have been paid prior to Petition Date but have not cleared as of the Petition Date.

81.    The Debtor pays the Taxes to Authorities on a periodic basis with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers").

Prior to the Petition Date, certain Authorities were sent Checks or Electronic Transfers in respect of such obligations that may not have cleared the Debtor's banks or other financial institutions (together, the "Banks") as of the Petition Date. The Debtor also may not have received certain bills from certain Taxing Authorities for prepetition taxes owed.

82.     The Debtor seeks authority to pay the prepetition Taxes and seeks an order authorizing the Banks, when requested by the Debtor in its sole discretion, to process, honor, and pay any and all checks and electronic fund transfers related to the prepetition Taxes.

**G.     Utilities Motion**

83.     The Debtor currently uses electric, natural gas, heat, water, sewer, and other similar services provided by the Utility Providers. The Debtor's Utility Providers provide traditional utility services related to the day-to-day operation of the Debtor's various service and retail centers and offices. The Debtor estimates that its aggregate average monthly obligations to the Utility Providers on account of services rendered total approximately $820,000. The Debtor believes that it is generally current on all prepetition obligations due the Utility Companies, other than the accrued, but unbilled, prepetition obligations for utility services.

84.     Uninterrupted service from the Utility Providers is essential to the Debtor's continued operation. The Debtor could not maintain its facilities in the absence of continuous service. It is therefore critical that the Utility Providers continue to provide uninterrupted services to the Debtor.

85.     The Debtor intends to timely pay its postpetition obligations to the Utility Providers. The Debtor has sufficient resources to pay all postpetition obligations for Utility Services as they arise in the ordinary course.

### H. Critical Vendor Motion

86.    The Debtor seeks the entry of interim and final orders (i) authorizing the payment of prepetition obligations of certain Critical Vendors, which in the Debtor's sole discretion, are necessary to prevent the disruption of the Debtor's operations, and (ii) as appropriate, authorizing the Debtor to enter into certain Trade Agreements.  On an interim basis, the Debtor seeks authority to pay approximately $2,000,000 to certain Critical Vendors.

87.    The Critical Vendors are comprised of two main categories:  (i) essential vendors that supply parts and supplies to the Debtor's retail stores and (ii) local jobbers that provide the Debtor with an immediate source of parts and supplies to the Debtor's service centers (the "Jobbers").

*Tire Vendors*

88.    Sales of tires represent approximately 15% of the Debtor's overall retail business.  Tire sales also are a primary driver of the Debtor's service business and customers generally have brand loyalty related to tires.  The two Critical Vendors in this subcategory are the sole-source providers for two leading brands of tires.  These Critical Vendors are essential for merchandise availability and maintaining sale levels and profitability.  A vendor change would add significant inventory to the system, take months to execute, cost considerable additional funds, and severely disrupt the Debtor's business.

*Battery Vendors*

89.    Sales of batteries represent approximately 10% of the Debtor's overall retail business.  The two Critical Vendors in this subcategory provide private label batteries and the leading battery in the industry.  The private label batteries that carry the "Strauss" brand name are not available elsewhere.  With respect to the leading battery in the industry, the Debtor's customers have come to rely on the availability of these batteries in the Debtor's locations.  If

DB02:7764021.6                                                                    067920.1001

these batteries are no longer available in the Debtor's locations, customers will likely shop elsewhere, resulting in an erosion of the Debtor's customer base. In addition, these Critical Vendors provide proper environmental used battery recycling. A vendor change with the volume of the Debtor's purchases is usually negotiated and planned over a minimum of a five month process.

*Motor Oil Vendor*

90.     The sale of motor oil represents approximately 9.5% of the Debtor's overall retail business. The Critical Vendor in this subcategory provides the Debtor with direct store delivery of bulk motor oil. The Critical Vendor is also the sole-source provider of the number one selling brand of motor oil. In the Debtor's stores, lack of this particular brand would greatly impact the Debtor's overall business, both in the retail and service sectors of the Debtor's business. Moreover, vendors that can meet bulk packaged needs, for the most part, do not exist. If the Debtor was able to procure a distributor to partner with, it would take months to implement due to the size of the Debtor's business.

*Jobbers*

91.     Service centers typically represent 50%, sometimes as much as 70%, of the overall business at the Debtor's wet stores, i.e., stores with service centers. The network of Jobbers supply the service centers with parts that the Debtor is out of stock of or does not carry. The Jobbers are absolutely vital to the functioning of the service centers. The Debtor often is completing a short-term service job, but needs a part quickly in order to complete the job. The Jobber has to be local so the Jobber can respond within a thirty-minute time frame to ensure that the customer's vehicle is repaired in a timely fashion and removed from the repair bay. Quick turnover is essential to the profitability of the service centers, as well as maintaining a strong customer base since customers typically wait for their vehicles to be repaired. Without

DB02:7764021.6                                                                           067920.1001

the Jobbers, the repairs at the service centers effectively would be brought to a halt due to the inability of the Debtor to stock every possible part necessary to complete repairs on various vehicles.

92.    The goods and services provided by these Critical Vendors are crucial to the Debtor's continuation of its business and would be difficult and expensive, if not impossible to replace.  Payment of the claims of Critical Vendors (the "Critical Vendor Claims") is vital to the Debtor's reorganization efforts because (a)  the Critical Vendors are often the only source from which the Debtor can procure certain goods or services, (b) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtor, result in the Critical Vendors refusing to provide its goods and/or services to the Debtor, (c) the Critical Vendors provide goods and services to the Debtor on advantageous terms, and/or (d) the Critical Vendors would themselves be irreparably damaged by the Debtor's failure to pay its prepetition claims, resulting in the Debtor being forced to obtain goods and services elsewhere that would either be at a higher price or not of the quantity or quality required by the Debtor, and result in significant disruption to the business.

93.    It is crucial that the Debtor be permitted to pay selected Critical Vendors in order to continue the Debtor's businesses and to satisfy its customers' expectations.  Indeed, the failure to pay these claims will result in damage to the value of the Debtor's estate as a result of, among other things, adverse impact on the quality of the goods and services provided by the Debtor to its customers including through lost sales and revenue and customer dissatisfaction.

94.    The Debtor has critically examined whether the payments of the Critical Vendor Claims described herein are necessary.  Specifically, the Debtor has undertaken a thorough review of its accounts payable and its list of prepetition vendors and service providers to

identify those vendors and providers who are essential to the Debtor's operations. The Debtor has further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors and service providers receiving payment for Critical Vendor Claims will continue to supply goods and services necessary to the Debtor's business on a postpetition basis.

95. In determining the amount of claims to pay pursuant to this Motion, the Debtor consulted with the Debtor's management to identify those creditors that are most essential to the Debtor's operations, using criteria developed by the Debtor. These criteria included: (a) whether the vendor in question was a "sole-source" vendor; (b) whether preferences or requirements of the Debtor's customers prevent the Debtor from looking to alternative sources for a vendor's products or services; (c) whether the Debtor receives advantageous pricing or other terms from a vendor such that replacing such vendor postpetition would result in significantly higher costs to the Debtor and significant disruption to the business; and (d) whether a vendor meeting the standards of (a), (b) or (c) above might additionally be forced to cease business operations (due to such vendor's own liquidity constraints) in the event its prepetition claim against the Debtor was not paid within a short time after the Petition Date.

96. After evaluating the information received in response to these inquiries, the Debtor estimated the payment amount necessary to ensure the continued supply of critical goods and services, taking into account (a) whether failure to pay a Critical Vendor's claims would result in the Critical Vendor terminating its provision of goods and/or services to the Debtor and (b) what percentage of the Critical Vendor's claims would need to be paid to induce it to continue providing goods and/or services to the Debtor. The Critical Vendor Cap

represents this estimated amount. Thus, it is the judgment of the Debtor and its professionals that the relief sought herein is critically important to the Debtor's overall reorganization goals.

97.    A key to the Debtor's value is maintaining its customer relationships, which will ensure a solid customer base for the sale of products and services going forward. This is expected to drive value for the benefit of creditors. It is the judgment of the Debtor and its professionals that the relief sought by the critical vendor motion is critically important to the Debtor's overall goals in filing this case.

98.    Payments to Critical Vendors are key to the success of this chapter 11 case. If these payments are not authorized, it is likely that Critical Vendors will stop providing goods and services to the Debtor on Customary Trade Terms, effectively reducing the amount of credit available to the Debtor. Moreover, certain of the Critical Vendors and, in turn, Debtor's customers could stop doing business with the Debtor altogether, leaving the Debtor unable to obtain certain essential goods and services, forcing the Debtor to incur higher costs to obtain certain others, and, in any event, causing such substantial delays in the Debtor's service and retail business that the Debtor may never fully recover from the harm resulting from such a delay. As further detailed below, such actions would be extremely damaging, if not devastating, to the Debtor, its estate, and its creditors.

99.    In particular, continued availability of trade credit in amounts and on terms consistent with those the Debtor enjoyed prepetition is vital to the Debtor's business because it allows the Debtor to maintain liquidity for operations and to maintain the high quality products for sale in its retail operations and used in its service business that the Debtor's customers have come to expect from the Debtor. Preserving working capital through the retention or reinstatement of traditional trade credit terms will enable the Debtor to maintain its

competitiveness and to maximize the value of its business. Conversely, a deterioration of trade credit and a disruption or cancellation of deliveries of goods—many of which are not readily replaceable—would cripple the Debtor's business operations, increase the amount of funding needed by the Debtor postpetition (which funding may not be available), and ultimately impede the Debtor's ability to provide services and products to its customers, thereby placing the successful reorganization of its business at risk.

100.     The Debtor represents that it will have sufficient cash from ongoing operations to pay the claims of critical vendors in the ordinary course of business.

101.     The Debtor has no direct ability to prevent Critical Vendors from shutting down the Debtor's business operations if the Debtor fails to make payment. Accordingly, the relief requested in this Motion satisfies the requirement of Bankruptcy Rule 6003.

## CONCLUSION

102.     Accordingly, for the reasons stated herein and in each of the motions and applications set forth above, the Debtor requests that the Court approve the corresponding orders submitted with each First Day Pleading.

DB02:7764021.6                                     067920.1001

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Dated:  February 4, 2009
        South River, New Jersey

Glenn R. Langberg
Autobacs Strauss Inc., President

DB02:7764021.6

067920.1001