## EXHIBIT B

## Blackline Version of Amended Disclosure Statement

# Blacklined

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x
In re:                                             :
                                                   :    Chapter 11
AUTOBACS STRAUSS INC.,                              :
a Delaware corporation,                            :    Case No. 09-10358 (CSS)
                                                   :
        Debtor.                                    :
-------------------------------------------------- x
```

## DISCLOSURE STATEMENT WITH RESPECT TO SECOND AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY AUTOBACS STRAUSS INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

M. Blake Cleary (No. 3614)
David R. Hurst (No. 3743)
Jaime N. Luton (No. 4936)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to Debtor and Debtor in Possession*

Dated:  Wilmington, Delaware
        ~~April ___,~~June 11, 2010

i

## INTRODUCTION AND DISCLAIMER

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE SECOND AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY AUTOBACS STRAUSS INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN, OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

THIS DISCLOSURE STATEMENT SETS FORTH CERTAIN INFORMATION REGARDING THE DEBTOR'S PREPETITION OPERATING AND FINANCIAL HISTORY, THE NEED TO SEEK CHAPTER 11 PROTECTION, SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE, AND THE ANTICIPATED ORGANIZATION, OPERATIONS AND FINANCING OF THE DEBTOR UPON SUCCESSFUL EMERGENCE FROM CHAPTER 11. THIS DISCLOSURE STATEMENT ALSO DESCRIBES TERMS AND PROVISIONS OF THE PLAN, CERTAIN EFFECTS OF CONFIRMATION OF THE PLAN, CERTAIN RISK FACTORS, AND THE CONFIRMATION PROCESS AND VOTING PROCEDURES THAT HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN MUST FOLLOW FOR THEIR VOTES TO BE COUNTED.

EXCEPT AS OTHERWISE PROVIDED HEREIN, CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. UNLESS OTHERWISE NOTED, ALL DOLLAR AMOUNTS PROVIDED IN THIS DISCLOSURE STATEMENT AND THE PLAN ARE GIVEN IN UNITED STATES DOLLARS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND

EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, AUTOBACS STRAUSS INC.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**DISCLOSURE STATEMENT WITH RESPECT TO SECOND AMENDED JOINT
PLAN OF REORGANIZATION PROPOSED BY AUTOBACS STRAUSS INC.
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

## I.     INTRODUCTION

The Debtor submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), for use in the solicitation of votes on the Second Amended Joint Plan of Reorganization Proposed by Autobacs Strauss Inc. and the Official Committee of Unsecured Creditors, dated ~~April    ,~~ June 11, 2010 (the "Plan"). The Debtor and the Creditors Committee are the proponents of the Plan (the "Proponents") within the meaning of section 1129 of the Bankruptcy Code. **A copy of the Plan is attached as Appendix A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in Article I of the Plan.**

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations and financing of the Debtor upon its successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on such plan. In the Debtor's case, only Claims in **Classes 3a, 3b and 3c** are impaired by and entitled to receive a Distribution under the Plan, and therefore only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims in **Classes 1 and 2** are unimpaired by the Plan, and such Holders are conclusively presumed to have accepted the Plan. Claims or Interests in **Classes 4, 5 and 6**, which receive no Distribution under the Plan, are deemed to have rejected the Plan and the Holders of Claims or Interests in each of such Classes are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH

THE DEBTOR BELIEVES THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE DEEMED LEGAL ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF ALLOWED CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the pro forma financial projections set forth in the attached Appendix B (the "Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtor does not undertake any obligation to, and does not intend to, update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof. Moreover, the Projections are based on assumptions that, although believed to be reasonable by the Debtor, may differ from actual results.

**THE DEBTOR AND THE CREDITORS COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THE DEBTOR TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS, INCLUDING THE HOLDERS OF CLAIMS IN CLASSES 3a, 3b AND 3c. THE DEBTOR AND THE CREDITORS COMMITTEE URGE SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

2

## II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan designates seven (7) Classes of Claims and one (1) Class of Interests. These Classes take into account the differing nature and priority of the various Claims and Interests under the Bankruptcy Code.

The Debtor and the Creditors Committee believe that the Plan provides the best means currently available for the Debtor's emergence from chapter 11.

### A.    General Structure of the Plan

Claims are treated generally in accordance with the priorities established under the Bankruptcy Code. Claims that have priority status under the Bankruptcy Code or that are secured by valid liens on collateral are to be paid in full or reinstated as provided in the Plan.

The following is an overview of certain material terms of the Plan:

- The Debtor will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of chapter 11 for the benefit of its creditors, customers, suppliers, employees and communities.

- Holders of Allowed DIP Facility Claims, Administrative Claims, 503(b)(9) Claims, Priority Tax Claims, and Non-Tax Priority Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the Holders of such claims; and Holders of Allowed Miscellaneous Secured Claims will be paid in full, or the Collateral securing such claims will be returned, unless otherwise agreed by the Holders of such claims.

- Holders of Allowed Unsecured Claims will receive a Pro Rata share of the Trust Assets, including (i) the Creditor ~~Notes~~Note Proceeds and (ii) the AB 7 – Creditors' Portion, subject to certain adjustments.

- On the Effective Date, the Reorganized Debtor will waive all of its rights, title and interest in Avoidance Actions that the Debtor or Reorganized Debtor may hold against any Entity (other than the Persons or Entities who may be potential defendants of Permitted Avoidance Actions as set forth in Schedule 1 to the Plan); provided, however, that the Debtor and Reorganized Debtor will retain and be permitted to use any available defenses under section 502 of the Bankruptcy Code, including the assertion of an Avoidance Action to setoff against or otherwise reduce all or part of any Claim asserted against the Debtor's Estate.

3

- The Debtor has commenced litigation against its former indirect owner, Autobacs Seven Co., Ltd. (the "AB 7 Litigation"), and the litigation is in its preliminary stages. The Plan contemplates that the litigation will be prosecuted after Confirmation of the Plan, and makes specific provision for the allocation of any recoveries.

- All Old Equity Interests will be cancelled~~, and~~. One hundred percent (100%) of the Reorganized Debtor's New Common Stock that is authorized and issued under the Plan will be issued in the name of the Stock Trust (for ultimate distribution to Holders of Unsecured Claims); the balance of the New Common Stock authorized under the Plan will be held by the Reorganized Debtor for possible implementation of a Management Incentive Plan.

- The Plan's effectiveness is contingent upon, among other things, the Court's approval of employment agreements with Mr. Glenn Langberg (the Debtor's current Chief Executive Officer and Chief Financial Officer) and Mr. Joseph Catalano (the Debtor's current President). In particular, the Plan Proponents will seek Court approval of the employment agreements with Mr. Langberg and Mr. Catalano attached to the Disclosure Statement as Appendices D and E, respectively. ~~As more fully set forth in Mr. Langberg's employment agreement, upon timely satisfaction in full of the 45% Creditor Note, Mr. Langberg shall have the option to purchase 100% of the New Common Stock from the Stock Trust for $300,000.~~

## B.    Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. Estimated Claim amounts assume a calculation date of January 22, 2010, except that General Unsecured Claims are calculated as of the Petition Date. Estimated percentage recoveries also are set forth below for certain Classes of Claims. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtor has not yet reviewed and fully analyzed all Proofs of Claim filed in the Chapter 11 Case. Estimated Claim amounts for each Class set forth below are based upon the Debtor's review of its books and records and of certain Proofs of Claim, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated.

4

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| Class 1: Miscellaneous Secured Claims<br><br>Estimated Aggregate Allowed Amount of Class 1 Claims: $0<br><br>Estimated Recovery: 100% | • **Unimpaired**<br>• Class 1 consists of Claims (a) secured by a valid and perfected Lien on property in which the Debtor's Estate has an interest and which Lien is superior to the Lien of the DIP Lender or (b) subject to setoff under section 553 of the Bankruptcy Code and such right of setoff has been asserted by the holder of such right prior to the Confirmation Date in a properly filed motion for relief from the automatic stay, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.<br>• On or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, the Holder of such Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Miscellaneous Secured Claim, (a) Cash equal to the value of its Allowed Miscellaneous Secured Claim; (b) the return of the Holder's Collateral securing the Allowed Miscellaneous Secured Claim; or (c) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing. Any Holder of a Miscellaneous Secured Claim will retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtor free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (A) the Holder of such Miscellaneous Secured Claim (i) has been paid Cash equal to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral securing the Allowed Miscellaneous Secured Claim or (iii) has been afforded such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing; or (B) such |

5

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | <ul><li>purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable.</li><li>The Debtor currently does not believe any Miscellaneous Secured Claims exist, but to the extent any such Claims exist, they will be Unimpaired under the Plan.</li><li>Class 1 Claims are Unimpaired and are therefore not entitled to vote on the Plan.</li></ul> |
| **Class 2: Non-Tax Priority Claims**<br><br>Estimated Aggregate Allowed Amount of Class 2 Claims: $0.<br><br>Estimated Recovery: 100% | <ul><li>**Unimpaired**</li><li>Class 2 consists of Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, a 503(b)(9) Claim or an Administrative Claim.</li><li>On or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which a Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, the Holder of such Allowed Non-Tax Priority Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Non-Tax Priority Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Non-Tax Priority Claim or (b) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing.</li><li>Class 2 Claims are Unimpaired and are therefore not entitled to vote on the Plan.</li></ul> |
| **Class 3a: General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount of Class 3a Claims: approximately $10.6 million<br><br>Estimated Recovery: ~~65%, except that if the aggregate amount of Creditor Notes Proceeds paid to the Creditor Trust (for the benefit of Holders of Allowed Unsecured Claims) on or before the second anniversary of the Effective Date is equal to or greater than 53.25% of the total amount of Unsecured Claims that are not Disallowed Claims, then the Creditor Notes will be deemed satisfied in full and no further payments will be made on the Creditor Notes, in which case the estimated recovery will be 53.25~~45%. In addition, holders of Unsecured Claims will receive proceeds from any recovery in the Debtor's litigation against AB 7, which the Debtor believes will be material, potentially resulting in an ultimate distribution to holders of Class 3a Claims | <ul><li>**Impaired**</li><li>Holders of Class 3a Claims are entitled to vote to accept or reject the Plan.</li><li>Class 3a consists of all Claims that are not DIP Facility Claims, Administrative Claims, 503(b)(9) Claims, Priority Tax Claims, Non-Tax Priority Claims, Miscellaneous Secured Claims, the R&S Strauss Claim, the AB 7 Claim, Intercompany Claims or Subordinated Claims.</li><li>On or as soon as practicable after the Initial Distribution Date, each ensuing Semi-Annual Distribution Date and the Final Distribution Date, the Creditor Trust will distribute to each Holder of an Allowed General Unsecured Claim its Pro Rata share of the <u>Creditor</u> Trust Assets, including the Creditor ~~Notes~~<u>Note</u> Proceeds and the AB 7 –</li></ul> |

6

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| far in excess of ~~65~~45%.<br><br>The recovery set forth above assumes that the entire amount of the AB 7 Claim is subject to disallowance, subordination and/or recharacterization.  If this assumption is incorrect, ~~the Reorganized Debtor may be unable to repay the Creditor Notes on the timetable specified in the Plan, resulting in~~there will be a materially lower recovery to Holders of Unsecured Claims ~~and a potential default by the Reorganized Debtor under the Creditor Notes~~.  For instance, if AB 7's Claim is allowed in the full amount of $~~43,994,044.12 resulting in a default by the Debtor under the Creditor Notes,~~43,994,044.12, Holders of Unsecured Claims will receive a cash recovery of approximately ~~14.6~~13.6% (plus their pro rata share of Class 3 New Common Stock).<br><br>~~In addition, if the Reorganized Debtor defaults on repayment of the 45% Creditor Note (or if Mr. Langberg declines or is otherwise unable to exercise his option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon satisfaction in full of the 45% Creditor Note), then, upon all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, the Stock Trustee shall distribute the New Common Stock held by it Pro Rata to the Holders of Allowed Unsecured Claims.~~  The Debtor believes that, for disclosure purposes only, it is too speculative to accurately value the New Common Stock ~~that would be received at a date which is five years after the Effective Date of the Plan (i.e., the likely date of any payment default)~~.  Moreover, the New Common Stock may be illiquid as there may not be a market in which it is traded. | Creditors' Portion, less its Pro Rata share of the fees and expenses of the Trusts (and their professionals) in excess of the budgeted fees and expenses set forth in Schedule 3 to the Plan.  In addition, the Stock Trust will distribute to each Holder of an Allowed General Unsecured Claim its Pro Rata share of the Stock Trust Assets in accordance with the terms of the Plan.<br><br>• So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust is required to establish a reserve to be funded with AB 7's Pro Rata share of any distributions (including Creditor ~~Notes~~Note proceeds) to which AB 7 would be entitled were the AB 7 Claim Allowed in its full face amount of $43,994,044.12.  As a result, the Creditor Trust will be required to withhold a majority of the distributions (including Creditor ~~Notes~~Note proceeds) from Holders of Class 3a and 3b Claims on any Distribution Date on which the AB 7 Claim remains Disputed.  By way of example, assuming that on the Initial Distribution Date, (a) the AB 7 Claim remains Disputed, (b) there are $18.7 million in Class 3a and 3b Claims that have not been Disallowed, and (c) the Creditor Trust has received $3 million in Creditor ~~Notes~~Note Proceeds that are available for distribution to Unsecured Creditors, Holders of Class 3a and 3b Claims will receive, collectively, approximately $900,000, while approximately $2.1 million will be reserved for distribution to AB 7 if the AB 7 Claim ultimately were Allowed.  If the AB Claim ultimately were Allowed in Class 3c in less than the full asserted amount, then all or some of this $2.1 million reserve would be redistributed to other Holders of Unsecured Claims. |
| Class 3b:  R&S Strauss Claim<br><br>Estimated Aggregate Allowed Amount of Class 3b Claims:  approximately $8.1 million<br><br>Estimated Recovery:  ~~65%, except that if the aggregate amount of Creditor Notes Proceeds paid to the Creditor Trust (for the benefit of Holders of Allowed Unsecured Claims) on or before the second anniversary of the Effective Date is equal to or greater than 53.25% of the~~ | • **Impaired**<br>• The Holder of the Class 3b Claim is entitled to vote to accept or reject the Plan.<br>• Class 3b consists of the Claim in the amount of $8,140,497.67 asserted by R&S Strauss in the Chapter 11 Case.<br>• On or as soon as practicable after the Initial Distribution Date, each ensuing Semi-Annual Distribution Date and the Final Distribution |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| ~~total amount of Unsecured Claims that are not Disallowed Claims, then the Creditor Notes will be deemed satisfied in full and no further payments will be made on the Creditor Notes, in which case the estimated recovery will be 53.25~~45%.  In addition, holders of Unsecured Claims will receive proceeds from any recovery in the Debtor's litigation against AB 7, which the Debtor believes will be material, potentially resulting in an ultimate distribution to holders of Class 3b Claims far in excess of ~~65~~45%.<br><br>The recovery set forth above assumes that the entire amount of the AB 7 Claim is subject to disallowance, subordination and/or recharacterization.  If this assumption is incorrect, ~~the Reorganized Debtor may be unable to repay the Creditor Notes on the timetable specified in the Plan, resulting in~~there will be a materially lower recovery to Holders of Unsecured Claims ~~and a potential default by the Reorganized Debtor under the Creditor Notes~~.  For instance, if AB 7's Claim is allowed in the full amount of ~~$43,994,044.12 resulting in a default by the Debtor under the Creditor Notes,~~43,994,044.12, Holders of Unsecured Claims will receive a cash recovery of approximately ~~14.6~~13.6% (plus their pro rata share of Class 3 New Common Stock).<br><br>~~In addition, if the Reorganized Debtor defaults on repayment of the 45% Creditor Note (or if Mr. Langberg declines or is otherwise unable to exercise his option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon satisfaction in full of the 45% Creditor Note), then, upon all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, the Stock Trustee shall distribute the New Common Stock held by it Pro Rata to the Holders of Allowed Unsecured Claims.~~  The Debtor believes that, for disclosure purposes only, it is too speculative to accurately value the New Common Stock ~~that would be received at a date which is five years after the Effective Date of the Plan (i.e., the likely date of any payment default)~~.  Moreover, the New Common Stock may be illiquid as there may not be a market in which it is traded. | Date, the Creditor Trust will distribute to the Holder of the R&S Strauss Claim, if Allowed, its Pro Rata share of the <u>Creditor Trust Assets, including the Creditor</u> ~~Notes~~<u>Note</u> Proceeds and the AB 7 – Creditors' Portion, less its Pro Rata share of the fees and expenses of the Trusts (and their professionals) in excess of the budgeted fees and expenses set forth in Schedule 3 to the Plan; provided, however, that the distribution to R&S Strauss may be reduced pursuant to the terms of the Expense Sharing Agreement, and the amount of any such reduction will be retained by the Reorganized Debtor.<u>  In addition, the Stock Trust will distribute to the Holder of the R&S Strauss Claim, if Allowed, its Pro Rata share of the Stock Trust Assets in accordance with the terms of the Plan.</u><br><br>• So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust is required to establish a reserve to be funded with AB 7's Pro Rata share of any distributions (including Credtor ~~Notes~~<u>Note</u> proceeds) to which AB 7 would be entitled were the AB 7 Claim Allowed in its full face amount of $43,994,044.12.  As a result, the Creditor Trust will be required to withhold a majority of the distributions (including Creditor ~~Notes~~<u>Note</u> proceeds) from Holders of Class 3a and 3b Claims on any Distribution Date on which the AB 7 Claim remains Disputed.  By way of example, assuming that on the Initial Distribution Date, (a) the AB 7 Claim remains Disputed, (b) there are $18.7 million in Class 3a and 3b Claims that have not been Disallowed, and (c) the Creditor Trust has received $3 million in Creditor ~~Notes~~<u>Note</u> Proceeds that are available for distribution to Unsecured Creditors, Holders of Class 3a and 3b Claims will receive, collectively, approximately $900,000, while approximately $2.1 million will be reserved for distribution to AB 7 if the AB 7 Claim ultimately were Allowed.  If the AB Claim ultimately were Allowed in Class 3c in less than the full asserted amount, then all or some of this $2.1 million reserve would be redistributed to other Holders of Unsecured Claims. |

8

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| **Class 3c:** AB 7 Claim<br><br>Estimated Allowed Amount of Class 3c Claim: $0<br><br>Estimated Recovery: The Debtor believes that the entire amount of the AB 7 Claim is subject to disallowance, subordination and/or recharacterization and, therefore, that the recovery to AB 7 in Class 3c is 0%. AB 7 disagrees. | • **Impaired**<br>• The Holder of the Class 3c Claim is entitled to vote to accept or reject the Plan.<br>• Class 3c consists of the Claim in the amount of $43,994,044.12 asserted by AB 7 in the Chapter 11 Case.<br>• On or as soon as practicable after the Initial Distribution Date, each ensuing Semi-Annual Distribution Date and the Final Distribution Date, the Creditor Trust will distribute to the Holder of the AB 7 Claim, if Allowed and not subordinated (and specifically authorized for payment by the Bankruptcy Court), its Pro Rata share of the ~~Creditor~~ Trust Assets, including the Creditor ~~Notes~~Note Proceeds and the AB 7 – Creditors' Portion, less its Pro Rata share of the fees and expenses of the Trusts (and their professionals) in excess of the budgeted fees and expenses set forth in Schedule 3 to the Plan; <u>provided</u>, <u>however</u>, that the AB 7 Claim will be treated as a Class 6 Subordinated Claim to the extent that such Claim is subordinated pursuant to a Final Order in accordance with section 510(b) or 510(c) of the Bankruptcy Code. <u>In addition, the Stock Trust will distribute to the Holder of the AB 7 Claim, if Allowed and not subordinated (and specifically authorized for payment by the Bankruptcy Court), its Pro Rata share of the Stock Trust Assets in accordance with the terms of the Plan.</u><br>• So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust will establish a reserve funded with AB 7's Pro Rata share of any distributions (including Creditor ~~Notes~~Note Proceeds) to which AB 7 is entied if the AB 7 Claim is Allowed in its full face amount of $43,994,044.12. |
| **Class 4:** Intercompany Claims<br><br>Estimated Aggregate Allowed Amount of Class 4 Claims: approximately $1,000<br><br>Estimated Recovery: No cash recovery | • **Impaired**<br>• Class 4 consists of Claims held by a Non-Debtor Affiliate against the Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Non-Debtor Affiliate with respect to the Debtor, (b) any Claim not reflected in such book entries that is held by a Non-Debtor Affiliate against the Debtor, and (c) any derivative Claim asserted by or on behalf of a Non-Debtor Affiliate against the Debtor. |

9

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | - On the Effective Date, at the option of the Debtor or the Reorganized Debtor for the purpose of effecting the Plan, the Intercompany Claims will either be (a) Reinstated, in full or in part, (b) resolved through set-off, distribution or contribution, in full or in part, or (c) cancelled and discharged in full or in part, in which case such discharged and satisfied portion will be eliminated and the Holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan; provided, however, that any distribution or Reinstatement on account of Intercompany Claims in excess of $15,000 will require approval of the New Board.<br>- Class 4 is deemed to have rejected the Plan and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan. |
| Class 5: Old Equity Interests<br><br>Estimated Recovery: 0% | - **Impaired**<br>- Class 5 consists of the common stock, preferred stock or other equity interests of and in Autobacs Strauss outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such common stock, preferred stock or other equity interest.<br>- On the Effective Date, all Old Equity Interests of any kind will be cancelled as of the Effective Date and the Holders thereof will not receive or retain any property or interest in property under the Plan on account of such Interests; provided, however, that if all Holders of Allowed Claims receive in respect of such Claims Distributions of a value as of the Effective Date equal to the Allowed amounts of such Claims, then the Holders of the Old Equity Interests will receive their pro rata shares of the Distributions that otherwise would have gone to the Holders of Allowed Claims.<br>- Class 5 is deemed to have rejected the Plan and, therefore, Holders of Old Equity Interests are not entitled to vote to accept or reject the Plan. |

DB02:8932523.16YCST01:8932523.20                                                      067920.1001

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| Class 6:  Subordinated Claims<br><br>Estimated Aggregate Allowed Amount of Class 6 Claims:  $0<br><br>Estimated Recovery: 0% | • **Impaired**<br>• Class 6 consists of Claims that are subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code, and will include any Claim arising from the rescission or right of rescission of a purchase or sale of a security or Interest of the Debtor, for damages arising from the purchase or sale of such a security or Interest, or for reimbursement or contribution on account of such Claim.<br>• The Holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims.<br>• The Debtor does not believe that any Subordinated Claims exist; however, the AB 7 Claim will be treated as a Class 6 Subordinated Claim to the extent that such Claim is subordinated pursuant to a Final Order in accordance with section 510(b) or 510(c) of the Bankruptcy Code.<br>• Class 6 is deemed to have rejected the Plan and, therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan |

As set forth above, estimated Claim amounts assume a calculation date of January 22, 2010, except that Unsecured Claims are calculated as of the Petition Date.  The calculation date is not necessarily the Effective Date of the Plan.  The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied.

THE DEBTOR AND THE CREDITORS COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND THUS **STRONGLY RECOMMEND** THAT YOU VOTE TO **ACCEPT** THE PLAN.

## III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    Notice to Holders of Claims

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims entitled to vote on the Plan to make an informed judgment about whether to accept or reject the Plan.  THE BANKRUPTCY COURT'S

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

### B. Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. Under the Plan, only Holders of Claims in Classes 3a, 3b and 3c are entitled to vote on the Plan. Claims and Interests in other Classes are either Unimpaired and their Holders are deemed to have accepted the Plan, or they are receiving no Distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Claims in the voting Classes are entitled to vote on the Plan. Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), any Holder of a Claim (a) that is either (i) not scheduled or (ii) scheduled in the Schedules at zero, as unknown or as disputed, contingent or unliquidated, and (b) that is not the subject of a Proof of Claim filed by May 22, 2009, the bar date established by the Court as the bar date for filing proofs of claim (the "Claims Bar Date"), will not be treated as a creditor with respect to such Claim for purposes of voting on or objecting to the Plan.

### C. Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through its voting agent, Epiq Bankruptcy Solutions, LLC (the "Voting Agent" or "Epiq"), will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and

Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (d) other materials as authorized by the Bankruptcy Court, as more fully set forth in the Solicitation Procedures Order.

If you are the Holder of a Claim who believes you are entitled to vote on the Plan, but you did not receive a ballot or your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the following:

EPIQ BANKRUPTCY SOLUTIONS, LLC
FDR STATION, P.O. BOX 5014
NEW YORK, NY 10150-5014
TELEPHONE: (646) 282-2400

**D.** **Voting Procedures, Ballots and Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it as instructed in the envelope provided.

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot(s) sent to you with this Disclosure Statement.

All votes to accept or reject the Plan must be cast by using the ballot enclosed with the Disclosure Statement. IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN ~~JUNE 4,~~JULY____, 2010, AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

If by first class mail:
AUTOBACS STRAUSS INC. BALLOT PROCESSING
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
FDR STATION, P.O. BOX 5014
NEW YORK, NY 10150-5014

If by overnight or hand delivery:
AUTOBACS STRAUSS INC. BALLOT PROCESSING
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10017

BALLOTS CAST BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received or (c) the amount of your Claim, or if you wish to obtain, at your own expense unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

> EPIQ BANKRUPTCY SOLUTIONS, LLC
> 757 THIRD AVENUE, 3RD FLOOR
> NEW YORK, NY 10017
> TELEPHONE: (646) 282-2400

For further information and general instruction on voting to accept or reject the Plan, see Article XI of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTOR AND THE CREDITORS COMMITTEE URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT TO ACCEPT THE PLAN BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

### E. Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for ~~June 21,~~July___, 2010 at 12:00 noon Eastern Time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing or in the hearing agenda for such hearing. Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim or Interest. Any such objection must be filed with the Bankruptcy Court on or before ~~May 28,~~July___, 2010, at 4:00 p.m. Eastern Time. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV. GENERAL INFORMATION CONCERNING THE DEBTOR

### A. Overview of Business Operations

The Debtor, a Delaware corporation with its headquarters located in South River, New Jersey, is a leading regional retailer of after-market automotive parts and accessories and an operator of automotive service centers located throughout New York, New Jersey, and the Philadelphia and Bethlehem, Pennsylvania areas. As of the Petition Date, the Debtor operated a total of eighty-six (86) retail store locations, sixty-eight (68) of which also provided auto service

work. Of the eighty-six (86) locations, the Debtor operated thirty-three (33) locations in New Jersey, forty (40) locations in the New York City metropolitan area and thirteen (13) locations in Pennsylvania. The Debtor's store portfolio consisted of four owned properties, three of which were held through the Debtor's wholly-owned, non-Debtor subsidiaries Wayne Philadelphia Associates, Inc. and 155 Route 10 Associates, Inc., and eighty-two (82) leased locations.

The Debtor anticipates that, on the Effective Date, it will be operating approximately sixty-three (63) stores.

## B.    The Debtor's Previous Reorganization Efforts

In March 2007, Autobacs Seven Co., Ltd. ("AB 7"), through its direct subsidiary Autobacs USA Inc. ("Autobacs USA"), formed the Debtor to purchase substantially all of the assets of R&S Parts and Service, Inc. and 1945 Route 23 Associates, Inc. (together, the "New Jersey Debtors"), which entities were then chapter 11 debtors in Case No. 06-17474 (NLW) (Bankr. D.N.J.) (the "New Jersey Chapter 11 Case"). As a result of this transaction, Autobacs USA became the Debtor's direct parent company and sole shareholder. The assets of the New Jersey Debtors previously were purchased in March 2000 pursuant to a sale under section 363 of the Bankruptcy Code in Case No. 98-1241 (JJF) (Bankr. D. Del.).

In the asset sale transaction (the "Asset Sale Transaction"), the Debtor purchased substantially all of the assets of the New Jersey Debtors and assumed certain of their liabilities, including the obligation to make certain installment payments due under the New Jersey Debtors' plan of reorganization to holders of general unsecured claims against the New Jersey Debtors (collectively, the "Deferred Payments").

## C.    The Debtor's Significant Prepetition Indebtedness

### 1.    Prepetition Debt Structure

The facts surrounding the Debtor's prepetition debt are sharply disputed and the subject of the AB 7 Litigation. It is undisputed that AB 7 made certain equity advances to, and entered into a series of purported loan agreements (the "Loan Agreements") with, the Debtor. All of the Debtor's borrowings under these purported Loan Agreements were made on an unsecured basis. The amount of equity advances and the status and validity of the Loan Agreements is presently the subject of litigation between the Debtor and AB 7 that is discussed in more detail herein.

In December 2008, AB 7 advised the Debtor that it was no longer willing to provide additional working capital. Further, on February 2, 2009, AB 7 provided written notification to the Debtor that the purported Loan Agreements were in default and declared all sums under the Loan Agreements immediately due and payable.

The Debtor believes that all of the purported loans are invalid, violate the confirmation order entered in the New Jersey Chapter 11 Case, are subject to various defenses and/or are subject to subordination or recharacterization. AB 7 disagrees and asserts that the Loan Agreements are fully documented intercompany loans that will be respected by the

15

Bankruptcy Court as true loans. AB 7 claims that, as of the Petition Date, the amount outstanding under the purported Loan Agreements was approximately $42.575 million, including accrued but unpaid interest.

AB 7 claims that the amount of equity advances made to the Debtor totals $32.3 million. The Debtor believes that more than $10 million of the equity advances made by AB 7 subsequently was taken back by AB 7.

As of the Petition Date, there was approximately $8.1 million of asserted Deferred Payments owed to the "Class 4 Administrator" in the New Jersey Chapter 11 Cases. The New Jersey Debtors have filed proof of claim no. 357 in the Chapter 11 Case in the amount of $8,140,496.67 ("Claim 357") for the Deferred Payments.

## 2. Litigation Claims

Various claims and lawsuits arising in the normal course of business are pending against the Debtor, including claims alleging violations of certain employment or civil rights laws, and claims relating to both regulated and non-regulated aspects of the business. The Debtor denies the allegations of the various complaints. As of the Debtor's chapter 11 filing, with certain exceptions or unless otherwise ordered by the Court, the automatic stay prevents parties from pursuing any prepetition claims and lawsuits. All liabilities alleged against the Debtor in such claims and lawsuits will be treated under the Plan as General Unsecured Claims, to the extent allowed. Claims and lawsuits based upon liabilities arising after the Petition Date generally are not subject to the automatic stay, although they will be subject to the Administrative Claims Bar Date established by the Plan.

## D. Events Leading to the Filing of the Chapter 11 Cases

After consummating the Asset Sale Transaction, the Debtor focused on increasing sales and revenues through the renovation and upgrading of stores, a major expansion of inventory and the introduction of new product categories. The Debtor further sought to develop a corporate and administrative infrastructure to support and facilitate the U.S. organization's continued expansion.

These efforts were costly and ultimately led to significant operating losses, and there are serious questions regarding the business viability and implementation of the expansionary business model. Moreover, the Debtor lacked funds to pay the purported AB 7 loans, and such loans were sustained only by AB 7 advances or deferrals.

The Debtor's operating losses were sustained by funds advanced by its corporate parent, AB 7. However, once AB 7 withdrew its financial support, the business model envisioned by AB 7 was no longer viable. Moreover, without the financial backing of AB 7, the Debtor did not have sufficient funds to repay the Loan Agreements, which purportedly were in default and had been declared due and payable by AB 7, or to pay the approximately $5.2 million Deferred Payment that was due in May 2009.

16

A more complete and detailed description by the Debtor of the facts that led to the chapter 11 filing is set forth in the complaints that the Debtor has filed against AB 7 and others in the United States Bankruptcy Court for the District of Delaware and the United States District Court for the District of New Jersey. The complaints filed by the Debtor against AB 7 are posted on the Debtor's claims agent's website: (http://chapter11.epiqsystems.com/asi).

The facts set forth in the complaints filed by the Debtor are sharply disputed by AB 7.

## V.    CHAPTER 11 CASE

### A.    Continuation of Business; Stay of Litigation

As described above, on February 4, 2009, the Debtor commenced the Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Since the Petition Date, the Debtor has continued to operate as a debtor in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its business and manage its properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtor, and the continuation of litigation against the Debtor. The relief provides the Debtor with the "breathing room" necessary to assess and reorganize its business and prevents Creditors from obtaining an unfair recovery advantage while the Chapter 11 Case is ongoing.

The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan.

### B.    First Day Orders

The first day hearing (the "First Day Hearing") was held in the Chapter 11 Case before the Bankruptcy Court on February 5, 2009. At the First Day Hearing, the Bankruptcy Court heard certain requests for immediate relief filed by the Debtor to facilitate the transition between the Debtor's prepetition and postpetition business operations. Many of the first day orders obtained in the Bankruptcy Cases by the Debtor were typical for a Chapter 11 Case of similar size.

Following the First Day Hearing, the Bankruptcy Court entered first day orders that authorized, among other things:

- payment of certain prepetition employee wages and certain employee benefits, and continuation of employee programs on a postpetition basis (Docket No. 23);

17

- the appointment of Epiq as claims, noticing and balloting agent (Docket No. 16);

- deeming utilities adequately assured of payment, prohibiting utilities from altering, refusing or discontinuing services, and establishing procedures for resolving requests for adequate assurance (Docket Nos. 22 and 111);

- the honoring of certain prepetition customer obligations and continuation of customer programs and practices (Docket No. 18);

- payment of certain prepetition taxes and other ordinary course governmental obligations (Docket No. 20); and

- continued use of the Debtor's existing cash management system and bank accounts (Docket No. 17).

## C.     Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court has authorized the retention of various professionals by the Debtor, including: (i) the retention of Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as bankruptcy counsel (Docket No. 423); (ii) the retention of Lowenstein Sandler PC as special counsel (Docket No. 410), which retention has since been terminated (Docket No. 605); (iii) the retention of PricewaterhouseCoopers LLP ("PwC") as financial advisors (Docket No. 482); and (iv) the retention of Milberg LLP ("Milberg") as special litigation counsel (Docket No. 569).

## D.     Appointment of Official Committee Unsecured Creditors

On February 12, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed, pursuant to section 1102(a) of the Bankruptcy Code, the following entities holding general unsecured claims to the Creditors Committee: R&S Parts and Service, Inc., Cooper Tire & Rubber Company, Robert Bosch LLC and Honeywell International.

The Bankruptcy Court has authorized the retention of Kane Russell Coleman & Logan PC as lead Creditors Committee counsel (Docket No. 210); Archer & Greiner, PC as Delaware counsel (Docket No. 211); and Amper, Politziner & Mattia, LLP as accountants and financial advisors (Docket No. 209). The expenses of members of the Creditors Committee, and the fees and expenses of the professionals serving on behalf of the Creditors Committee, are required to be paid by the Debtor, subject to approval by the Bankruptcy Court.

## E.     DIP Facility

On February 27, 2009, the Debtor filed a Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition Financing and Grant Liens, Security Interests and Superpriority Administrative Expense Claims Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(c); and (III) Granting Related Relief (Docket No. 80) (the "DIP Motion").[1] On March 3, 2009, the Court entered the Interim DIP Order that, among other things, authorized and approved Interim Financing and scheduled the Final Hearing on the DIP Motion for March 27, 2009 (Docket No. 110). On that date, the Court entered the Final DIP Order approving the postpetition financing on a final basis (Docket No. 189).

Since the entry of the Final DIP Order, the Debtor has negotiated nine amendments to the DIP Facility. The first amendment provided for a fourteen-day extension of the deadline to assume or reject non-residential real property leases set forth in Section 7.12 of the Credit Agreement (the "Section 7.12 Deadline") (Docket No. 361). The second amendment provided a further extension of the Section 7.12 Deadline and modified the definition of "Borrowing Base" under the DIP Facility to limit the availability to borrow against the net liquidation value of the eligible inventory to $6.5 million (Docket No. 399). On October 6, 2009, the Court entered an order approving the Debtor's entry into the third amendment (the "Third Amendment") (Docket No. 570). The Third Amendment provided for a reduction in the commitment amount from $20 million to $7.5 million and added Section 7.13, which set forth a deadline for the Debtor to file a motion outlining a proposed process for disposing of assets (the "Section 7.13 Deadline"). The fourth and fifth amendments provided for a further extension of the Section 7.12 and Section 7.13 Deadlines (Docket No. 665). The sixth amendment added the "Lease Designation Requirement" and further extended the Section 7.13 Deadline (Docket No. 665). The seventh amendment amended the definition of "Compliant Leased Property" so that the Borrower only has to have an extension in excess of 60 days to determine whether to assume or reject a lease and required the Borrower under Section 7.13 to file a plan of reorganization on or prior to January 22, 2010 (Docket No. 778). The eighth amendment (i) amended the definition of "Compliant Leased Property" so the Debtor must have an extension in excess of 105 days to determine whether to assume or reject a lease, (ii) removed the definition of Lease Designation Requirement and the 7.12 Deadline, and (iii) required the Debtor under Section 7.13 to file a plan of reorganization on or prior to January 25, 2010 (Docket No. 809). On February 9, 2010, the Debtor filed a motion for an order approving the Debtor's entry into the ninth amendment (the "Ninth Amendment") (Docket No. 863). The Ninth Amendment provides the Debtor continued access to the borrowing availability under the Credit Agreement by extending the Maturity Date from March 3, 2010 through June 3, 2010. The Ninth Amendment also eliminates the potential Event of Default associated with the Debtor's obligations under Section 8.17 of the Credit Agreement to maintain certain EBITDAR levels. To date, the Debtor has not borrowed any funds under the DIP Facility.

---

[1]   Capitalized terms not otherwise defined in this Article V.E will have the meanings ascribed to them in the Final DIP Order.

## F.    Significant Litigation

### 1.    Autobacs Seven Co., Ltd.

The Debtor and the New Jersey Debtors each hold and own certain claims or potential claims against AB 7, the former indirect parent of the Debtor. The Debtor and the New Jersey Debtors each independently retained Milberg as special litigation counsel on a contingency fee basis to pursue such claims (the "Special Litigation Matters").

On December 11, 2009, the Debtor and the New Jersey Debtors filed the *Complaint and Objection to Claim* against AB 7 and various other parties including certain of the Debtor's former directors and officers described as Autobacs Strauss Inc. v. Autobacs Seven Co. Ltd., Adv. Proc. No. 09-52849 (CSS) (Bankr. D. Del.), which alleges in excess of $100 million in damages, not including punitive damages. On December 17, 2009, the Debtor and the New Jersey Debtors also filed a related complaint in the United States District Court for the District of New Jersey described as Autobacs Strauss Inc. v. Autobacs Seven Co. Ltd., Case No. 3:09-CV-06365-MLC-DEA (D.N.J.). Both of these actions are pending.

AB 7 filed a proof of claim in the Chapter 11 Case in the amount of $43,994,044.12, which claim is based essentially on alleged unpaid principal and interest on certain purported loans made by AB 7 to the Debtor. In the Delaware action, the Debtor alleges that, under the plan in the New Jersey Chapter 11 Case, all or most of the purported loans were required to be provided to the Debtor as equity investments, did not comply with relevant requirements of Delaware law, and/or were otherwise invalid or should be subordinated. The complaint seeks to invalidate AB 7's proof of claim, void and recover fraudulent and preferential transfers, recharacterize or equitably subordinate certain of AB 7's claims, obtain damages for breach of fiduciary duty and breach of contract, and impose liability on AB 7 for all the Debtor's obligations as the alter ego of AB 7.

AB 7 sharply disputes the allegations being asserted in the Delaware action and asserts that there is no basis, in fact, law or equity, for the Debtor and/or the New Jersey Debtors to recover damages from AB 7. Specifically, AB 7 asserts that (i) the fully documented intercompany loans should be respected by the Bankruptcy Court as true loans, (ii) nothing in the New Jersey Chapter 11 Case restricted the Debtor from borrowing funds from AB 7 as needed and (iii) as of the Petition Date, the Debtor was appropriately capitalized with $32.3 million in equity and $40.25 million in unsecured loans (exclusive of interest). AB 7 asserts that, even if the AB 7 Claim is Allowed in full, AB 7 stands to lose far more as a result of its equity and debt investments in the Debtor than all other unsecured creditors combined.

The Debtor's former directors and officers who are named as defendants in the Delaware complaint also sharply dispute the allegations that they breached their fiduciary duties to the Debtor. To the contrary, those defendants assert that at all times, they have fully and faithfully discharged their fiduciary obligations in accordance with applicable Delaware law and expect that all fiduciary duty claims against them will be dismissed. To the extent any such claims survive a motion to dismiss, the Debtor's former directors and officers have asserted that (i) the Debtor's current directors and officers share responsibility for the prepetition management

of the Debtor and (ii) the Debtor's former directors and officers will assert claims against the Debtor's current directors and officers for, among other things, contribution and/or indemnification.

The complaint in the New Jersey action is based essentially upon the same facts as alleged in the Delaware action and seeks damages for common law fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Those allegations allege fraud in the form of misrepresentations to the United States Bankruptcy Court for the District of New Jersey and on the participants in the New Jersey Chapter 11 Case. The Debtor also is seeking the cancellation of certain trademark registrations.

AB 7 sharply disputes the allegations and the relief being requested in the New Jersey complaint. AB 7 asserts that it made no misrepresentations to the New Jersey Bankruptcy Court or to the participants in the New Jersey Chapter 11 Case and submits that nothing in that case prohibited AB 7 from extending unsecured credit to the Debtor.

AB 7 similarly disputes the Debtor's allegation that it has abandoned certain of its trademark registrations. By letter dated October 5, 2009, AB 7 advised the Debtor that it must cease and desist all use of the AUTOBACS trade name and marks (the "Autobacs Marks") and that any such use constitutes willful trademark infringement and unfair competition under various state and federal laws. In addition, AB 7 advised that should the Debtor fail to terminate all use of the Autobacs Marks and remove all Autobacs Marks from all premises, websites and promotional materials affiliated with the Debtor, AB 7 may seek injunctive relief and damages (payable as administrative claims). AB 7 expects that the issues relating to the Debtor's (or the Reorganized Debtor's) continued use of the Autobacs Marks will be resolved in connection with the resolution of the New Jersey Complaint.

While the Debtor believes that it has meritorious claims against the defendants in these actions, the actions are expected to be contested by the defendants and the outcome cannot be predicted. The Plan is based on the assumption that the litigation claims against AB 7 will be resolved after confirmation and contains provisions allocating any recoveries between Creditors and the Reorganized Debtor.

However, in the event that AB 7 prevails in the litigation, there will be a significant adverse effect on Class 3a and 3b unsecured recoveries. In particular, if the entire amount of the AB 7 Claim is not disallowed, subordinated or recharacterized, ~~the Reorganized Debtor may be unable to repay the Creditor Notes on the timetable specified in the Plan, resulting in~~there will be a materially lower recovery to Holders of Unsecured Claims~~and a potential default by the Reorganized Debtor under the Creditor Notes. If the Reorganized Debtor defaults on repayment of the 45% Creditor Note, then, upon all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, the Stock Trustee shall distribute the New Common Stock held by it Pro Rata to the Holders of Allowed Unsecured Claims~~.

Given that the New Jersey Debtors do not have adequate funds to pay the expenses associated with the Special Litigation Matters and related proceedings, the Debtor and the New Jersey Debtors have entered into an agreement (the "Expense Sharing Agreement") that

21

provides a mechanism for the Debtor to share the burden of such expenses with the New Jersey Debtors. The Agreement allows the litigation by both the Debtor and the New Jersey Debtors against AB 7 to proceed, while providing the Debtor a procedure to recoup from the New Jersey Debtors up to fifty percent (50%) of the Expenses paid to Milberg by the Debtor upon either (i) a recovery by the New Jersey Debtors from the Special Litigation Matters and/or related proceedings or (ii) a cash distribution on account of Claim 357 to the New Jersey Debtors pursuant to the Plan. Under the Plan, Claim 357 against the Debtor will be reduced dollar-for-dollar by any direct recovery received by the New Jersey Debtors on account of the Special Litigation Matters.

    2.    Pep Boys

    On November 23, 2009, the Debtor filed the *Verified Complaint of Debtor* and *Debtor's Motion for Temporary Restraining Order and Preliminary Injunction* against the Pep Boys – Manny, Moe & Jack ("Pep Boys") thereby initiating the adversary proceeding captioned as <u>Autobacs Strauss Inc. v. The Pep Boys – Manny, Moe, & Jack</u>, Adv. Proc. No. 09-52813 (CSS) (Bankr. D. Del.) (the "<u>Pep Boys Action</u>"). By the Pep Boys Action, the Debtor sought to enjoin or otherwise restrain Pep Boys from taking or continuing any actions to interfere with the Debtor's reorganization process, including, without limitation, using certain confidential business information to interfere with the Debtor's ongoing contractual or business relations and negotiations with its landlords. The Debtor also sought monetary damages in connection with the foregoing.

    By order dated November 23, 2009, the Court granted the Debtor's request for a temporary restraining order and scheduled a preliminary injunction hearing. Prior to the hearing, the parties entered into discussions in an attempt to reach a consensual resolution of the Pep Boys Action. As a result of good faith negotiations, the parties entered into a stipulated order that was entered by the Court on December 7, 2009 (the "Stipulated Order"), whereby Pep Boys agreed to refrain from communicating with any of the Debtor's landlords for a certain time period and agreed to return all documents previously provided to Pep Boys by the Debtor pursuant to that certain confidentiality agreement dated November 20, 2008. Pep Boys also agreed to produce documents to the Debtor which were responsive to document requests served on Pep Boys prior to the entry of the Stipulated Order. In exchange, the Debtor agreed to dismiss the Pep Boys Action without prejudice.

**G.    Other Material Matters Addressed During the Chapter 11 Case**

    In addition to the first day relief sought in the Chapter 11 Case, the Debtor has sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Case, maximize the value of the Debtor's estate, and provide the foundation for the Debtor's emergence from chapter 11. Set forth below is a brief summary of certain of the principal motions the Debtor has filed during the pendency of the Chapter 11 Case.

    1.    Operational Restructuring Measures

    Since the filing of this case, the Debtor has focused primarily on restructuring its business operations with the goal of obtaining positive EBITDAR. As part of its restructuring

efforts, the Debtor has spent considerable time negotiating with landlords, vendors and labor unions to reduce costs and increase profitability to maximize the recovery to the Debtor's creditors.

As a result of its restructuring efforts to date, the Debtor has reduced its (i) labor costs by approximately $150,000 a week through union concessions and staff realignment and reductions, (ii) rent and occupancy costs by approximately $40,000 a month through store closings and rental concessions, and (iii) equipment costs by approximately $90,000 a month through restructuring equipment leases.

    2.    <u>Store Closings</u>

On March 17, 2009, the Court entered the *Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (A) Authorizing the Debtor to Conduct Store Closing Sales; and (B) Granting Related Relief* (Docket No. 166). Since the Petition Date, the Debtor has filed eight motions seeking authority to reject leases related to certain closed store locations (Docket Nos. 172, 228, 272, 493, 629, 653, 826 and 895) and the Court has subsequently approved the motions (Docket Nos. 207, 338, 341, 527, 677, 761, 951 and 978). In furtherance of its reorganization efforts, the Debtor has closed a total of twenty underperforming store locations.

    3.    Extension of Time to Assume or Reject Unexpired
               <u>Non-Residential Real Property Leases</u>

Section 365(d)(4) of the Bankruptcy Code allows a debtor an initial 120-day period for determining whether to assume or reject nonresidential real property leases, which period may be extended by order of the bankruptcy court. A failure to assume or reject during the period or to obtain an extension of the period results in a deemed rejection of nonresidential real property leases. Given the size and complexity of the Chapter 11 Case, and the need to delay decisions as to leased premises until the structure of its reorganization was determined, on April 23, 2009, the Debtor filed a motion (Docket No. 255) to extend the assumption or rejection period. On May 11, 2009, the Court entered an order granting an extension of the 120-day period in which the Debtor was required to assume or reject its leases of non-residential real property until September 2, 2009, and until December 31, 2009 for those certain leases where the Debtor had obtained prior written consent (Docket No. 305). The Debtor obtained the written consent from a majority of its landlords to further extend the period in which the Debtor is required to assume or reject its leases of non-residential real property through March 31, 2010 (Docket No. 723). The Debtor also continued to approach landlords to request additional consensual extensions to allow the Debtor more time to evaluate its leases. As a result, a substantial number of landlords have agreed to further extensions through May 31, 2010.

In addition, the Debtor has filed six motions to assume a total of twenty-six leases (the "Assumed Leases") after determining that the retail and service centers operated on the premises covered by the Assumed Leases are profitable and the Assumed Leases are valuable assets that the Debtor should retain for the benefit of its estate and creditors (Docket Nos. 436, 494, 728, 730, 906 and 979). The Court has approved five of the motions (Docket Nos. 485, 609, 755, 768 and 960) with one motion still pending before the Court. The Debtor also entered

into a new Lease Agreement for a portion of its existing corporate headquarters and distribution center premises located in South River, New Jersey at a reduced rental rate per square foot (Docket No. 771).

4. Employee Issues

(a) Additional Compensation Plan

To help insure that those employees necessary for effectuating and managing the Debtor's reorganization process were properly motivated to continue to undertake the substantial efforts that have been and will continue to be required of them during the Chapter 11 Case, the Debtor sought approval of an additional compensation plan (the "Additional Compensation Plan"). The Additional Compensation Plan was designed, in consultation with the Creditors Committee, to help insure that the value of the Debtor's assets is maximized through a chapter 11 plan of reorganization. On June 26, 2009, the Court entered an order approving the Additional Compensation Plan (Docket No. 392).

(b) Union Negotiations

Recognizing the importance of reducing its labor costs, the Debtor has spent considerable time negotiating with its labor unions to modify the terms of certain collective bargaining agreements. To this end, the Debtor entered into a Memorandum of Understanding Modifying the Terms of a Collective Bargaining Agreement with Local 888 and a Memorandum of Understanding Modifying the Terms of a Collective Bargaining Agreement with Local 108 (together, the "MOUs"), both of which were approved by the Court (Docket Nos. 567 and 573). The MOUs significantly reduce the Debtor's labor costs related to employees of Local 108 and Local 888 and provide a level of certainty with respect to those labor costs.

The Debtor currently is negotiating with Local 1776 to modify the terms of the collective bargaining agreement between the Debtor and Local 1776. To the extent that the Debtor is successful in reaching a memorandum of understanding with Local 1776, that agreement will be included in the definition of "MOUs."

5. Change of Equity Holder

Contemporaneously with the filing of the Debtor's Chapter 11 Case, Autobacs USA, the direct parent of the Debtor, commenced a chapter 11 proceeding in the United States Bankruptcy Court for the Central District of California (the "California Proceeding"). In the California Proceeding, GRL Capital Advisors LLC purchased 100% of the Debtor's common stock on June 2, 2009. The sole member of GRL Capital Advisors LLC is Glenn Langberg, the chief executive officer of the Debtor; GRL has no other relationship to any former or current insider of the Debtor.

6. Creditors Committee's Informal 2004 Examination

On or about February 23, 2009, the Creditors Committee provided the Debtor a copy of a draft 2004 motion (the "2004 Motion"), which requested the production of certain

24

documents and requested the depositions of certain of the Debtor's officers and directors. Since receipt of the 2004 Motion, the Debtor has worked in a constructive fashion to provide the information requested in the 2004 Motion. The Debtor has produced hundreds of pages of documents. In addition, the Debtor has made certain officers and directors available for 2004 examinations by the Creditors Committee.

7.   Sales Process

In late July 2009, the Debtor in consultation with the Creditors Committee began a process to test the market for interest in a possible transaction that would result in the sale of substantially all or any other potential subset or combination of the Debtor's assets. This sale process included, without limitation, developing materials to provide to prospective purchasers, causing confidentiality agreements to be executed with interested parties, developing an electronic and/or physical data room, responding to inquiries from prospective purchasers, and all other steps necessary to fully explore the sale of substantially all (or a subset thereof) of the Debtor's assets. The Creditors Committee provided input with regard to, and was kept apprised of, significant aspects of the sale process, subject to the confidentiality agreement previously executed by the Creditors Committee members and its professionals. PricewaterhouseCoopers was involved in all significant aspects of the sale process and the Creditors Committee had direct access to PwC's professionals involved in the sale process.

In connection with the sale process, marketing materials were provided to over 1,150 prospective parties in interest and approximately 16 parties signed confidentiality agreements.

As the sale process unfolded, it became apparent to the Debtor and the Creditors Committee that the process would not yield a result that was acceptable to the Debtor and Creditors Committee. As a result, the Debtor and Creditors Committee entered into substantive discussions and negotiations regarding a plan of reorganization. The results of those negotiations are memorialized in the Plan.

8.   Claims Process

(a)   Schedules and Statements of Financial Affairs

On March 7, 2009, the Debtor filed its Schedules (Docket Nos. 137 and 138) that, among other things, set forth the Claims of known creditors against the Debtor as of the Petition Date, based upon the Debtor's books and records.

(b)   503(b)(9) Claims Bar Date

By order entered on March 3, 2009 (Docket No. 112), the Bankruptcy Court established May 11, 2009, as the bar date for filing 503(b)(9) Claims.

(c)   Claims Bar Date and Proofs of Claim

25

By order entered March 17, 2009 (Docket No. 167) (the "Bar Date Order"), the Bankruptcy Court established May 22, 2009 at 5:00 p.m. (Eastern Time) as the general bar date for filing proofs of claim against the Debtor (the "General Bar Date"). Governmental units were required to file proofs of claim by August 3, 2009 at 5:00 p.m. (the "Governmental Bar Date"). In addition, the Bar Date Order provides that any Creditor that is required to file but fails to file a Proof of Claim for its Claim on or before the General Bar Date or the Governmental Bar Date, as applicable, will not be treated as a Creditor with respect to such Claim for purposes of voting and distribution while the case remains in chapter 11.

## VI. SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS AND SCHEDULES ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A. Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the

26

plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtor's Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the Distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of its businesses. Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive Distributions equal to the full amount of such Claims, (ii) the Claims of certain other Classes will be modified and receive Distributions constituting a partial recovery on such Claims, and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Reorganized Debtor will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

## B. Reorganized Capital Structure Created by Plan

The Plan sets forth the capital structure for the Reorganized Debtor upon its emergence from chapter 11, which is summarized as follows:

- ***Exit Facility.*** Although the Debtor currently is negotiating the terms of an exit financing facility in an amount of up to $10 million, the Debtor currently does not have a firm commitment from any lender to provide such financing. Funds from the exit facility will be used to support payments required to be made under the Plan, pay transaction costs, and fund working capital and other general corporate purposes of the Reorganized Debtor following the Effective Date. The Exit Facility is expected to be secured by substantially all the assets of the Reorganized Debtor, subject to customary limitations. As disclosed in the Projections attached hereto as Appendix B, the Debtor's entry into an exit financing facility is necessary to enable the Debtor to effectuate its emergence from chapter 11.

- ***Creditor ~~Notes~~Note.*** Under the Plan, the Reorganized Debtor will issue ~~two~~a junior secured promissory ~~notes~~note (the "~~45% Creditor Note" and the "20%~~Creditor Note") that will be executed and delivered by the

27

Reorganized Debtor on the Effective Date and made payable to the order of the Creditor Trust in an original principal amount ~~equal to 45% and 20%, respectively, of the total amount of Unsecured Claims that are not Disallowed Claims, as determined on the Effective Date~~of $8.5 million.

- ***Reorganized Debtor's Equity Ownership.*** On or as soon as practicable after the Effective Date, the Reorganized Debtor will issue, in the name of the Stock Trust, ~~all~~100% of ~~its~~the New Common Stock authorized ~~New Common Stock~~and issued under the Plan, and will deliver ~~the New Common Stock Certificate to the Stock Trustee. Pursuant to his employment agreement with the Reorganized Debtor, Mr. Langberg will have the option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon timely satisfaction in full of the 45% Creditor Note. On the other hand, if the Reorganized Debtor defaults on repayment of the 45% Creditor Note, then, upon all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, the Stock Trustee shall distribute the New Common Stock held by it Pro Rata to the Holders of Allowed Unsecured Claims~~one or more certificates representing such New Common Stock to the Stock Trustee.

## C.  Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a Debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1), do not need to be classified). The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total

Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims also may vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below. The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtor's assets. In view of the deemed rejection by Classes 4, 5 and 6, however, as set forth below, the Debtor will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. See Article IX.E below. Although the Debtor believes that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

~~AB 7 asserts that it will not accept the Plan and, as a result, the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code. AB 7 asserts that Mr. Langberg's employment agreement violates the "absolute priority rule" embodied in section 1129(b) by permitting Mr. Langberg to acquire 100% of the New Common Stock before unsecured creditors are paid in full. As a result, AB 7 asserts that the Plan is not fair and equitable with respect to Class 3c (the AB 7 Claim).~~

1.       <u>Treatment of Unclassified Claims under the Plan</u>

      (a)     DIP Facility Claims

Pursuant to the Plan, a DIP Facility Claim is a Claim arising under the DIP Agreement.

All DIP Facility Claims will be Allowed, and on or before the Effective Date each Holder of an Allowed DIP Facility Claim will receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed DIP Facility Claim, (i) Cash equal to the unpaid portion of such Allowed DIP Facility Claim or (ii) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing.

      (b)     Administrative Claims

An Administrative Claim is defined in the Plan as a Claim arising under section 507(a)(2) of the Bankruptcy Code for costs and expenses of administration of the Chapter 11 Case under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, including, but not limited to, (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries and commissions for services rendered after the commencement

29

of the Chapter 11 Case and payments for inventory, leased equipment and premises), (b) all other Claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, but excluding Priority Tax Claims, Non-Tax Priority Claims, 503(b)(9) Claims and Professional Fee Claims and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code.

On or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Plan provides that all Administrative Expense Requests (other than as set forth in Sections 3.1(b), 11.1 or 11.2 of the Plan) must be made by application filed with the Bankruptcy Court and served on counsel for the Reorganized Debtor by the Administrative Claims Bar Date. In the event that the Reorganized Debtor objects to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no application seeking payment of an Administrative Claim need be filed with respect to an undisputed postpetition obligation which was paid or is payable by the Debtor pursuant to an order of the Bankruptcy Court or in the ordinary course of the Debtor's business.

The Plan further provides that all final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code must be made by application filed with the Bankruptcy Court and served on the Reorganized Debtor, its counsel, counsel to the Creditors Committee, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; provided, however, that Claims of Milberg LLP for compensation for services rendered will not be subject to the procedure described in this Section 11.2(a), but rather will be governed by the Order Authorizing the Debtor To Retain and Employ Milberg LLP as Special Litigation Counsel to the Debtor (Docket No. 569), which will remain in full force and effect and will not be affected by Confirmation of the Plan. Objections to such applications must be filed and served on the Reorganized Debtor, its counsel, counsel to the Creditors Committee and the requesting Professional or other entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(c)     503(b)(9) Claims

The Plan defines 503(b)(9) Claims as Claims to the extent asserted against the Debtor pursuant to Bankruptcy Code section 503(b)(9).

On or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which a 503(b)(9) Claim becomes an Allowed 503(b)(9) Claim, the Holder of such Allowed 503(b)(9) Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed 503(b)(9) Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed 503(b)(9) Claim or (b) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing

Although Creditors have asserted 503(b)(9) Claims in an aggregate amount of approximately $3.6 million, the Debtor nonetheless believes that the Allowed amount of such Claims will be approximately $1.8 million in light of offsets and other defenses that the Debtor intends to assert, including but not limited to the Debtor's right to assert defenses against such 503(b)(9) Claims under sections 502(d) and 547 of the Bankruptcy Code.

(d)     Priority Tax Claims

The Plan defines Priority Tax Claims as Claims of a governmental unit of the kind specified in section 502(i), 507(a)(8) or 1129(a)(9)(D) of the Bankruptcy Code.

On or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, the Holder of such Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtor or Reorganized Debtor in its sole discretion, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim; (b) deferred Cash payments over a period not exceeding five (5) years after the Petition Date in an aggregate principal amount equal to the Face Amount of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which the Plan is confirmed; or (c) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing.

The Debtor estimates that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $2,500.

2.      Treatment of Classified Claims and Interests under the Plan

(a)     Class 1: Miscellaneous Secured Claims

The Plan defines Miscellaneous Secured Claims as Claims that are (a) secured by a valid and properly perfected Lien on property in which the Debtor's Estate has an interest and which Lien is superior to the Lien of the DIP Lender or (b) subject to setoff under section 553 of the Bankruptcy Code and such right of setoff has been asserted by the holder of such right prior to the Confirmation Date in a properly filed motion for relief from the automatic stay, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

The Plan provides that on or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, the Holder of such Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Miscellaneous Secured Claim, (a) Cash equal to the value of its Allowed Miscellaneous Secured Claim; (b) the return of the Holder's Collateral securing the Allowed Miscellaneous Secured Claim; or (c) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing. Any Holder of a Miscellaneous Secured Claim will retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtor free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (A) the Holder of such Miscellaneous Secured Claim (i) has been paid Cash equal to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral securing the Allowed Miscellaneous Secured Claim or (iii) has been afforded such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing; or (B) such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable.

The Debtor currently does not believe any Miscellaneous Secured Claims exist, but to the extent any such Claims exist, they will be Unimpaired under the Plan and are therefore not entitled to vote on the Plan.

(b)     Class 2: Non-Tax Priority Claims

The Plan defines Non-Tax Priority Claims as Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, a 503(b)(9) Claim or an Administrative Claim.

The Plan provides that on or as soon as practicable after the later of (i) the Effective Date or (ii) the date on which a Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, the Holder of such Allowed Non-Tax Priority Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Non-Tax Priority Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Non-Tax Priority Claim or (b) such other less favorable treatment as to which the Debtor or Reorganized Debtor and such Holder will have agreed upon in writing.

Non-Tax Priority Claims are Unimpaired under the Plan. The Debtor estimates that there will be no Allowed Non-Tax Priority Claims.

(c)     Class 3a: General Unsecured Claims

The Plan defines General Unsecured Claims as Claims that are not a DIP Facility Claims, Administrative Claims, 503(b)(9) Claims, Priority Tax Claims, Non-Tax Priority Claims, Miscellaneous Secured Claims, the R&S Strauss Claim, the AB 7 Claim, Intercompany Claims or Subordinated Claims.

The Plan provides that on or as soon as practicable after the Initial Distribution Date, each ensuing Semi-Annual Distribution Date and the Final Distribution Date, the Creditor Trust will distribute to each Holder of an Allowed General Unsecured Claim its Pro Rata share of the Creditor Trust Assets, including the Creditor ~~Notes~~Note Proceeds and the AB 7 – Creditors' Portion, less its Pro Rata share of the fees and expenses of the Trusts (and their professionals) in excess of the budgeted fees and expenses set forth in Schedule 3 to the Plan. In addition, the Stock Trust will distribute to each Holder of an Allowed General Unsecured Claim its Pro Rata share of the Stock Trust Assets in accordance with the terms of the Plan.

If the entire amount of the AB 7 Claim is not disallowed, subordinated or recharacterized, ~~the Reorganized Debtor may be unable to repay the Creditor Notes on the timetable specified in the Plan, resulting in~~there will be a materially lower recovery to Holders of Unsecured Claims ~~and a potential default by the Reorganized Debtor under the Creditor Notes. If the Reorganized Debtor defaults on repayment of the 45% Creditor Note (or if Mr. Langberg declines or is otherwise unable to exercise his option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon satisfaction in full of the 45% Creditor Note), then, upon all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, the Stock Trustee shall distribute the New Common Stock held by it Pro Rata to the Holders of Allowed Unsecured Claims~~.

For purposes of calculating a Holder's Pro Rata share of any distribution under the Plan, Classes 3a, 3b and 3c are treated together as a single Class. As a result, in the event that (i) the AB 7 Claim in Class 3c is Allowed in its full Face Amount of $43,994,044.12 and (ii) total Allowed Class 3a and 3b Claims total $18.7 million, then Holders of Class 3a and 3b Claims, collectively, would be entitled to receive approximately 30% of the Creditor ~~Notes~~Note Proceeds that would be available for distribution to Holders of Unsecured Claims, and the remaining 70% would be distributed to AB 7.

So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust is required to establish a reserve to be funded with AB 7's Pro Rata share of any distributions (including Creditor ~~Notes~~Note proceeds) to which AB 7 would be entitled were the AB 7 Claim Allowed in its full face amount of $43,994,044.12. As a result, the Creditor Trust will be required to withhold a majority of the distributions (including Creditor ~~Notes~~Note proceeds) from Holders of Class 3a and 3b Claims on any Distribution Date on which the AB 7 Claim remains Disputed. By way of example, assuming that on the Initial Distribution Date, (a) the AB 7 Claim remains Disputed, (b) there are $18.7 million in Class 3a and 3b Claims that have not been Disallowed, and (c) the Creditor Trust has received $3 million in Creditor ~~Notes~~Note Proceeds that are available for distribution to Unsecured Creditors, Holders of Class 3a and 3b Claims will receive, collectively, approximately $900,000, while approximately $2.1 million will be reserved for distribution to AB 7 if the AB 7 Claim ultimately were Allowed. If the AB Claim ultimately were Allowed in Class 3c in less than the full asserted amount, then all or some of this $2.1 million reserve would be redistributed to other Holders of Unsecured Claims.

General Unsecured Claims are Impaired and entitled to vote to accept or reject the Plan. The Debtor estimates that Allowed General Unsecured Claims will total approximately $10.6 million.

(d)     Class 3b: R&S Strauss Claim

The Plan defines the R&S Strauss Claim as the Claim (Claim No. 357) in the amount of $8,140,497.67 asserted by R&S Strauss in the Chapter 11 Case.

The Plan provides that on or as soon as practicable after the Initial Distribution Date, each ensuing Semi-Annual Distribution Date and the Final Distribution Date, the Creditor Trust will distribute to the Holder of the R&S Strauss Claim, if Allowed, its Pro Rata share of the Trust Assets, including the Creditor ~~Notes~~Note Proceeds and the AB 7 – Creditors' Portion, less its Pro Rata share of the fees and expenses of the Trusts (and their professionals) in excess of the budgeted fees and expenses set forth in Schedule 3 to the Plan; provided, however, that the distribution to R&S Strauss may be reduced pursuant to the terms of the Expense Sharing Agreement, and the amount of any such reduction will be retained by the Reorganized Debtor. In addition, the Stock Trust will distribute to the Holder of the R&S Strauss Claim, if Allowed, its Pro Rata share of the Stock Trust Assets in accordance with the terms of the Plan.

If the entire amount of the AB 7 Claim is not disallowed, subordinated or recharacterized, ~~the Reorganized Debtor may be unable to repay the Creditor Notes on the timetable specified in the Plan, resulting in~~there will be a materially lower recovery to Holders of ~~Unsecured Claims. If the Reorganized Debtor defaults on repayment of the 45% Creditor Note (or if Mr. Langberg declines or is otherwise unable to exercise his option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon satisfaction in full of the 45% Creditor Note), then, upon all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, the Stock Trustee shall distribute the New Common Stock held by it Pro Rata to the Holders of Allowed~~ Unsecured Claims.

For purposes of calculating a Holder's Pro Rata share of any distribution under the Plan, Classes 3a, 3b and 3c are treated together as a single Class. As a result, in the event that (i) the AB 7 Claim in Class 3c is Allowed in its full Face Amount of $43,994,044.12 and (ii) total Allowed Class 3a and 3b Claims total $18.7 million, then Holders of Class 3a and 3b Claims, collectively, would be entitled to receive approximately 30% of the Creditor ~~Notes~~Note Proceeds that would be available for distribution to Holders of Unsecured Claims, and the remaining 70% would be distributed to AB 7.

So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust is required to establish a reserve to be funded with AB 7's Pro Rata share of any distributions (including Creditor ~~Notes~~Note proceeds) to which AB 7 would be entitled were the AB 7 Claim Allowed in its full face amount of $43,994,044.12. As a result, the Creditor Trust will be required to withhold a majority of the distributions (including Creditor ~~Notes~~Note proceeds) from Holders of Class 3a and 3b Claims on any Distribution Date on which the AB 7 Claim remains Disputed. By way of example, assuming that on the Initial Distribution Date, (a) the AB 7 Claim remains Disputed, (b) there are $18.7 million in Class 3a and 3b Claims that have not been Disallowed, and (c) the Creditor Trust has received $3 million in Creditor ~~Notes~~Note Proceeds that are available for distribution to Unsecured Creditors, Holders of Class 3a and 3b Claims will receive, collectively, approximately $900,000, while approximately $2.1 million will be reserved for distribution to AB 7 if the AB 7 Claim ultimately were Allowed. If the AB Claim ultimately

34

were Allowed in Class 3c in less than the full asserted amount, then all or some of this $2.1 million reserve would be redistributed to other Holders of Unsecured Claims.

The R&S Strauss Claim is Impaired and entitled to vote to accept or reject the Plan. The Debtor estimates that the Allowed amount of the R&S Strauss Claim will be $8,140,497.67.

(e)     Class 3c: AB 7 Claim

The Plan defines the AB 7 Claim as the Claim (Claim No. 330) in the amount of $43,994,044.12 asserted by AB 7 in the Chapter 11 Case.

The Plan provides that on or as soon as practicable after the Initial Distribution Date, each ensuing Semi-Annual Distribution Date and the Final Distribution Date, the Creditor Trust will distribute to the Holder of the AB 7 Claim, if Allowed, its Pro Rata share of the Creditor Trust Assets, including the Creditor ~~Notes~~Note Proceeds and the AB 7 – Creditors' Portion, less its Pro Rata share of the fees and expenses of the Trusts (and their professionals) in excess of the budgeted fees and expenses set forth in Schedule 3 to the Plan; provided, however, that the AB 7 Claim will be treated as a Class 6 Subordinated Claim to the extent that such Claim is subordinated pursuant to a Final Order in accordance with section 510(b) or 510(c) of the Bankruptcy Code. <u>In addition, the Stock Trust will distribute to the Holder of the AB 7 Claim, if Allowed and not subordinated (and specifically authorized for payment by the Bankruptcy Court), its Pro Rata share of the Stock Trust Assets in accordance with the terms of the Plan.</u>

The AB 7 Claim is a Disputed Claim. So long as the AB 7 Claim remains Disputed, the Creditor Trust will establish a reserve funded with AB 7's Pro Rata share of any distributions (including Creditor ~~Notes~~Note Proceeds) to which AB 7 would be entitled if the AB 7 Claim is Allowed in its full Face Amount of $43,994,044.12.

The AB 7 Claim is  Impaired and entitled to vote to accept or reject the Plan.

(f)     Class 4: Intercompany Claims

The Plan defines Intercompany Claims as Claims held by a Non-Debtor Affiliate against the Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Non-Debtor Affiliate with respect to the Debtor, (b) any Claim not reflected in such book entries that is held by a Non-Debtor Affiliate against the Debtor, and (c) any derivative Claim asserted by or on behalf of a Non-Debtor Affiliate against the Debtor. The definition of an "Intercompany Claim" expressly excludes any and all Claims and Causes of Action by, between or among AB 7, or any Affiliate or Insider thereof, on the one hand, and any of the Debtor, the Reorganized Debtor, R&S Strauss, <u>the Non-Debtor Affiliates</u> or their respective Affiliates, Insiders, predecessors-in-interest or successors-in-interest, on the other hand.

The Plan provides that on the Effective Date, at the option of the Debtor or the Reorganized Debtor for the purpose of effecting the Plan, the Intercompany Claims will either be (a) Reinstated, in full or in part, (b) resolved through set-off, distribution or contribution, in full or in part, or (c) cancelled and discharged in full or in part, in which case such discharged and

35

satisfied portion will be eliminated and the Holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan; provided, however, that any distribution or Reinstatement on account of Intercompany Claims in excess of $15,000 will require approval of the New Board. Class 4 is deemed to have rejected the Plan and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

As used in the Plan, Reinstated means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Claim Holder or Interest Holder so as to leave such Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the Claim Holder or Interest Holder to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (c) compensating the Claim Holder or Interest Holder for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Claim Holder or Interest Holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, will not be required to be reinstated in order to accomplish Reinstatement.

Intercompany Claims are Impaired. Class 4 is deemed to have rejected the Plan and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

(g)     Class 5: Old Equity Interests

The Plan defines Old Equity Interests as the common stock, preferred stock or other equity interests of and in Autobacs Strauss outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such common stock, preferred stock or other equity interest.

The Plan provides that all Old Equity Interests of any kind will be cancelled as of the Effective Date and the Holders thereof will not receive or retain any property or interest in property under the Plan on account of such Interests; provided, however, that if all Holders of Allowed Claims receive in respect of such Claims Distributions of a value as of the Effective Date equal to the Allowed amounts of such Claims, then the Holders of the Old Equity Interests will receive their pro rata shares of the Distributions that otherwise would have gone to the Holders of Allowed Claims.

Old Equity Interests are Impaired. Class 5 is deemed to have rejected the Plan, and therefore, Holders of Class 5 Old Equity Interests are not entitled to vote to accept or reject the Plan.

        (h)     Class 6: Subordinated Claims

The Plan defines Subordinated Claims as Claims that are subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code, and will include any Claim arising from the rescission or right of rescission of a purchase or sale of a security or Interest of the Debtor, for damages arising from the purchase or sale of such a security or Interest, or for reimbursement or contribution on account of such Claim.

The Plan provides that the Holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims.

Subordinated Claims are Impaired. Class 6 is deemed to have rejected the Plan, and therefore, Holders of Class 6 Subordinated Claims are not entitled to vote to accept or reject the Plan.

        3.     <u>Special Provisions Regarding Insured Claims</u>

Distributions under the Plan to each holder of an Insured Claim will be in accordance with the treatment provided under the Plan for General Unsecured Claims; <u>provided, however</u>, that the maximum amount of any Distribution under the Plan on account of an Allowed Insured Claim will be limited to an amount equal to the applicable self-insured retention under the relevant insurance policy; <u>provided further, however</u>, that, to the extent a Holder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtor, such Holder will have an Allowed General Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the coverage available from the Debtor's insurance policies. Nothing in this section will constitute a waiver of any Litigation Rights the Debtor or Reorganized Debtor may hold relating directly or indirectly to any Person, including the Debtor's insurance carriers; and nothing in this section is intended to, will or will be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtor in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; <u>provided, however</u>, that the Debtor and Reorganized Debtor do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estate to which they are entitled.

The Plan will not expand the scope of, or alter in any other way, the rights and obligations of the Debtor's insurers under their policies, and the Debtor's insurers will retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtor, the existence, primacy and/or scope of available coverage under any alleged applicable policy. The Plan will not operate as a waiver of any other Claims the Debtor's insurers have asserted or may assert in any Proof of Claim or the Debtor's rights and defenses to such Proofs of Claim.

        4.     <u>Reservation of Rights Regarding Claims</u>

        

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's, the Reorganized Debtor's or the Creditors Committee's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### D. Waiver of Avoidance Actions; Preservation and Pursuit of Litigation Rights and Permitted Avoidance Actions; Resulting Claim Treatment

The Plan provides that, except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, the Reorganized Debtor will waive all of its rights, title and interest in Avoidance Actions that the Debtor or Reorganized Debtor may hold against any Entity (other than the Persons or Entities who may be potential defendants of Permitted Avoidance Actions as set forth in Schedule 1 to the Plan). A large majority of the Avoidance Actions being waived under the Plan relate to vendor or vendor-related payments. However, the Debtor believes that such payments generally would not be recoverable as preferences under section 547 of the Bankruptcy Code because they were made in the ordinary course of business or otherwise are entitled one of the defenses specified in section 547(c) of the Bankruptcy Code. Such payments also may be entitled to other defenses.

Although the Debtor estimates that the payments made to vendors during the 90-day period prior to the Chapter 11 filing totaled approximately $25.3 million (in addition to the Langberg Payment discussed in the following paragraph), the Debtor believes that substantially all of these payments, with the exception of approximately $300,000 paid to certain oil vendors, are entitled to one or more defenses.

In connection with the sale of substantially all of the New Jersey Debtors' assets to AB 7 in the New Jersey Chapter 11 Case, a payment in the amount of $3 million was made by the Debtor to Mr. Langberg in consideration for the release of certain litigation claims and the sale of certain intellectual property (the "Langberg Payment"). The Debtor and the Creditors Committee believe that such payment, and the assets and releases that were acquired on account of same, were a matter of negotiation between AB 7, as the purchaser of the assets of the New Jersey Debtors, and Mr. Langberg, as the seller. The Plan Proponents further believe that the agreement to make such payment was announced in open court during the New Jersey Debtors' confirmation hearing, that the agreements evidencing the transaction set forth that the payments to Mr. Langberg were integrated with AB 7's acquisition and that the purchase price was the result of arms' length negotiations by a sophisticated purchaser (AB 7) through its acquisition subsidiary that is now the Debtor, and were part and parcel of the acquisition that was approved by the bankruptcy court overseeing the New Jersey Chapter 11 Case. Thus, although the Langberg Payment is included within the Avoidance Actions that are being waived under the Plan, the Committee has determined that there is no merit in pursuing such a claim, particularly in light of the benefit to unsecured creditors as set forth in the Plan.

On the other hand, AB 7 asserts that the Langberg Payment may be recoverable by the Debtor as a fraudulent transfer.

DB02:8932523.16YCST01:8932523.20

067920.1001

Notwithstanding the foregoing waiver of Avoidance Actions, the Debtor and Reorganized Debtor will retain and be permitted to use any available defenses under section 502 of the Bankruptcy Code to reduce all or part of any Claim asserted against the Debtor's Estate; provided, however, that the Debtor will not assert an Avoidance Action to setoff against or otherwise reduce all or part of any Claim asserted against the Debtor's Estate unless the Holder of such Claim is listed on Schedule 4 hereto.

The Plan further provides that, except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and subject to the release, waiver, exculpation and indemnity provisions set forth in the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, the Reorganized Debtor will retain all Litigation Rights and Permitted Avoidance Actions that the Debtor or Reorganized Debtor may hold against any Entity. The Reorganized Debtor may enforce, sue on, settle or compromise all such Litigation Rights, or may decline to do any of the foregoing with respect to any such Litigation Rights and Permitted Avoidance Actions.

### E. Post-Effective Date Payments and Transfers to Insiders

Until the Creditor ~~Notes have~~Note has been satisfied in full and the AB 7 – Creditors' Portion has been paid in full, the Reorganized Debtor will make no payments or transfers to Insiders, unless such payments or transfers (i) as to senior management compensation, are approved by the Creditors Committee and set forth in the Plan Documents; (ii) are approved by the New Board and the Creditor Trustee; (iii) are in payment of rental obligations due under a lease for nonresidential real property in place on the Effective Date, and are in accordance with the terms of such lease as such terms existed on the Effective Date; or (iv) are in repayment of Permissible Secured Debt that previously was approved by the New Board.

### F. Allowed Claims, Distribution Rights and Objections to Claims

#### 1. Allowance Requirement

Only Holders of Allowed Claims are entitled to receive Distributions under the Plan. An Allowed Claim is a Claim or any portion thereof (a) that has been allowed by a Final Order of the Bankruptcy Court (or such court as the Debtor or Reorganized Debtor, as applicable, and the Holder(s) of any such Claim agree may adjudicate such Claim and any objections thereto), (b) that either (x) has been scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero on the Schedules or (y) is the subject of a timely filed Proof of Claim, as to which either (i) no objection to such scheduled or filed Claim's allowance has been Filed on or before the Claims Objection Deadline or (ii) any objection to its allowance has been settled, waived through payment, withdrawn or denied by a Final Order, or (c) that is expressly allowed in a liquidated amount in the Plan; provided, however, that with respect to an Administrative Claim or 503(b)(9) Claim, "Allowed Claim" means an Administrative Claim or 503(b)(9) Claim as to which a timely written request for payment has been made in accordance with applicable bar dates for such requests set by the Bankruptcy Court (if such written request is required) in each case as to which the Debtor, Reorganized Debtor or

any other party in interest (x) has not interposed a timely objection by the applicable Claims Objection Deadline or (y) has interposed a timely objection and such objection has been settled, waived through payment, withdrawn or denied by a Final Order.  Unless otherwise provided in the Plan, section 506(b) of the Bankruptcy Code or a Final Order of the Bankruptcy Court, "Allowed Claim" will not, for purposes of Distributions under the Plan, include for prepetition Claims interest or any other amounts accruing on, in connection with, or with respect to, such Allowed Claim from and after the Petition Date.

An Allowed Administrative Claim is an Allowed Claim arising under section 507(a)(2) of the Bankruptcy Code for costs and expenses of administration of the Chapter 11 Case under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, including, but not limited to, (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries and commissions for services rendered after the commencement of the Chapter 11 Case and payments for inventory, leased equipment and premises), (b) all other Claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, but excluding Priority Tax Claims, Non-Tax Priority Claims, 503(b)(9) Claims and Professional Fee Claims and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code.

### 2.    Distribution Record Date Requirements

In making Distributions under the Plan, the Debtor will recognize only Holders as of the applicable Distribution Record Date.  As defined in the Plan, the Distribution Record Date is the date for determining entitlement to receive Distributions under the Plan on account of Allowed Claims.  For all Holders of Claims, the Distribution Record Date is the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern Time.

At the close of business on the Distribution Record Date, the claims registers for all Claims will be closed, and there will be no further changes in the record holders of such Claims.  Except as provided in the Plan, the Disbursing Agent and its agents, successors and assigns will have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and will be entitled instead to recognize and deal for all purposes under the Plan with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date.

### 3.    Date of Distribution

All Distributions to Holders of Allowed Claims as of the applicable Distribution Date will be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date will be made pursuant to Section 8.2 of the Plan and on such day as selected by the Reorganized Debtor or the Trustee, as applicable, in its sole discretion.  Notwithstanding the foregoing, however anything to the contrary in the Plan or Plan Documents, Distributions of New Common Stock will only be made: (i) upon the expiration or termination of Mr. Langberg's option to purchase the New Common Stock from the Stock Trust; and (ii) after all Class 3a, 3b

40

and 3c Claims have been determined by Final Order to be either Allowed Claims or Disallowed Claims.

The Reorganized Debtor will have the right, in its sole and absolute discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

4.  Sources of Cash for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Disbursing Agent to make payments pursuant to the Plan will be obtained from the Reorganized Debtor's Cash balances, Net AB 7 Litigation Proceeds, if any, and bank loan availability and as otherwise set forth in the Plan. Cash payments to be made pursuant to the Plan will be made by the Disbursing Agent as set forth therein.

5.  Interest on Claims; Dividends

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest will not accrue or be paid on Claims, and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim. Moreover, unless otherwise specifically provided for in the Plan or the Confirmation Order, interest will not accrue or be paid upon any Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Claim becomes an Allowed Claim.

6.  Making of Distributions

The Disbursing Agent will make all Distributions required to be made to Holders of Allowed Claims under the Plan. The Reorganized Debtor will serve as the Disbursing Agent with respect to Classes 1, 2 and 4; and the Creditor Trust (for Creditor Trust Assets) and the Stock Trust (for Stock Trust Assets) will serve as the Disbursing Agent with respect to Classes 3a, 3b and 3c. The ~~Creditor Trust~~Trusts will receive, in ~~its~~their capacity as Disbursing Agent with respect to Classes 3a, 3b and 3c, and without further approval from the Bankruptcy Court, reasonable compensation for distribution and related services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from the Reorganized Debtor, subject to the budget attached as Schedule 3 to the Plan. The ~~Creditor Trust~~Trusts will not be required to give any bond or surety or other security for the performance of ~~its~~their duties unless otherwise ordered by the Bankruptcy Court.

Distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in the Schedules or the ballot submitted by such Holder if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Disbursing Agent after the date of any related Proof of Claim or after the date of the Schedules or ballot if no Proof of Claim was filed.

~~DB02:8932523.16~~YCST01:8932523.20                                    067920.1001

If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder will be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed Distributions will be made to such Holder without interest. Amounts in respect of undeliverable Distributions will be held in trust by the Disbursing Agent until such Distributions are claimed, at which time the applicable amounts will be distributed by the Disbursing Agent pursuant to the Plan.

All claims for undeliverable Distributions must be made on or before the second (2nd) anniversary of the Initial Distribution Date, after which date all unclaimed property will revert to the Reorganized Debtor free of any restrictions thereon and the claims of any Holder or successor to such Holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan will require the Debtor or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

7.    Tax Withholding, Payment and Reporting Requirements

In connection with the Plan and all Distributions under the Plan, the Disbursing Agent will, to the extent applicable, comply with all tax withholding, payment and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority, and all Distributions under the Plan will be subject to any such withholding, payment and reporting requirements. The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment and reporting requirements. For example, with respect to any employee-related withholding, if the Debtor is obligated by law to withhold amounts from Distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Disbursing Agent may withhold a portion of the Distributions allocated to the Holder of an Allowed Claim that is a present or former employee in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution, and (b) no Distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed in connection with such Distribution. Any property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 7.8 of the Plan.

8.    Setoffs

The Reorganized Debtor may, but will not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim (the "Setoff Claims"), including (i) claims that the Reorganized Debtor may assert arising from the failure of vendors to honor

42

warranty or other product-related obligations and (ii) the Setoff Claims listed on Schedule 4 to the Plan; provided, however, that neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Reorganized Debtor of any such Setoff Claim that the Debtor or the Reorganized Debtor may have against such Holder.

9.   Means of Cash Payment

Cash payments under the Plan will be in U.S. funds, and may be made, at the option, and in the sole discretion, of the Disbursing Agent, by either (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Disbursing Agent. Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks issued by the Disbursing Agent will be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check will be made directly to the Disbursing Agent.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

10.   Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars or New Common Stock will be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or more being rounded up and fractions less than half of a dollar being rounded down. To the extent that the Pro Rata Distribution of New Common Stock results in fractional shares to be issued, the Stock Trust will round down to the nearest whole number of shares; and the aggregate amount of remaining fractional shares will constitute treasury stock of the Reorganized Debtor.

11.   De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent will not be required to distribute, and will not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $25. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $25 will have such Claim discharged and will be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor or their respective property. Any Cash or other property not distributed pursuant to this provision will be the property of the Reorganized Debtor, free of any restrictions thereon.

12. Prepayment

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtor will have the right to prepay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time after the Effective Date; provided, however, that any such prepayment will not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

13. No Distribution in Excess of Allowed Amounts

The Plan provides that notwithstanding anything to the contrary therein, no Holder of an Allowed Claim will receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan, if any).

14. Allocation of Distributions

All Distributions received under the Plan by Holders of Claims will be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

15. R&S Claims Reduction

The Claim of R&S Strauss in the Chapter 11 Case will be reduced dollar-for-dollar to the extent that R&S Strauss receives any direct payment in settlement or in satisfaction of any judgment upon its claims (net of expenses reimbursed to the Reorganized Debtor pursuant to the Expense Sharing Agreement), as opposed to any other plaintiff's claims, against AB 7 as the same have been or may be asserted in the AB 7 LItigation (the "R&S Claim Reduction"). If as a result of the R&S Claim Reduction, R&S Strauss has received more than its pro rata share of distributions under the Plan, then R&S Strauss will return the amount of such cash and/or stock overpayment to the Creditor Trust for redistribution on a pro rata basis to all holders of Unsecured Claims.

16. Objection Procedures

Except as set forth in the Plan or any applicable Court order, all objections to Claims must be filed and served on the Holders of such Claims by the applicable Claims Objection Deadline, as the same may be extended by the Bankruptcy Court. If a timely objection has not been filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was scheduled by the Debtor but (ii) was not scheduled as contingent, unliquidated and/or disputed, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. Notice of any motion for an order extending any Claims Objection Deadline will be required to be given only to those persons or entities that have requested notice in the Chapter 11 Case, or to such persons as the Bankruptcy Court will order.

44

With respect to Administrative Claims, the last day for Filing an objection to any Administrative Expense Request will be the later of (a) one hundred and thirty-five (135) days after the Effective Date, (b) ninety (90) days after the Filing of such Administrative Expense Request and (c) such other date specified in the Plan or ordered by the Bankruptcy Court. The Filing of a motion to extend the Administrative Claims Objection Deadline will automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, the Administrative Claims Objection Deadline will be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) and thirty (30) days after the Bankruptcy Court's entry of an order denying the motion to extend the Administrative Claims Objection Deadline.

With respect to 503(b)(9) Claims, the last day for Filing an objection to any request for the payment of a 503(b)(9) Claim will be the later of (a) ninety (90) days after the Effective Date, (b) ninety (90) days after the Filing of such 503(b)(9) Claim and (c) such other date specified in the Plan or ordered by the Bankruptcy Court. The Filing of a motion to extend the 503(b)(9) Claims Objection Deadline will automatically extend the 503(b)(9) Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the 503(b)(9) Claims Objection Deadline is denied by the Bankruptcy Court, the 503(b)(9) Claims Objection Deadline will be the later of the current 503(b)(9) Claims Objection Deadline (as previously extended, if applicable) and thirty (30) days after the Bankruptcy Court's entry of an order denying the motion to extend the 503(b)(9) Claims Objection Deadline.

With respect to Unsecured Claims, the last day for filing objections to Claims, other than 503(b)(9) Claims, Administrative Claims, Professional Fee Claims, Miscellaneous Secured Claims, Priority Tax Claims and Non-Tax Priority Claims will be the latest of (a) one hundred and eighty (180) days after the Effective Date, (b) thirty (30) days after entry of a Final Order under section 502(j) of the Bankruptcy Code reinstating any Claim previously disallowed, and (c) such other date specified in the Plan or ordered by the Bankruptcy Court. The Filing of a motion to extend the Unsecured Claims Objection Deadline will automatically extend the Unsecured Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Unsecured Claims Objection Deadline is denied by the Bankruptcy Court, the Unsecured Claims Objection Deadline will be the later of the current Unsecured Claims Objection Deadline (as previously extended, if applicable) and thirty (30) days after the Bankruptcy Court's entry of an order denying the motion to extend the Unsecured Claims Objection Deadline.

After the Effective Date, only the Reorganized Debtor will have the authority to file objections to Claims and to settle, compromise, withdraw or litigate to judgment objections to Claims, except that objections to Professional Fee Claims and Administrative Claims may be filed by all parties in interest. The Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided, however, that any compromise of a Claim in the original asserted amount of $100,000 or greater will require the consent of the Creditor Trust. In the event that the Creditor Trust does not consent to the compromise of such Claim, the Reorganized Debtor may seek and obtain Bankruptcy Court approval of such compromised Claim.

17.     Estimation of Contingent or Unliquidated Claims

The Debtor or Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

18.     Provisions for Disputed Claims

No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Disputed Claim becomes an Allowed Claim. Notwithstanding any other provisions of the Plan, the Disbursing Agent may, in its discretion and without liability of any kind or character whatsoever on account of such action, make a payment or Distribution on account of the undisputed portion of a Disputed Claim, subject to availability of funds in the applicable reserves. The AB 7 Claim is a Disputed Claim under the Plan.

The Reorganized Debtor will make Distributions from the appropriate reserve account to the Holder of any Disputed Administrative Claim, Disputed 503(b)(9) Claim, Disputed Priority Tax Claim, Disputed Miscellaneous Secured Claim or Disputed Non-Tax Priority Claim that has become an Allowed Claim as soon as practicable following the date that such Disputed Claim becomes an Allowed Claim. The Creditor Trust will make Distributions from the Unsecured Claims Reserve to the Holder of any Disputed Unsecured Claim that has become an Allowed Claim as soon as practicable following (i) the Initial Distribution Date, if such Unsecured Claim becomes an Allowed Claim prior to the Initial Distribution Date; or (ii) the first Semi-Annual Distribution Date following the date that such Disputed Unsecured Claim becomes an Allowed Claim, if such Unsecured Claim does not become an Allowed Claim prior to the Initial Distribution Date.

19.     Accounts; Escrows; Reserves

The Debtor, the Reorganized Debtor and the Creditor Trust, as applicable, will, subject to and in accordance with the provisions of the Plan, (a) establish one or more general accounts into which will be deposited all funds not required to be deposited into any other account, reserve or escrow; (b) create, fund and withdraw funds from, as appropriate, the Priority/Secured Claims Reserve, the 503(b)(9) Claims Reserve, the Unsecured Claims Reserve

46

and the Professional Fee Reserve; and (c) if practicable, deposit any Cash that is withheld as the applicable claims reserve in an appropriate manner to ensure the safety of the investment. Nothing in the Plan or the Disclosure Statement will be deemed to entitle the Holder of a Disputed Claim to postpetition or post-confirmation interest on such Claim, however.

(a)     Priority/Secured Claims Reserve

On the Effective Date (or as soon thereafter as is practicable), the Reorganized Debtor will create and fund the Priority/Secured Claims Reserve with an amount of the Estate's Cash equal to the aggregate Disputed Claim Amount of all Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Miscellaneous Secured Claims and Disputed Non-Tax Priority Claims; provided, however, that the Priority/Secured Claims Reserve may be subdivided into one or more sub-reserves for purposes of segregating those funds reserved for particular Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Miscellaneous Secured Claims or Disputed Non-Tax Priority Claims.  In the event that any Cash remains in the Priority/Secured Claims Reserve after payment of all Allowed Claims to be paid thereunder, such Cash will be distributed to the Reorganized Debtor.

(b)     503(b)(9) Claims Reserve

On the Effective Date (or as soon thereafter as is practicable), the Reorganized Debtor will create and fund the 503(b)(9) Claims Reserve with an amount of the Estate's Cash equal to the aggregate Disputed Claim Amount of all Disputed 503(b)(9) Claims.  In the event that any Cash remains in the 503(b)(9) Claims Reserve after payment of all Allowed 503(b)(9) Claims, such Cash will be distributed to the Reorganized Debtor.

(c)     Unsecured Claims Reserve

On or before the Initial Distribution Date, on each ensuing Semi-Annual Distribution Date and on or before the Final Distribution Date, the Creditor Trust will create and fund the Unsecured Claims Reserve with an amount of Cash equal to 100% of distributions to which Holders of Disputed Unsecured Claims would be entitled under the Plan as of such date if such Disputed Unsecured Claims were Allowed in their Disputed Claims Amount; provided, however, that the Debtor or the Reorganized Debtor or the Creditor Trustee may, at any time, File motion(s) pursuant to section 502(c) of the Bankruptcy Code for order(s) estimating and limiting the amount of Cash which will be deposited in the Unsecured Claims Reserve in respect of any Disputed Unsecured Claims, with notice and an opportunity to be heard to the Creditor Trust and the affected Holders of such Disputed Unsecured Claims.

So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust will fund the Unsecured Claims Reserve on each Distribution Date with an amount of Cash equal to 100% of the distributions to which AB 7 would be entitled under the Plan as of such date if the AB 7 Claim is Allowed in its full Face Amount of $43,994,044.12.

(d)     Professional Fee Reserve

47

The Reorganized Debtor will create and fund the Professional Fee Reserve thirty (30) days after the Effective Date (or as soon thereafter as is practicable) in the amount of the budgeted but unpaid Professional fees projected through the Effective Date, which amount will be used to pay Allowed Professional Fee Claims held by (i) any professionals working on behalf of the Debtor and (ii) counsel and any advisers to the Creditors Committee. The Reorganized Debtor will be obligated to pay all Allowed Professional Fee Claims designated to be paid from the proceeds of the Professional Fee Reserve in excess of the amounts actually deposited in the Professional Fee Reserve. In the event that any Cash remains in the Professional Fee Reserve after payment of all Allowed Professional Fee Claims, such Cash will be distributed to the Reorganized Debtor.

## G.     Disposition of Executory Contracts and Unexpired Leases

### 1.     Executory Contracts and Unexpired Leases Deemed Rejected

The Plan provides for the deemed rejection of all executory contracts or unexpired leases that have not been otherwise disposed of. Specifically, except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor will be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such executory contract or unexpired lease (a) was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its own terms, (c) is listed on the Schedule of contracts and leases to be assumed by the Debtor and vested with the Reorganized Debtor on the Effective Date, attached to the Plan as Schedule 2, or (d) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by the Debtor on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date.

### 2.     Assignment of Executory Contracts and Unexpired Leases

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned pursuant to the Plan will remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

### 3.     Rejection Damages Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtor within thirty (30) days after entry of the Confirmation Order. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease will have been evidenced by a Proof of Claim filed by earlier applicable Bar Dates or such party will not be treated as a creditor with respect to such Claims for the purposes of voting and distribution.

4.    Assumption of Certain Executory Contracts and Unexpired Leases

The contracts and leases set forth on Schedule 2 to the Plan will be deemed assumed by the Debtor and vested with the Reorganized Debtor as of the Effective Date; provided, however, that the Debtor reserves the right to amend Schedule 2 at any time prior to the date that is five (5) Business Days prior to the Confirmation Hearing. The Debtor further reserves the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to assume or reject any executory contract or unexpired lease to which the Debtor is a party and to file a motion requesting authorization for the assumption or rejection of any such executory contract or unexpired lease.

5.    Contract and Lease Cure Rights

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that the Debtor or Reorganized Debtor, as applicable, will be authorized to reject any executory contract or unexpired lease to the extent the Debtor or Reorganized Debtor, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by such Final Order renders assumption of such executory contract or unexpired lease unfavorable to the Debtor or Reorganized Debtor; provided further, however, that there will be no Cure due or claim allowed in connection with the assumption of the MOUs or any of the related collective bargaining agreements pursuant to Section 6.7 of the Plan.

6.    Assumption of Governmental Licenses

In the event that any license granted to the Debtor by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtor, such license will be deemed to be assumed by the Debtor and vested with the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

49

7.     Treatment of Compensation and Benefit Programs

The Plan provides that except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation and benefit programs of the Debtor in effect during the pendency of the Chapter 11 Case, including the MOUs, all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Case, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code. Nothing contained in the Plan will be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

The Debtor's existing vacation policies (as may be modified) will be reinstated on the Effective Date for any employees of the Debtor employed on the Effective Date that have not received a notice of termination prior to or on the Effective Date; provided, however, that such policies may be modified before or after the Effective Date at the sole discretion of the Debtor or Reorganized Debtor, as applicable.

(c)     As of the Effective Date, any and all stock based incentive plans or stock ownership plans of the Debtor entered into before the Effective Date, or other agreements or documents giving rise to Old Equity Interests, including the contingent cash components of any such plans, agreements or documents, will be terminated. To the extent such plans, agreements or documents are considered to be executory contracts, such plans, agreements or documents will be deemed to be rejected pursuant to section 365 of the Bankruptcy Code under the Plan. Any Claims resulting from such rejection will constitute Subordinated Claims. From and after the Effective Date, stock options, whether included in a contract, agreement or otherwise, will have no value and will not entitle any Holder thereof to purchase or otherwise acquire any equity interests in the Reorganized Debtor.

8.     Certain Indemnification Obligations Owed by Debtor

The Plan provides that Indemnification Obligations owed to directors, officers and employees of the Debtor (or the Estate) who are serving and are employed by the Debtor immediately prior to the Effective Date, to the extent that such Indemnification Obligations relate to the period after the Petition Date and excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, fraud or intentional tort, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code. The Debtor's Indemnification Obligations may include the obligation to indemnify certain of the Debtor's current directors and officers for claims asserted by the AB 7 Litigation Parties. The Debtor does not believe that there exist valid claims against its directors, officers and employees that would be owed an Indemnification Obligation (which

50

specifically would not include any of the Persons listed on Schedule 1 to the Plan) and therefore does not believe that the Debtor's Indemnification Obligations will have any material impact on the Reorganized Debtor or its business plan.

On the other hand, AB 7 asserts that the AB 7 Litigation Parties may assert claims against certain of the Debtor's directors, officers and employees for contribution, indemnification or on other grounds.

All Indemnification Obligations owed to directors, officers and employees of the Debtor who served or were employed by the Debtor prior to, but not after, the Petition Date will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan.

Indemnification Obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code.

9.    Continuing Obligations Owed to Debtor

Under the Plan, any confidentiality agreement entered into between the Debtor and another party requiring the parties to maintain the confidentiality of each other's proprietary information will be deemed to be, and will be treated as though it is, an executory contract that is assumed by the Debtor and vested with the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Plan further provides that any indemnity agreement entered into between the Debtor and another party requiring the non-Debtor party to provide insurance in favor of the Debtor, to warrant or guarantee such party's goods or services, or to indemnify the Debtor for claims arising from the goods or services will be deemed to be, and will be treated as though it is, an executory contract that is assumed by the Debtor and vested with the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Plan also provides that continuing obligations of third parties to the Debtor under insurance policies, contracts or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, will continue and will be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtor or by order of the Bankruptcy Court.

(d)——To the extent any insurance policy under which the insurer has a continuing obligation to pay (i) the Debtor or one of its predecessors in interest, including R&S Parts & Service, Inc. or WSR Corporation, or (ii) a third party on behalf of the Debtor is held by the Bankruptcy Court to be an executory contract, such insurance policy will be treated as though

51

it is an executory contract that is assumed by the Debtor and vested with the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code. Any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtor prior to or as of the Effective Date: (i) will not be discharged; (ii) will be Allowed Administrative Claims; and (iii) will be paid in full in the ordinary course of business of the Reorganized Debtor as set forth in Section 3.1(b) of the Plan.

          10.    <u>Limited Extension of Time to Assume or Reject</u>

Under the Plan, in the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtor or Reorganized Debtor to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, except as otherwise provided by section 365(d)(4) of the Bankruptcy Code.

In the event the Debtor or Reorganized Debtor becomes aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Reorganized Debtor to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the date on which the Debtor or Reorganized Debtor becomes aware of the existence of such contract or lease, except as otherwise provided by section 365(d)(4) of the Bankruptcy Code.

          11.    <u>Postpetition Contracts and Leases</u>

The Plan provides that the Debtor will not be required to assume or reject any contract or lease entered into by the Debtor after the Petition Date. Any such contract or lease will continue in effect in accordance with its terms after the Effective Date, unless the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection or other termination of such contract and lease.

          12.    <u>Treatment of Claims Arising From Assumption or Rejection</u>

The Plan provides that all Allowed Claims for Cure arising from the assumption of any executory contract or unexpired lease will be treated as Administrative Claims pursuant to Section 3.1(b) of the Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease will be treated, to the extent applicable, as General Unsecured Claims or Subordinated Claims, unless otherwise ordered by Final Order of the Bankruptcy Court; and all other Allowed Claims relating to an executory contract or unexpired lease will have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

**H.    Revesting of Assets; Release of Liens, Claims and Encumbrances**

Except as otherwise provided in the Plan, the property of the Debtor's Estate, together with any property of the Debtor that is not property of its Estate and that specifically is disposed of pursuant to the Plan, will vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire and dispose of

52

such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all such property of the Reorganized Debtor will be free and clear of all Liens, Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.

## I.     Restructuring Transactions; Strauss Conversion

Under the Plan, on, as of, or after the Effective Date, the Reorganized Debtor may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of its businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtor, to achieve corporate or operational efficiencies, or to otherwise improve financial results; provided that such transactions or actions are not otherwise inconsistent with applicable state law or the Plan or the Distributions to be made under the Plan. Such transactions or actions may include any mergers, consolidations, restructurings, dispositions, liquidations, closures or dissolutions, as may be determined by the Reorganized Debtor to be necessary or appropriate, and specifically will include the transition of the Debtor's existing retail and service business to a primarily service-based business through the sale of inventory and fixtures or other assets and/or the sale, assignment or renegotiation of real property leases. This transition to a more service-based business is referred to as the "Strauss Conversion."

Although the Debtor has converted certain of its retail locations and will continue to convert other locations, the ultimate extent of the Strauss Conversion will depend on various factors, including the willingness of landlords to amend existing leases. The financial Projections attached hereto as Appendix B reflect a limited conversion of retail locations. Although the conversion of additional retail locations likely would improve the profitability and cash flow reflected in the Projections, the Debtor has assumed a limited conversion of retail locations for purposes of the Projections because the conversion of additional locations is dependant on factors that are beyond the Debtor's control and therefore may not be achieved.

As described more fully in Article V.F of the Disclosure Statement, the Debtor has asserted in the AB 7 Litigation Matters that AB 7 has abandoned certain of its trademark registrations. As such, the Reorganized Debtor may continue to use the Autobacs Marks on its premises, websites and promotional materials after the Effective Date. As set forth in Article V.F of the Disclosure Statement, AB 7 disputes the Debtor's allegation that AB 7 has abandoned certain of its trademark registrations and disputes that the Debtor may continue to use the Autobacs Marks on its premises, websites and promotional materials after the Effective Date. See Article VII.G of the Disclosure Statement for additional discussion of the Debtor's use of the Autobacs Marks.

After the Confirmation Date, the Reorganized Debtor's management team will continue to implement and direct the Strauss Conversion; provided, however, that prior to the Effective Date, the Creditors Committee will be consulted on an advisory basis regarding the Strauss Conversion; provided further, however, that after the Effective Date, the Creditor Trust will be consulted on an advisory basis regarding the Strauss Conversion, and will be kept

reasonably apprised of the status of, plans for and corresponding financial implications of the Strauss Conversion

## J. Authorization and Issuance of New Common Stock

As of the Effective Date, without the requirement of further act or action under applicable non-bankruptcy law, regulation, order or rule, the Reorganized Debtor is authorized to issue 1,000 shares of New Common Stock, including the issuance of 800 shares of New Common Stock in the name of the Stock Trust. On or as soon as practicable after the Effective Date, the Reorganized Debtor will issue ~~such~~800 shares of New Common Stock in the name of the Stock Trust, and will deliver the Class 3 New Common Stock Certificate to the Stock Trustee.

~~Pursuant to his employment agreement with the Reorganized Debtor, Mr. Langberg will have the option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon timely satisfaction in full of the 45% Creditor Note. On the other hand, if the Reorganized Debtor defaults on repayment of the 45% Creditor Note (or if Mr. Langberg declines or is otherwise unable to exercise his option to purchase 100% of the New Common Stock from the Stock Trust for $300,000 upon timely satisfaction in full of the 45% Creditor Note), then, upon~~Within twenty-four (24) months (or some additional time as may be subsequently ordered by the Bankruptcy Court) of all Unsecured Claims becoming either Allowed Claims or Disallowed Claims by Final Order, if the Stock Trustee has not previously sold the Class 3 New Common Stock, then the Stock Trustee will ~~distribute the New Common Stock held by it~~either (i) distribute all New Common Stock then held by the Stock Trust, or (ii) sell all New Common Stock then held by the Stock Trust and distribute the proceeds thereof, Pro Rata to the Holders of Allowed Unsecured Claims. In the event that the Confirmation Order does not include a finding that the Stock Trustee's distribution of ~~the~~ New Common Stock is exempt pursuant to section 1145 of the Bankruptcy Code, then the Stock Trustee will distribute the New Common Stock held by it only upon (~~i~~x) the effectiveness of a registration statement filed with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, and any applicable state law requirements; or (~~ii~~y) confirmation by counsel to the Stock Trust that an exemption to such registration requirements exists for each creditor to whom New Common Stock is distributed.

Except as provided in the preceding paragraph or in connection with any Management Incentive Plan, no dividends ~~or other distributions~~ will be declared, paid or set aside relating to the New Common Stock until all of the Reorganized Debtor's obligations under the Creditor ~~Notes~~Note have been satisfied in full ~~and the AB 7 Creditors' Portion has been reduced to Cash and delivered to the Creditor Trust~~.

## K. Management Incentive Plan

On or after the Effective Date, the New Board may establish and implement a Management Incentive Plan, thereby providing grants to participating employees and members of management of New Common Stock or options to acquire New Common Stock in an aggregate amount not to exceed twenty percent (20%) of the New Common Stock authorized

54

under the Plan. The employees and members of management entitled to participate in the Management Incentive Plan, if any, and the awards for each, will be determined by the New Board in its sole and absolute discretion. The New Board will be under no obligation, however, to establish or implement any Management Incentive Plan. Glenn Langberg, who will be a director of the Reorganized Debtor upon the Effective Date, will have no vote on the New Board relating to the Management Incentive Plan.

Except as otherwise provided in the Plan, any pre-existing understandings, either oral or written, between the Debtor and any current or former director, officer or employee as to entitlement to participate in any pre-existing equity or other incentive plan of any kind will be null and void as of the Effective Date and will not be binding on the Reorganized Debtor with respect to the Management Incentive Plan or any other incentive plan implemented after the Effective Date.

## L. ~~K.~~ The Creditor Trust

### 1. The Creditor Trust

The Plan provides that the Creditor Trust will be created for the purpose of liquidating the Creditor Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and making the distributions to Holders of General Unsecured Claims (Class 3a), the R&S Strauss Claim (Class 3b) and the AB 7 Claim (Class 3c), to the extent that such Claims ultimately are Allowed; the Creditor Trust is not otherwise authorized to engage in any trade or business.

The Trust Beneficiaries will be treated as the grantors and deemed owners for federal income tax purposes. The Creditor Trust Interests may not be transferred, sold, pledged or otherwise disposed of or offered for sale, except for transfers by operation of law.

The Creditor Trustee will file federal income tax returns for the Creditor Trust as a grantor trust pursuant to § 671 of the Internal Revenue Code of 1986, as amended, and the Treasury Tax Regulations promulgated thereunder. The Plan provides that parties will not take any position on their respective tax returns or with respect to any other matter related to taxes that is inconsistent with treating the Creditor Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance to the contrary from the Internal Revenue Service. The Creditor Trust Agreement will provide for the ability of the Creditor Trust to request the Bankruptcy Court to extend the duration of its existence should it be necessary to fully carry out and complete its responsibilities under the Plan.

### 2. Funding of Trust

To fund the Creditor Trust, all of the Creditor Trust Assets will be transferred and assigned to the Creditor Trust, and the Creditor Trust will be in possession of, and have title to, all the Creditor Trust Assets, as of the Effective Date. The conveyances of all Creditor Trust Assets will be accomplished pursuant to the Plan and the Confirmation Order and will be

55

effective upon the Effective Date.  The Debtor will convey, transfer, assign and deliver the Creditor Trust Assets ~~Free~~free and ~~Clear~~clear of all Liens.

For all federal income tax purposes, all Persons (including, without limitation, the Debtor, the Creditor Trustee and the Trust Beneficiaries) will treat the transfer and assignment of the Creditor Trust Assets to the Creditor Trust for the benefit of the Trust Beneficiaries as (a) a transfer of the Creditor Trust Assets directly to the Trust Beneficiaries followed by (b) the transfer by the Trust Beneficiaries to the Creditor Trust of the Creditor Trust Assets.  The Creditor Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata portion of the Creditor Trust Assets for federal income tax purposes.

3.     The Creditor Trustee

The Plan provides that the Creditor Trustee will be appointed by the Committee. The Creditor Trustee will retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Creditor Trust Agreement, and as otherwise provided in the Confirmation Order, including the right, at the Trustee's sole and absolute discretion, to negotiate reasonable extensions of the payments due and other modifications, if any, under the terms of the Creditor Note.  However, the Creditor Trustee will not be obligated or permitted to review, investigate, evaluate, analyze or object to any claims, which will be the responsibility of the Reorganized Debtor.  The Creditor Trustee will be the exclusive trustee of the Creditor Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).

As will be set forth more fully in the Creditor Trust Agreement (which will be filed as part of the Plan Supplement), the Creditor Trustee may be removed by a vote of two-thirds of Allowed Claims, excluding any claims that are transferred after the Effective Date.

4.     Retention of Professionals

The Creditor Trustee will have the right under the Plan to retain the services of attorneys, accountants and other professionals that, in the discretion of the Creditor Trustee, are necessary to assist the Creditor Trustee in the performance of his or her duties.

5.     Compensation of the Creditor Trustee

The Creditor Trustee's identity and compensation will be disclosed in the Plan Supplement or in a notice filed with the Court no later than five (5) business days prior to the Confirmation Hearing.  The Creditor Trustee will serve in such capacity pursuant to the Creditor Trust Agreement until the resignation or discharge of the Creditor Trustee and the appointment of a successor Creditor Trustee in accordance with the Creditor Trust Agreement.

6.     Creditor Trust Expenses

The Creditor Trust and any professionals retained by the Creditor Trust will be entitled to reasonable compensation for services rendered and reimbursement of expenses from

the Reorganized Debtor, subject to the budget attached to the Plan as Schedule 3; any fees and expenses of the Creditor Trust or the Stock Trust and their respective professionals in excess of the amounts permitted under such budget, including any attorney fees and expenses incurred in any litigation, will be deducted and paid from the Creditor Trust on a Pro Rata basis from the Distributions to be made to Holders of Allowed Unsecured Claims in Classes 3a, 3b and 3c. The payment of the reasonable fees and expenses of the Creditor Trust and its retained professionals will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court.

### 7.     Liability; Indemnification

The Creditor Trustee will not be liable for (and the Creditor Trust Assets will not be burdened or otherwise available to satisfy any judgment for) any act or omission taken or omitted to be taken in his or her capacity as the Creditor Trustee, other than acts or omissions resulting from such Person's fraud, gross negligence or willful misconduct. The Creditor Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with attorneys, accountants and agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Creditor Trustee will be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Creditor Trustee unless such determination is based on fraud, gross negligence or willful misconduct. The Creditor Trust and the Reorganized Debtor will indemnify and hold harmless the Creditor Trustee and his or her agents, representatives, professionals and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Creditor Trust or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of fraud, gross negligence or willful misconduct.

### 8.     Termination

The duties, responsibilities and powers of the Creditor Trustee will terminate after all Creditor Trust Assets have been distributed in accordance with the Plan and the Creditor Trust Agreement. Except in the circumstances set forth below, the Creditor Trust will terminate no later than five years after the Effective Date. However, if warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Creditor Trust, the term of the Creditor Trust may be extended, one or more times (not to exceed a total of four extensions, unless the Creditor Trustee receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Creditor Trust as a grantor trust for federal income tax purposes) for a finite period, based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court within two months prior to the beginning of the extended term with notice thereof to all of the unpaid beneficiaries of the Creditor Trust. Upon the occurrence of the termination of the Creditor Trust, the Creditor

Trustee will File with the Bankruptcy Court a report thereof, seeking an order discharging the Creditor Trustee.

### M. ~~L.~~ The Stock Trust

1. The Stock Trust

The Plan provides that the Stock Trust will be created for the purpose of liquidating the Stock Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and making the distributions to Holders of General Unsecured Claims (Class 3a), the R&S Strauss Claim (Class 3b) and the AB 7 Claim (Class 3c), to the extent that such Claims ultimately are Allowed; the Stock Trust is not otherwise authorized to engage in any trade or business.

The Trust Beneficiaries will be treated as the grantors and deemed owners for federal income tax purposes. The Stock Trust Interests may not be transferred, sold, pledged or otherwise disposed of or offered for sale, except for transfers by operation of law.

The Stock Trustee will file federal income tax returns for the Stock Trust as a grantor trust pursuant to § 671 of the Internal Revenue Code of 1986, as amended, and the Treasury Tax Regulations promulgated thereunder. The Plan provides that parties will not take any position on their respective tax returns or with respect to any other matter related to taxes that is inconsistent with treating the Stock Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance to the contrary from the Internal Revenue Service. The Stock Trust Agreement will provide for the ability of the Stock Trust to request the Bankruptcy Court to extend the duration of its existence should it be necessary to fully carry out and complete its responsibilities under the Plan.

2. Funding of Trust

To fund the Stock Trust, all of the Stock Trust Assets will be transferred and assigned to the Stock Trust, and the Stock Trust will be in possession of, and have title to, all the Stock Trust Assets, as of the Effective Date. The conveyances of all Stock Trust Assets will be accomplished pursuant to the Plan and the Confirmation Order and will be effective upon the Effective Date. The Debtor will convey, transfer, assign and deliver the Stock Trust Assets free and clear of all Liens.

For all federal income tax purposes, all Persons (including, without limitation, the Debtor, the Stock Trustee and the Trust Beneficiaries) will treat the transfer and assignment of the Stock Trust Assets to the Stock Trust for the benefit of the Trust Beneficiaries as (a) a transfer of the Stock Trust Assets directly to the Trust Beneficiaries followed by (b) the transfer by the Trust Beneficiaries to the Stock Trust of the Stock Trust Assets. The Stock Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata portion of the Stock Trust Assets for federal income tax purposes.

3.     The Stock Trustee

The Plan provides that the Stock Trustee will be appointed by the Committee. The Stock Trustee will retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Stock Trust Agreement, and as otherwise provided in the Confirmation Order, including the right to sell the Class 3 New Common Stock. However, the Stock Trustee will not be obligated or permitted to review, investigate, evaluate, analyze or object to any claims, which will be the responsibility of the Reorganized Debtor. The Stock Trustee will be the exclusive trustee of the Stock Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). Further, until Distribution or other divestiture of the Class 3 New Common Stock either pursuant to the Reorganized Debtor's employment agreement with Mr. Langberg or to Holders of Allowed Unsecured Claims pursuant to the Plan, the Stock Trust will have all customary rights under applicable state law as the sole shareholder of the Reorganized Debtor, including the ability to vote the Class 3 New Common Stock and replace the Reorganized Debtor's directors.

As will be set forth more fully in the Stock Trust Agreement (which will be filed as part of the Plan Supplement), the Stock Trustee may be removed by a vote of two-thirds of Allowed Claims, excluding any claims that are transferred after the Effective Date.

4.     Sale of Class 3 New Common Stock

At any time after the Effective Date, and subject to the terms of the Stock Trust Agreement, the Stock Trustee, in his sole and absolute discretion, may sell all or portions of the Class 3 New Common Stock. Notwithstanding anything to the contrary in the Plan, but subject to the treatment and reserves for Disputed Claims as set forth in the Plan, the Stock Trustee may distribute the proceeds of any sale of the Class 3 New Common Stock, Pro Rata, at any time to the holders of Allowed Class 3a, 3b and 3c Claims.

5.     4. Retention of Professionals

The Stock Trustee will have the right under the Plan to retain the services of attorneys, accountants and other professionals that, in the discretion of the Stock Trustee, are necessary to assist the Stock Trustee in the performance of his or her duties.

6.     5. Compensation of the Stock Trustee

The Stock Trustee's identity and compensation will be disclosed in the Plan Supplement or in a notice filed with the Court no later than five (5) business days prior to the Confirmation Hearing. The Stock Trustee will serve in such capacity pursuant to the Stock Trust Agreement until the resignation or discharge of the Stock Trustee and the appointment of a successor Stock Trustee in accordance with the Stock Trust Agreement.

7.     6. Stock Trust Expenses

The Stock Trust and any professionals retained by the Stock Trust will be entitled to reasonable compensation for services rendered and reimbursement of expenses from the

    067920.1001

Reorganized Debtor, subject to the budget attached to the Plan as Schedule 3; any fees and expenses of the Stock Trust and its professionals in excess of the amounts permitted under such budget, including any attorney fees and expenses incurred in any litigation, will be deducted and paid from the Creditor Trust on a Pro Rata basis from the Distributions from the Creditor Trust to be made to Holders of Allowed Unsecured Claims in Classes 3a, 3b and 3c. The payment of the reasonable fees and expenses of the Stock Trust and its retained professionals will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court.

### 8. 7. Liability; Indemnification

The Stock Trustee will not be liable for (and the Stock Trust Assets will not be burdened or otherwise available to satisfy any judgment for) any act or omission taken or omitted to be taken in his or her capacity as the Stock Trustee, other than acts or omissions resulting from such Person's fraud, gross negligence or willful misconduct. The Stock Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with attorneys, accountants and agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Stock Trustee will be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Stock Trustee unless such determination is based on fraud, gross negligence or willful misconduct. The Stock Trust and the Reorganized Debtor will indemnify and hold harmless the Stock Trustee and his or her agents, representatives, professionals and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Stock Trust or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of fraud, gross negligence or willful misconduct.

### 9. 8. Termination

The duties, responsibilities and powers of the Stock Trustee will terminate after all Stock Trust Assets have been distributed in accordance with the Plan and the Stock Trust Agreement. Except in the circumstances set forth below, the Stock Trust will terminate no later than five years after the Effective Date. However, if warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Stock Trust, the term of the Stock Trust may be extended, one or more times (not to exceed a total of four extensions, unless the Stock Trustee receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Stock Trust as a grantor trust for federal income tax purposes) for a finite period, based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court within two months prior to the beginning of the extended term with notice thereof to all of the unpaid beneficiaries of the Stock Trust. Upon the occurrence of the termination of the Stock Trust, the Stock Trustee will File with the Bankruptcy Court a report thereof, seeking an order discharging the Stock Trustee.

60

**N. ~~M.~~ Trust Committee**

      1.     Formation of Trust Committee

On the Effective Date, the Trust Committee shall be formed and constituted of Persons, numbering no more than three, designated by the Creditors Committee prior to the conclusion of the Confirmation Hearing.

      2.     Resignation, Removal and Replacement of Committee Members

If a member of the Trust Committee resigns or is otherwise removed, a replacement Trust Committee member may be appointed by the remaining Trust Committee members.

      3.     Procedures

The Trust Committee may adopt bylaws that will provide for the governance of the Trust Committee.

      4.     Function, Duties and Responsibilities

The Trust Committee will merely be a group of Claim Holders to provide input to the Trustee upon request, acting solely as a "sounding board" for the benefit of the Trustee. The Trust Committee and each of its individual members will have no duty or responsibility of any kind whatsoever to the Trusts or any Creditor or party in interest, including any Holder of a Claim classified under Class 3a, 3b or 3c. The members of the Trust Committee will serve without compensation.

      5.     Duration

The Trust Committee will remain in existence until the Trusts are terminated in accordance with the Plan or, in the event one or more of the Trust Committee member(s) resign and the Trustee is unable to locate replacement members, then the Trustee, in his or her sole discretion, may declare the Trust Committee terminated without any impact of any kind or character upon the Trusts or the Trustee.

      6.     Liability; Indemnification

Neither the Trust Committee, nor any of its members or designees, nor any duly designated agent or representative of the Trust Committee, or their respective employees, will be liable for the act or omission of any other member, designee, agent or representative of the Trust Committee, nor will any member of the Trust Committee be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Trust Committee, other than acts or omissions resulting from such member's fraud, gross negligence or willful misconduct. The Trust Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with attorneys, accountants and its agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions

rendered by such professionals. Notwithstanding such authority, the Trust Committee will be under no obligation to consult with attorneys, accountants or its agents, and its determination to not do so will not result in the imposition of liability on the Trust Committee, or its members and/or designees, unless such determination is based on fraud, gross negligence or willful misconduct. The Trusts will indemnify and hold harmless the Trust Committee and its members, designees and professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions with respect to the Trusts or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of fraud, gross negligence or willful misconduct.

### O. ~~N.~~ Creditor ~~Notes~~Note

1. Execution and Delivery of Creditor ~~Notes~~Note

On the Effective Date, the Reorganized Debtor will execute and deliver the Creditor ~~Notes~~Note to the Creditor Trust. ~~Forms~~A form of the ~~20%~~ Creditor Note ~~and 45% Creditor Note are~~is attached to the Plan as ~~Exhibits A and B, respectively~~Exhibit A. The ultimate form of the Creditor Note may be subject to comment by and negotiation with the lender providing the Debtor's exit financing. The payment and enforcement terms of the Creditor ~~Notes~~Note are set forth in the Credit Agreement attached to the Plan as Exhibit ~~E~~D.

As set forth more fully in the Credit Agreement, the Credit Agreement will contain, among other things: (i) a "due on sale" provision, requiring payment in full of the Creditor Note upon the sale of substantially all of the Debtor's assets or the sale of at least 75% of the issued and outstanding New Common Stock, unless waived by the Creditor Trustee in his sole and absolute discretion; (ii) customary remedy provisions upon default; (iii) a requirement that notice of default be provided in writing and be subject to cure within thirty (30) days; (iv) a requirement that the Reorganized Debtor provide quarterly financial statements to the Creditor Trust by the 20th day after the end of each quarter while any amounts due under the Creditor ~~Notes~~Note remain unpaid; and (v) a provision that limits the Reorganized Debtor's capital expenditures until the Creditor ~~Notes are~~Note is fully satisfied to the following amounts: (a) $2,000,000 in calendar year 2010; (b) $2,000,000 in calendar year 2011; and (c) $1,000,000 in each year thereafter, provided that, for purposes of determining the extent to which capital leases are included within the amount of net capital expenditures under such limiations, only the payments applicable to capital leases executed after January 1, 2010 will be included.

2. Principal ~~Amounts~~Amount of Creditor ~~Notes~~Note

The ~~20% Creditor Note and 45%~~ Creditor Note will be made payable to the order of the Creditor Trust, in an original principal ~~amounts equal to 20% and 45%, respectively, of the total amount of Unsecured Claims that are not Disallowed Claims, as determined on the Effective Date. The Plan Proponents estimate that on the Effective Date, the principal amounts~~

62

~~of the 45% Creditor Note and the 20% Creditor Note will be approximately $28.2 million and $12.5 million, respectively. Over time, the principal amounts of the Creditor Notes will be reduced as Claims are reconciled and ultimately allowed or disallowed. In particular, on each Distribution Date, the principal amounts of the Creditor Notes will be modified by the amounts of the Unsecured Claims that, since the principal amount of the Creditor Notes was last determined, (i) have become Allowed Unsecured Claims or Disallowed Unsecured Claims, (ii) have been withdrawn or (iii) have been voluntarily reduced, with each such reduction being made pursuant to a writing signed by the Holder of such Claim.~~

3. Reduction of Payment Amount Upon Early Satisfaction

~~3.     Reduction of Payment Amount Upon Early Satisfaction~~

~~The Plan provides that if the aggregate amount of Creditor Notes Proceeds paid to the Creditor Trust (for the benefit of Holders of Allowed Unsecured Claims) on or before the second anniversary of the Effective Date is equal to or greater than 53.25% of the total amount of Unsecured Claims that are not Disallowed Claims, then the Creditor Notes will be deemed satisfied in full and no further payments will be made on the Creditor Notes. However, notwithstanding the full and complete payment and satisfaction of the Creditor Notes, the Reorganized Debtor will remain obligated to pay the AB 7 Creditors' Portion, which is not part of the Creditor Notes Proceeds~~amount of $8.5 million.

### 3.     ~~4.~~ Security for Creditor ~~Notes~~Note

The Creditor ~~Notes~~Note will be secured by a security interest in all of the Reorganized Debtor's assets; provided, however, that (i) the Creditor Trust's security interest will be second in priority and subject to the liens and security interests securing any Permissible Secured Debt, and (ii) the Creditor Trust will execute a reasonable subordination agreement as required by any first lien lender providing such Permissible Secured Debt that is acceptable to the Debtor (or Reorganized Debtor post-Confirmation), the Committee (or the Creditor Trustee post-Confirmation) and the proposed lender.

Permissible Secured Debt is secured indebtedness advanced from a third party lender (which, absent consent of the Creditor Trustee, is not an Insider or Affiliate of the Debtor or the Holder of Old Equity Interests) in an amount not to exceed $10 million (in addition to amounts borrowed by the Reorganized Debtor under the Creditor ~~Notes~~Note) incurred to provide working capital, fund any reserves required under the terms of the Plan, fund capital expenditures and/or fund repayment of the Creditor ~~Notes~~Note. Permissible Secured Debt specifically does not include the Reorganized Debtor's obligations arising under equipment leases. Also, the Reorganized Debtor is not permitted to encumber the AB 7 Litigation Matters in connection with incurring any Permissible Secured Debt.

Upon satisfaction in full of the Creditor ~~Notes~~Note, the security interest held by the Creditor Trust in all of the Reorganized Debtor's assets will be deemed released without the requirement of further act or action under applicable non-bankruptcy law, regulation, order or rule; provided, however, that the Creditor Trust will execute documentation necessary to evidence the release of such security interest as reasonably requested by the Reorganized Debtor.

### 4.     ~~5.~~ Creditor ~~Notes~~Note Proceeds; Repayment of Creditor ~~Notes~~Note

The Creditor ~~Notes~~Note will be repaid by the Reorganized Debtor to the Creditor Trust (which will make the ultimate payments to Holders of Claims in Classes 3a, 3b and 3c) according to the Creditor ~~Notes Payment Schedule.  All payments by the Reorganized Debtor on the Creditor Notes first will be applied to satisfy the 45% Creditor Note, prior to application of any such payments to satisfaction in whole or part of the 20% Creditor Note.~~Note Payment Schedule.

The Creditor ~~Notes~~Note Payment Schedule is the timetable for repayment of the Creditor ~~Notes~~Note by the Reorganized Debtor.  In particular, the Creditor ~~Notes~~Note will be repaid according to the following schedule: (i) a payment in the amount of $3 million to be paid on or before the first anniversary of the Effective Date; (ii) payments in an amount equal to or greater than the sum of 33% EBITDA and the AB 7 – Creditor ~~Notes~~Note Portion to be paid approximately each six months thereafter; and (iii) a final payment equal to the remaining balance under the Creditor ~~Notes~~Note to be paid on or before the fifth anniversary of the Effective Date.  The Plan provides, however, that the Reorganized Debtor is entitled to miss one 33.3% EBITDA semi-annual payment every two years (i.e., the Reorganized Debtor elects to retain EBITDA that otherwise would have been paid to Holders of Unsecured Claims), other than the payment to be made on the first anniversary of the Effective Date.  The Plan further provides that if the Creditor ~~Notes are~~Note is satisfied in full prior to the fifth anniversary of the Effective Date, no further payments will be made on the Creditor ~~Notes~~Note.

5.    ~~6.~~Calculation of 33.3% EBITDA; Trust Right to Verification

One of the principal funding sources for the semi-annual payments to be made on the Creditor ~~Notes~~Note is 33.3% EBITDA.  "33.3% EBITDA" means one third of the Debtor's operating profit for the six-month period ending on the final day of the last full month immediately preceding the respective Semi-Annual Distribution Date before deducting interest, tax, depreciation and amortization, and also before: (i) reorganization expenses due to bankruptcy; (ii) gain on discharge of prepetition obligations and fresh-start adjustments; (iii) restructuring expenses; (iv) conversion costs; (v) any gain or loss on investments; (vi) out of the ordinary course of business asset write offs (including those related to inventory owned prior to the Effective Date); (vii) other income (expense) not related to business operations; and (viii) extraordinary items (as defined by GAAP).  The Net AB 7 Litigation Proceeds will not be part of the 33.3% EBITDA calculation.

To the extent that there is no EBITDA generated by the Debtor for a particular semi-annual period, the Distribution to Holders of Unsecured Claims for that period will be funded solely from the AB 7 – Creditor ~~Notes~~Note Portion and the AB 7 – Creditors' Portion, if any.  The absence of positive EBITDA for a particular semi-annual period does not trigger a default under the Creditor ~~Notes~~Note.

In addition to its other rights under applicable law ~~as the Reorganized Debtor's sole shareholder~~, as long as the Creditor ~~Notes are~~Note is outstanding, the ~~Stock~~Creditor Trust or its professionals may review, upon reasonable prior notice, the general ledger, subsidiary ledgers, other financial records and supporting documentation for any asserted amounts relied on by the

64

Reorganized Debtor in its calculation of 33.3% EBITDA in order to ensure a proper calculation of such amount.

      6.    ~~7.~~ AB 7 – Creditor ~~Notes~~<u>Note</u> Portion

In addition to 33.3% EBITDA, the principal funding sources for the semi-annual payments to be made on the Creditor ~~Notes~~<u>Note</u> (as well as the final payment to be made on the Creditor ~~Notes~~<u>Note</u>) are (i) the portion of the Net AB 7 Litigation Proceeds, if any, designated for repayment of the Creditor ~~Notes~~<u>Note</u> (called the "AB 7 – Creditor ~~Notes~~<u>Note</u> Portion") and (ii) bank loan availability.

**<u>P.</u>    ~~O.~~ Post-Consummation Corporate Structure, Management and Operation**

    1.    <u>Continued Corporate Existence</u>

The Plan provides that the Debtor will continue to exist as the Reorganized Debtor after the Effective Date, in accordance with the applicable laws in the jurisdiction in which it is incorporated and pursuant to the Amended Bylaws and Amended Certificate of Incorporation.

    2.    <u>New Corporate Governance Documents</u>

The corporate governance documents of the Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.

In addition to the specific requirements imposed by the corporate governance documents of the Reorganized Debtor and applicable non-bankruptcy law, the New Board will, until the Creditor ~~Notes have~~<u>Note has</u> been satisfied in full, (i) approve one or more general budgets within which the Reorganized Debtor must operate; (ii) subject to the terms of the employment agreements between the Reorganized Debtor and each of Mr. Langberg and Mr. Catalano, approve any salary increases for, and the general parameters of any incentive program applicable to, the Reorganized Debtor's management; and (iii) approve the borrowing of any Permissible Secured Debt in excess of $500,000.

Further, until the Reorganized Debtor actually makes the payment of $3 million on or before the Initial Distribution Date pursuant to the Creditor ~~Notes~~<u>Note</u> Payment Schedule, the New Board will meet at least once each calendar month to monitor the Reorganized Debtor's progress under the Plan. Following the payment of $3 million on or before the Initial Distribution Date pursuant to the Creditor ~~Notes~~<u>Note</u> Payment Schedule, the New Board will meet pursuant to a schedule determined by the New Board, but not less than once a quarter until the Creditor ~~Notes are~~<u>Note is</u> satisfied in full. Such meetings may be telephonic or in person as determined by the New Board.

    3.    <u>Cancellation of Old Securities and Agreements</u>

Except as otherwise provided for in the Plan, or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date the Old Equity Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, other than a Claim that is being Reinstated and rendered unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests will be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtor under the notes, share certificates and other agreements and instruments governing such Claims and Interests will be discharged. The holders of or parties to such canceled notes, share certificates and other agreements and instruments will have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

4.     <u>Officers and Directors of Reorganized Debtor</u>

On the Effective Date, each member of the existing board of directors of Autobacs Strauss will be deemed to have resigned. The New Board of Autobacs Strauss will be comprised of three (3) directors, which will be the Debtor's Chief Executive Officer (Glenn Langberg), along with the two (2) directors selected by the Creditors Committee, which are Daniel Griffin and Charles Mendeljian.

<u>Mr. Griffin</u>. After a successful career in credit and financial analysis at Dun & Bradstreet and the private sector, Mr. Griffin joined the Motor & Equipment Manufacturers Association (MEMA) Financial Services Group in November 1984. Over the years Mr. Griffin's responsibility grew to encompass financial restructuring and rehabilitation of distressed debtors of manufacturer clients, and Mr. Griffin represented supplier interests in informal workouts as well as chapter 11 and chapter 7 bankruptcies. From the late 1980's until retirement in 2006 as Executive Vice President and General Manager, Mr. Griffin was involved with virtually every workout or reorganization in the automotive aftermarket. Whether retailer or warehouse distributor, he represented industry interests in cases transacting volumes from several million to several billion dollars with more than 1,000 retail stores. Following retirement, for sixteen months, Mr. Griffin served as an industry Consultant on the automotive retail market for Susquehanna Financial Corp., an international firm providing guidance for institutional investors.

<u>Mr. Mendeljian</u>. Mr. Mendeljian has worked in the automotive aftermarket industry for over thirty years, serving as a financial overseer, business consultant and administrator to a large number of world wide business units' credit and collections operations. Mr. Mendeljian has been deeply involved in banking relationships, customer financial reviews and in developing policies and procedures. He has worked extensively as a trouble shooter with companies experiencing financial challenges, and has served on numerous creditors' committees, chairing many of them. Mr. Mendeljian has been active in the MEMA Financial Services Group and in the National Association of Credit Management.

Until Distribution <u>or other divestiture</u> of the <u>Class 3</u> New Common Stock ~~either pursuant to the Reorganized Debtor's employment agreement with Mr. Langberg or to Holders of Allowed Unsecured Claims pursuant to the Plan~~, the Stock Trust will have all customary rights under applicable state law as the sole shareholder of the Reorganized Debtor, including the ability to <u>vote the Class 3 New Common Stock and</u> replace the Reorganized Debtor's directors.

66

The members of the New Board that are not officers of the Reorganized Debtor each will receive compensation in the amount of $15,000 per year, will be reimbursed for reasonable and necessary travel and related expenses and will be provided usual and customary directors and officers insurance coverage. Mr. Langberg will not be compensated for his services as a director, but will be reimbursed for reasonable and necessary travel and related expenses and will be provided usual and customary directors and officers insurance coverage.

The Debtor's current officers will continue to serve as officers of the Reorganized Debtor after the Effective Date and will serve until replaced or removed in accordance with the Amended Bylaws and applicable law. In particular, Mr. Langberg will serve as the Reorganized Debtor's Chief Executive Officer and Chief Financial Officer, and Mr. Catalano will serve as the Reorganized Debtor's President. Pursuant to the Confirmation Order, the Plan Proponents will seek Bankruptcy Court approval of the employment agreements with Mr. Langberg and Mr. Catalano attached hereto as Appendices D and E, respectively.

Under his proposed employment agreement, Mr. Langberg would receive an annual base salary of $280,000 ~~and, upon timely satisfaction in full of the 45% Creditor Note, an option to purchase 100% of the Reorganized Debtor's New Common Stock for $300,000.~~ 325,000 and would be entitled to certain severance benefits. In addition, Mr. Langberg would be entitled to receive: (i) a milestone bonus payment of $100,000 upon the effective date of the Plan; (ii) beginning in calendar year 2011, yearly EBITDA bonus payments of $100,000 if the EBITDA projections set forth in the Disclosure Statement are achieved as of the end of each calendar year, plus 15% of any EBITDA exceeding the Disclosure Statement projections; and (iii) reasonable out of pocket expenses incurred in the furtherance of the performance of Mr. Langberg's duties under his employment agreement, including, but not limited to, reasonable attorney's fees incurred in connection with the Chapter 11 Case, up to a maximum dollar amount of $100,000.

Under Mr. Catalano's proposed employment agreement, he would receive an annual base salary of $~~250,000~~ 265,000 and would be entitled to certain severance benefits.

5.     Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer from the Debtor to the Reorganized Debtor or any other Person or Entity pursuant to the Plan, including, without limitation, the granting or recording of any Lien or mortgage on any property, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

~~DB02:8932523.16~~YCST01:8932523.20                                                                                                   067920.1001

6.     <u>Corporate Action</u>

On the Effective Date, the adoption and filing of the Amended Certificate of Incorporation of Autobacs Strauss, the appointment of the New Board, and all other actions contemplated hereby will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the directors or stockholders of the Debtor or Reorganized Debtor. On the Effective Date, the appropriate officers of the Reorganized Debtor are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations or consents, except for any express consents required under the Plan.

7.     <u>Effectuating Documents; Further Transactions</u>

The Chief Executive Officer (or any other appropriate officer of the Reorganized Debtor) and the Trustee will be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary or Assistant Secretary of the Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.

**<u>Q.</u>**     ~~P.~~ **Treatment of AB 7 Litigation Matters Under Plan**

The Plan contains specific provisions concerning matters relating to, claims asserted in, and Claims objections in the pending cases filed against AB 7 and various other parties described as <u>Autobacs Strauss Inc. v. Autobacs Seven Co. Ltd.</u>, Adv. Proc. No. 09-52849 (CSS) (Bankr. D. Del.) and <u>Autobacs Strauss Inc. v. Autobacs Seven Co. Ltd.</u>, Case No. 3:09-CV-06365-MLC-DEA (D.N.J.), and all other matters and claims against AB 7 and any other parties (all such parties to present and future litigation the "AB 7 Litigation Parties") which involve (i) claims arising from or related to AB 7's control, ownership, administration and management of the Debtor, (ii) claims arising from business relationships and transactions with the Debtor, and business operations of the Debtor, (iii) claims arising under or relating to the confirmed plan of reorganization in the New Jersey Chapter 11 Case, (iv) corporate claims including claims for breach of fiduciary duty, negligence and other claims for tortious actions, (v) claims arising under or related to the avoidance powers, and objections to the claims of AB 7 (all of the foregoing, together with any claims asserted subsequently, the "AB 7 Litigation Matters").

By the Plan, the Debtor is expressly preserving all of its claims and causes of action against the AB 7 Litigation Parties and any other Persons or Entities on or in connection with the AB 7 Litigation Matters, and expressly states its intention to prosecute all such claims and causes of action following any confirmation of the Plan, entry of the Confirmation Order,

and the occurrence of the Effective Date of the Plan. No provision of the Plan will be interpreted to release, discharge, waive or otherwise limit the prosecution of such claims or causes of action.

Notwithstanding any provision of the Plan or Plan Documents to the contrary, any provisions in the Plan relating directly or indirectly to intercompany claims (including, without limitation, Section 3.4), avoidance actions (including, without limitation, Section 5.14), indemnification obligations (including, without limitation, Section 6.8), resolving disputed claims (including, without limitation, Article VIII), releases (including, without limitation, Section 11.11), injunctions (including, without limitation, Section 11.13), and exculpation and limitations of liability (including, without limitation, Section 11.14), will not apply to any of the claims involved in the AB 7 Litigation Matters or to any of the AB 7 Litigation Parties as it pertains, directly or indirectly, to the AB 7 Litigation Matters. None of the AB 7 Litigation Parties will have any Claims or rights under any such provisions. Any provisions in the Plan which purport to limit Avoidance Actions will not apply to AB 7 Litigation Matters, and the AB 7 Litigation Matters are specifically designated under the Plan as Permitted Avoidance Actions.

No provision of the Plan will affect or be deemed to affect or limit the right of the Debtor, the Reorganized Debtor or any other Person to jury trial.

The claims of AB 7 and the Debtor's objections, requests for recharacterization, requests for subordination and related matters will be determined as part of the AB 7 Litigation Matters, and the provisions of Article VIII of the Plan will not apply to any litigation, dispute resolution and liquidation of such claims; provided, however, that pursuant to Section 8.3(c) of the Plan, the Creditor Trust will be required to fund the Unsecured Claims Reserve with an amount of Cash equal to 100% of the distributions to which AB 7 would be entitled under the Plan on each Distribution Date if the AB 7 Claim is Allowed in its full Face Amount of $43,994,044.12.

The claims of AB 7 and Takenaka Partners LLC are Disputed Claims under the Plan and are not Intercompany Claims under the Plan. Such claims will not be Allowed for the purpose of section 3.3(c) of the Plan unless and until the Bankruptcy Court authorizes such claims for payment pursuant to section 3.3(c) of the Plan. The claims of the Debtor against AB 7 and Takenaka Partners LLC (including any Insider or Affiliate of such Entities) are included within the Permitted Avoidance Actions.

The Reorganized Debtor exclusively will be responsible for the day to day oversight and management of any and all of the AB 7 Litigation Matters. The New Board will be kept apprised and provide for approval of significant decisions, including all settlements. The Trusts will not initiate or otherwise become directly involved with settlement negotiations with the AB 7 Litigation Parties except as requested by the Reorganized Debtor. In addition, notwithstanding any other provision of the Plan, any settlement of all or any portion of the AB 7 Litigation Matters, whether involving all or some of the AB 7 Litigation Parties, will require unanimous approval by the New Board and approval by the Bankruptcy Court.

The Reorganized Debtor will have no legal right or interest in or to the AB 7 – Creditors' Portion. In the event that the Reorganized Debtor satisfies a judgment, settles or

otherwise resolves any part of the AB 7 Litigation Matters, any Cash or other property constituting the AB 7 – Creditors' Portion will be delivered directly to the Creditor Trust, rather than to the Reorganized Debtor. Notwithstanding these prohibitions, in the event that the Reorganized Debtor receives Cash or other property constituting the AB 7 – Creditors' Portion, the Reorganized Debtor will be deemed to hold the same in trust for the benefit of the Creditor Trust and Holders of Allowed Unsecured Claims and is required to immediately deliver such AB 7 – Creditors' Portion to the Creditor Trust.

1. <u>Allocation of AB Litigation Proceeds</u>

A significant source of funding for the Plan is the proceeds of the AB 7 Litigation Matters that have been (and may be) commended by the Debtor or Reorganized Debtor. After deducting the fees and expenses of conducting such litigation (but specifically not deducting any amounts being paid by the Debtor to Milberg LLP for which the Debtor is entitled to reimbursement by R&S Strauss pursuant to the Expense Sharing Agreement), the remaining proceeds of the AB 7 Litigation Matters will be utilized for three purposes, in relative amounts determined according to a formula established by the Plan: (i) direct distributions to Holders of Unsecured Claims (the "AB 7 – Creditors' Portion"); (ii) direct distribution to the Debtor or Reorganized Debtor, as applicable (the "AB 7 – Debtor's Portion"); and (iii) repayment of the Creditor ~~Notes~~Note (the "AB 7 – Creditor ~~Notes~~Note Portion"). In particular, the net proceeds of the AB 7 Litigation Matters will be allocated as follows:

| Net AB 7 Litigation Proceeds | AB 7 – Creditor ~~Notes~~Note Portion | AB 7 – Creditors' Portion | AB 7 – Debtor's Portion |
|---|---|---|---|
| Proceeds exceeding $0, but less than or equal to $4 million | 87.5% (maximum of $3.5 million) | 12.5% (maximum of $500,000) | 0% |
| Proceeds exceeding $4 million, but less than or equal to $7.125 million | 80% (incremental maximum of $2.5 million; aggregate maximum of $6.0 million) | 12% (incremental maximum of $375,000; aggregate maximum of $875,000) | 8% (incremental maximum of $250,000; aggregate maximum of $250,000) |
| Proceeds exceeding $7.125 million, but less than or equal to $10 million | 0% (incremental maximum of $0; aggregate maximum of $6.0 million) | 60% (incremental maximum of $1.725 million; aggregate maximum of $2.6 million) | 40% (incremental maximum of $1.15 million; aggregate maximum of $1.4 million) |
| Proceeds exceeding $10 million, but less than or equal to $13.33 million | 60% (incremental maximum of $2.0 million; aggregate maximum of $8.0 million) | 19.33% (incremental maximum of $643,689; aggregate maximum of $3,243,689) | 20.67% (incremental maximum of $688,311; aggregate maximum of $2,088,311) |
| Proceeds exceeding $13.33 million, but less than or equal to $15 million | 0% (incremental maximum of $0; aggregate maximum of $8.0 million) | 48.33% (incremental maximum of $807,111; aggregate maximum of $4,050,800) | 51.67% (incremental maximum of $862,889; aggregate maximum of $2,951,200) |
| Proceeds exceeding $15 million, but less than or equal to $19 million | 50% (incremental maximum of $2.0 million; aggregate maximum of $10.0 million) | 25% (incremental maximum of $1 million; aggregate maximum of $5,050,800) | 25% (incremental maximum of $1 million; aggregate maximum of $3,951,200) |
| Proceeds exceeding $19 million, but less than or equal to $20 million | 0% (incremental maximum of $0; aggregate maximum of $10.0 million) | 50% (incremental maximum of $500,000; aggregate maximum of $5,550,800) | 50% (incremental maximum of $500,000; aggregate maximum of $4,451,200) |
| Proceeds exceeding $20 million | 0% | 50% | 50% |

If the Creditor ~~Notes have~~Note has been satisfied in full, then the AB 7 – Creditors' Portion and the AB 7 – Debtor's Portion also will include an amount equal to 50% of any amount that would have been allocated to the AB 7 – Creditor ~~Notes~~Note Portion. Further, if Holders of Allowed Unsecured Claims have received Distributions of a value equal to the Face Amount of such Allowed Unsecured Claims, then the AB 7 – Creditors' Portion will be $0, and the AB 7 – Debtor's Portion will be equal to the full amount of the Net AB 7 Litigation Proceeds.

    2.    <u>Expense Sharing Agreement with R&S Strauss</u>

Pursuant to the Expense Sharing Agreement, (i) the Debtor has agreed to reimburse and pay Milberg LLP for all out-of-pocket costs for disbursements and expenses incurred in connection with the prosecution of claims and causes of action asserted by the Debtor and R&S Strauss against AB 7; and (ii) R&S Strauss has agreed to reimburse the Debtor up to

50% of such amounts paid by the Debtor to Milberg LLP. The Expense Sharing Agreement is attached to the Plan as Exhibit ~~GF~~.

### **R.** ~~Q.~~ Releases, Discharge, Injunctions, Exculpation and Indemnification

   1.   Releases by Debtor in Favor of Third Parties

The Plan provides for certain releases to be granted by the Debtor in favor of (i) the Debtor's non-Debtor subsidiaries, (ii) the present or former shareholders, directors, officers, employees or advisors of the Debtor or any of the Debtor's non-Debtor subsidiaries, (iii) Professionals of the Debtor, (iv) the Creditors Committee, its members and its and their advisors and Professionals, respectively (but not its members in their individual capacities), except for those persons and entities listed on Schedule 1 to the Plan.

**Specifically, as of the Effective Date, the Debtor, the Reorganized Debtor and any Person or Entity seeking to exercise the rights of the Debtor's Estate, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under chapter 5 of the Bankruptcy Code) and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case or the Plan (other than the rights of the Debtor and the Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtor, the Estate or the Reorganized Debtor against (i) the Debtor's non-Debtor subsidiaries, (ii) any of the present or former shareholders, directors, officers, employees or advisors of the Debtor or any of the Debtor's non-Debtor subsidiaries, (iii) any Professionals of the Debtor, (iv) the Creditors Committee, each of its members and its advisors and Professionals, respectively (but not its members for actions unrelated to their capacity as members of the Creditors Committee), except for those persons and entities listed on Schedule 1 to the Plan, which will not be released under the Plan; provided, however, that nothing in the Plan will be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Claim objections or liabilities they may have against any employee (other than any director or officer) that are based upon an alleged breach of a confidentiality, noncompete or any other contractual or fiduciary obligation owed to the Debtor or the Reorganized Debtor.**

The releases being provided by the Debtor relate to claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under chapter 5 of the Bankruptcy Code), and liabilities held by the Debtor or that may be asserted on behalf of the Debtor (the "Debtor Claims"). The Debtor Claims are part of

72

the Debtor's Estates created pursuant to section 541 of the Bankruptcy Code and, absent extraordinary circumstances, the Debtor has the exclusive authority to pursue or settle such claims. See, e.g., Mitchell v. Mitchell, 734 F.2d 129, 131 (2d Cir. 1984) (holding that derivative actions are property of the bankruptcy estate and enforceable by the trustee). The releases of the Debtor Claims are in the best interests of the Debtor's Estate and arise from an appropriate exercise of the Debtor's authority under section 1123(b)(3) to include in the Plan "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3). See also In re Pacific Gas & Elec. Co., 304 B.R. 395, 404, 416-418 (Bankr. N.D. Cal. 2004) (court approved release and settlement of debtor's claims pursuant to section 1123(b)(3)); In re Best Products Co., Inc., 168 B.R. 35, 61, 63-64 (Bankr. S.D.N.Y. 1994) (same); In re General Homes Corp., FGMC, Inc., 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that the language contained in the plan purports to release any causes of action against the Bank Group which the Debtor could assert, such provision is authorized by section 1123(b)(3)(A), subject to compliance with provisions of the code requiring that the plan be proposed in good faith."); In re Freedom Rings LLC, (Case No. 05-14268) (CSS) (Bankr. D. Del. April 20, 2006) (stating that "[under] In Re: Zenith Electronics Corporation, 241 B[.]R[.] 92 and it[]s progeny, this Court may authorize the release of direct and derivative claims of the Debtor . . ."); In re Zenith Elecs. Corp., 241 B.R. 92, 110-11 (Bankr. D. Del. 1999) (approving plan provision allowing for the releases of debtor's claims); In re Coram Healthcare Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004) (same).

The Debtor Claims that are being released include claims and causes of action that the Debtor may hold against the Debtor's current directors and officers relating to the AB 7 Litigation Matters, as well as claims and causes of action arising from the Langberg Payment described herein in Article VI.D of the Disclosure Statement. AB 7 asserts that the Debtor's current directors and officers shared responsibility for the prepetition management and operation of the Debtor, and therefore may be liable for any mismanagement that may have occurred prior to the commencement of this case.

The Debtor does not believe that there are any valid Debtor Claims against any of the parties to be released. Moreover, any action brought to enforce a potential Debtor Claim would involve significant costs to the Debtor, including legal expenses and the distraction of the Debtor's key personnel from the demands of the Debtor's ongoing businesses. In light of these considerations, and given the contributions made by the recipients of the releases to the Debtor's businesses and reorganization efforts, the releases of the Debtor Claims are appropriate and in the best interests of the Debtor's Estate.

2.    Releases by Creditors of Claims Against Third Parties

**As of the Effective Date, each Holder of a Claim that has not opted out of this release on its respective Ballot will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any**

73

way relating to the Debtor, the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under the Plan), and that may be asserted against any of the present or former shareholders, directors, officers, employees, Professionals or advisors of the Debtor, the Debtor's non-Debtor subsidiaries, the Creditors Committee and each of the Creditor Committee members (but not its members for actions unrelated to their capacity as members of the Creditor Committee), the Trustee, the Trusts and the Trust Committee, except for those persons and entities listed on Schedule 1 to the Plan, which will not be released under the Plan (all parties to be released, collectively, the "Releasees").**

The Claims that are being released by Creditors include claims and causes of action that such Creditors may hold against the Debtor's current directors and officers relating to the AB 7 Litigation Matters. AB 7 asserts that the Debtor's current directors and officers shared responsibility for the prepetition management and operation of the Debtor, and therefore may be liable for any mismanagement that may have occurred prior to the commencement of this case.

**The Plan provides that each of the Releasees will be deemed to forever release, waive and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case or the Plan, that such Releasees may hold in their individual capacities against each Holder of a Claim that receives a Distribution pursuant to the Plan, except for those persons and entities listed on Schedule 1 to the Plan, which shall not be released under the Plan.**

The releases by and among the Claim Holders who receive Distributions pursuant to the Plan and the Releasees meet the standards of fairness and necessity to the Debtor's reorganization required to justify Bankruptcy Court approval of non-consensual releases. See Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 214 (3d Cir. 2000) (noting that "[t]he hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions"). The Holders of Allowed Claims who will receive Distributions pursuant to the Plan are receiving material, specific and identifiable consideration for such releases consisting of: (a) the services and contributions of the Releasees to the Debtor's business and reorganization, (b) the Distribution of the Creditor ~~Notes~~Note Proceeds and the AB 7 – Creditors' Portion to Holders of Allowed Unsecured Claims, and (c) the releases granted by the Releasees to the Claim Holders. Where, as here, non-consensual releases by and among non-Debtor parties are fair and necessary to the success of the reorganization, such releases are appropriate and should be approved by the Bankruptcy Court. See, e.g., In re Freedom Rings LLC, (Case No. 05-14268) (CSS) (Bankr. D. Del. April 20, 2006) (approving non-consensual third-party releases of secured lenders as fair and necessary to reorganization); Metalforming Technologies, Inc., (Case No. 05-11697) (Bankr. D. Del. April 11, 2006) (MFW) (same).

3.    Discharge and Discharge Injunction

As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, on the Effective Date, (i) the Debtor will be discharged from any debt that arose before the Confirmation Date, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (A) a proof of the claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (B) a claim based upon such debt is allowed under section 502 of the Bankruptcy Code; (C) a claim based upon such debt is or has been disallowed by order of the Bankruptcy Court; or (D) the holder of a claim based upon such debt has accepted the Plan; and (ii) all Old Equity Interests will be terminated.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order or under the terms of the documents evidencing and orders approving the DIP Facility, all Persons will be precluded from asserting against the Debtor or the Reorganized Debtor or any of their assets or properties, any other or further claims, debts, rights, causes of action, claims for relief, liabilities or equity interests relating to the Debtor based upon any act, omission, transaction, occurrence or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor and termination of all Old Equity Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest. None of the foregoing will preclude an applicable governmental taxing authority from conducting a tax audit covering the postpetition, pre-Effective Date period or from asserting and recovering a claim arising from such tax audit, to the extent such claim is an Allowed Claim.

In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold or allege that they hold, a Claim or other debt, liability or cause of action that is discharged or an Old Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Trust Assets, the Debtor, the Reorganized Debtor, the Trustee and the Trusts and their respective subsidiaries or their property on account of any such discharged Claims, demands, liabilities or debts or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtor or the Reorganized Debtor; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

The Plan further provides that as of the Effective Date, all Persons that have held, currently hold or may hold, a claim, obligation, suit, judgment, damage, demand,

debt, right, cause of action or liability that is released pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; (iv) asserting a setoff of any kind against any debt, liability or obligation due to any released Person; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Moreover, the Plan provides that without limiting the effect of the foregoing provisions of Section 11.13 of the Plan upon any Person, by accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim receiving a Distribution pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 11.13 of the Plan.

The Plan further provides that nothing in Section 11.13 of the Plan will impair (i) the rights of any Holder of a Disputed Claim to establish its Claim in response to an objection filed by the Debtor or the Reorganized Debtor, (ii) the rights of any defendant in an Avoidance Action filed by the Debtor or the Reorganized Debtor to assert defenses in such action or (iii) the rights of any party to an executory contract or unexpired lease that has been assumed by the Debtor pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

4.  Exculpation Relating to Chapter 11 Case

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case. Specifically, the Plan provides that none of the Debtor, the Reorganized Debtor, their respective subsidiaries, the Creditors Committee (as to itself or any of its members), the Trustee or the Trusts, or any of their respective present or former members, officers, managers, directors, employees, advisors, attorneys, financial advisors, Professionals or agents, will have or incur any liability to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Case, the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or the post-Effective Date responsibilities set forth in the Plan, or any duties or actions of the Trustee or the Trusts relating to the implementation of the Plan, including the administration, distribution or sale of the Trust Assets, except for acts or omissions that are the result of fraud, gross negligence or willful misconduct.

Moreover, the Plan provides that no Holder of a Claim or an Interest, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys or Affiliates, and none of their respective successors or assigns will have any right of action, claim or cause of action against the Debtor, the Reorganized Debtor, any of the Debtor's or Reorganized Debtor's subsidiaries, the Creditors Committee, the Trustee, the Trusts, the Trust Assets, the Trust Committee, or their respective present or former members, officers, managers, directors, employees, advisors, attorneys, financial advisors, Professionals or agents, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Case, the formulation, negotiation or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan or the post-Effective Date responsibilities set forth in the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct.

The exculpations contained in the Plan are appropriate and are standard in large chapter 11 cases such as the Debtor's Chapter 11 Case. The exculpations are appropriately limited in scope, applying only to acts and omissions occurring after the Petition Date and in connection with the Chapter 11 Case or the Plan and conferring only a qualified immunity by excluding acts or omissions which are the result of fraud, gross negligence or willful misconduct. Moreover, these exculpations have, in the Plan Proponents' view, been earned. The beneficiaries of the exculpations have made significant contributions to the Debtor's reorganization, which contributions have allowed for the formulation of the Plan which resolves many complicated issues between and among the Debtor and other interested parties and which, in the Plan Proponents' view, provides for the best possible recoveries for Claims against the Debtor. In the Plan Proponents' view, the beneficiaries of the exculpations would not have contributed as they did without the prospect of the limited immunity reflected in the exculpations. The Plan Proponents also are unaware of any valid causes of action against any of the beneficiaries of the exculpations. In view of the foregoing, the exculpations are appropriate and in the best interests of the Debtor's Estate.

5.    Post-Effective Date Indemnifications

Upon and after the Effective Date, the Reorganized Debtor will provide usual and customary directors and officers insurance coverage and indemnification for those directors and officers employed by the Reorganized Debtor on and after the Effective Date.

**S.    R. Dissolution of Creditors Committee**

The Creditors Committee will continue in existence until the Effective Date, to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code, and will perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Creditors Committee's attorneys, accountants and other agents will terminate.

All expenses of Creditors Committee members and the fees and expenses of their professionals through the Effective Date will be paid in accordance with the terms and conditions of the Plan and any applicable order of the Bankruptcy Court.

## T. S. Retention of Jurisdiction

The Plan provides that under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim or 503(b)(9) Claim and the resolution of any objections to the allowance or priority of Claims;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtor will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

- hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under or related to the Chapter 11 Case, the Avoidance Actions, the Litigation Rights, the AB 7 Litigation Matters or the Plan;

- enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the implementation, consummation or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Plan Documents, the schedules to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Plan Supplement, the Plan Documents, the schedules to the Plan, the Disclosure Statement or the Confirmation Order;

- enforce, interpret and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

- hear and determine all matters related to the property of the Estate from and after the Confirmation Date;

- hear and determine all matters related to Trust Assets, including issues relating to the Creditor NotesNote and any purported default thereunder;

- except as otherwise limited by the Plan, recover all assets of the Debtor and property of the Estate, wherever located;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; ~~and~~

- enter a final decree closing the Chapter 11 Case; and

- hear any disputes relating to the Officer Employment Agreements.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under or related to the Chapter 11 Case, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

### U.      ~~T.~~Amendment, Alteration and Revocation of Plan

The Plan Proponents may alter, amend or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. The Plan Proponents will provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder. In the event of any dispute as to whether such proposed alteration, amendment, modification or clarification materially and adversely changes the treatment of the Claim of any such Holder, the Debtor will bear the burden of demonstrating that such proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder.

After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the ~~Debtor~~Plan Proponents or the Reorganized Debtor, as the case may be, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that, to the extent required, prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court, including notice served upon the Trustee. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder. In the event of any dispute as to whether such proposed alteration, amendment, modification or clarification materially and adversely changes the treatment of the Claim of any such Holder, the Debtor or Reorganized Debtor, as the case may be, will bear the burden of demonstrating that such proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder.

If, prior to Confirmation, any term or provision of the Plan or Plan Documents is held by the Bankruptcy Court to be invalid, void or unenforceable or otherwise is not approved by the Bankruptcy Court, the Bankruptcy Court, at the request of the Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, the Debtor, or any Avoidance Actions, Litigation Rights or other claims by or against the Debtor, the Creditors Committee, or any Person or Entity, (ii) prejudice in any manner the rights of the Debtor, the Creditors Committee, or any Person or Entity in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor, the Creditors Committee or any other Person or Entity.

## V. U. Plan Implementing Documents

The documents necessary to implement the Plan include the following:

- the Creditor NotesNote;

- the Amended Bylaws of Autobacs Strauss Inc.;

- the Amended Certificate of Incorporation of Autobacs Strauss Inc.;

- the Creditor Agreement;

- the Trust Agreements;

- the Expense Sharing Agreement; and

- the Security Agreement

81

The proposed forms for each of the foregoing are attached to the Plan or will be included in the Plan Supplement. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than ~~May 28,~~July____, 2010 or by such later date as may be established by order of the Bankruptcy Court. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtor in accordance with Section 11.18 of the Plan.

**W.** ~~V.~~ **Confirmation and/or Consummation**

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

    1.    <u>Requirements for Confirmation of the Plan</u>

Before the Plan can be confirmed, the Bankruptcy Court must determine at the hearing on confirmation of the Plan (the "Confirmation Hearing") that, among others, the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtor or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor has disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Reorganized Debtor, (ii) any Affiliate of the Debtor participating in a joint plan with the Debtor, or (iii) any successor to the Debtor under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtor and the nature of any compensation for such insider.

~~DB02:8932523.16~~YCST01:8932523.20             067920.1001

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code. See Article IX.D hereto.

- The Plan provides that Administrative Claims, 503(b)(9) Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Allowed Claims deferred cash payments, over a period not exceeding five (5) years after the Petition Date, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the Holder of any such Claim has agreed to another less favorable treatment. See Article VI.C.1(d) hereto.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. See Article IX.A hereto.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

The Debtor believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

2. Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date.

Under the Plan, the conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code will have been entered; (b) the proposed

83

Confirmation Order will be in form and substance reasonably satisfactory to the Debtor, the Creditors Committee and KRC Capital (but only as to issues affecting the DIP Facility); and (c) the Plan Documents will be in form and substance satisfactory to the Debtor and the Creditors Committee.

The Plan further provides that the conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived by the Plan Proponents, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order will have been entered in form and substance reasonably satisfactory to the Debtor, the Creditors Committee and KRC Capital (but only as to issues affecting the DIP Facility), and will, among other things, (i) provide that the Debtor, the Reorganized Debtor and the Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan, (ii) authorize the issuance of the New Common Stock, and (iii) provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; (b) the Confirmation Order will not then be stayed, vacated or reversed; (c) the Confirmation Order will be a Final Order and no request for revocation of the Confirmation Order will have been made or, if made, remain pending; (d) all material authorizations, consents and regulatory approvals required, if any, in connection with consummation of the Plan will have been obtained; (e) all material actions, documents and agreements necessary to implement the Plan will have been effected or executed; (f) the Debtor will have Cash on hand sufficient to fund the Priority/Secured Claims Reserve, the 503(b)(9) Claims Reserve and the Professional Fee Reserve; and (g) the Court has approved agreements providing for the employment by the Reorganized Debtor of Mr. Glenn Langberg and Mr. Joseph Catalano. The Plan Proponents will seek approval pursuant to the Confirmation Order of the employment agreements with Mr. Langberg and Mr. Catalano attached hereto as Appendices D and E, respectively.

The Plan provides that each of the above conditions (except the condition that the Debtor have Cash on hand sufficient to fund the Priority/Secured Claims Reserve, the 503(b)(9) Claims Reserve and the Professional Fee Reserve) may be waived in whole or in part by the ~~Debtor~~Plan Proponents without any notice to parties in interest or the Bankruptcy Court and without a hearing; provided, however, that such waiver will not be effective without the consent of KRC Capital (but only as to issues affecting the DIP Facilities) ~~and the Creditors Committee~~, which consent will not be unreasonably withheld.

3.    Effects of Failure of Conditions

If the Effective Date does not occur within sixty (60) days after the Confirmation Date, or by such later date, after notice and a hearing, as is proposed by the Debtor and the Creditors Committee, then upon motion by the Debtor or the Creditors Committee: (a) the Confirmation Order will be vacated and all provisions contained therein, including without limitation, any provisions relating to discharge, will be null and void, (b) no Distributions under the Plan will be made, (c) the Debtor and all Holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the

84

Confirmation Date had never occurred, and (d) the Debtor's obligations with respect to the Claims and Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

## VII. CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes 3a, 3b and 3c should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A. General Considerations

The Plan sets forth the means for satisfying the Claims against the Debtor. Certain Claims and Interests receive no Distributions pursuant to the Plan. Nevertheless, reorganization of the Debtor's business and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtor's customers, suppliers, employees, communities and other stakeholders.

### B. Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, see Article IX.A hereto, and that the value of Distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. See Article IX.C hereto. Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix C for a liquidation analysis of the Debtor.

The Debtor's future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtor's operating results, as the Debtor's ability to obtain financing to fund its operations and its relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders, customers and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

DB02:8932523.16YCST01:8932523.20                                                           067920.1001

## C.    Claims Estimations

The Debtor reserves the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan. There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

For example, if AB 7 prevails in the AB 7 Litigation, the AB 7 Claim may be Allowed in the amount of $43,994,044.12. As a result, cash recoveries to holders of Class 3a and 3b Claims (which the Debtor estimates hold Claims of approximately $18.7 million) will be significantly reduced.

## D.    Distributions to Holders of Class 3a and 3b Claims

So long as the AB 7 Claim is a Disputed Claim, the Creditor Trust is required to establish a reserve to be funded with AB 7's Pro Rata share of any distributions (including Creditor NotesNote proceeds) to which AB 7 would be entitled were the AB 7 Claim Allowed in its full face amount of $43,994,044.12. As a result, the Creditor Trust will be required to withhold a majority of the distributions (including Creditor NotesNote proceeds) from Holders of Class 3a and 3b Claims on any Distribution Date on which the AB 7 Claim remains Disputed. By way of example, assuming that on the Initial Distribution Date, (a) the AB 7 Claim remains Disputed, (b) there are $18.7 million in Class 3a and 3b Claims that have not been Disallowed, and (c) the Creditor Trust has received $3 million in Creditor NotesNote Proceeds that are available for distribution to Unsecured Creditors, Holders of Class 3a and 3b Claims will receive, collectively, approximately $900,000, while approximately $2.1 million will be reserved for distribution to AB 7 if the AB 7 Claim ultimately were Allowed. If the AB Claim ultimately were Allowed in Class 3c in less than the full asserted amount, then all or some of this $2.1 million reserve would be redistributed to other Holders of Unsecured Claims.

## E.    Conditions Precedent to Consummation; Timing

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## F.    Inherent Uncertainty of Financial Projections

The Projections set forth in the attached Appendix B cover the operations of the Reorganized Debtor through fiscal year 2014. These Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms;

realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors or any other person that the Projections can or will be achieved.

AB 7 asserts that the Projections should reflect potential expenses that could arise from (i) indemnification obligations, if any, related to claims asserted against the Debtor's current directors and officers relating to the AB 7 Litigation Matters; and (ii) the purported unauthorized use of the Autobacs Marks, as more fully described in Article V.F of the Disclosure Statement. The Debtor does not believe that it will incur expenses relating to these items and, therefore, has not accounted for any such expenses.

## G. Operational Risk Factors

The Debtor faces a number of risks with respect to its continuing business operations, including but not limited to the following: (i) its ability to improve profitability and generate positive operating cash flow; (ii) changes in accounting standards, taxation requirements and bankruptcy laws; (iii) its ability to increase capital expenditures in the future to invest in its store base and other capital projects; (iv) its response to the entry of new competitors into its markets; (v) changes in federal, state or local laws or regulations affecting manufacturing, distribution or retailing, including environmental regulations; (vi) general economic conditions in its operating regions, which may result in changes in consumer spending; (vii) stability of product costs; and (viii) increases in labor and employee benefit costs, such as health care and pension expenses.

Additionally, as described more fully in Article V.F of the Disclosure Statement, although the Debtor has asserted in the AB 7 Litigation Matters that AB 7 has abandoned certain of its trademark registrations, AB 7 disputes this position. In particular, by letter dated October 5, 2009, AB 7 advised the Debtor that it must cease and desist all use of the Autobacs Marks and that any such use constitutes willful trademark infringement and unfair competition under various state and federal laws. In addition, AB 7 advised that should the Debtor fail to terminate all use of the Autobacs Marks and remove all Autobacs Marks from all premises, websites and promotional materials affiliated with the Debtor, AB 7 may seek injunctive relief and damages (payable as administrative claims).

If AB 7 ultimately prevails in the trademark dispute and the Reorganized Debtor is forced to cease use of the Autobacs Marks, the Reorganized Debtor will incur certain costs to remove the Autobacs Marks from its premises, websites and promotional materials. However, the Debtor does not believe that such costs would materially impact the Projections attached hereto as Appendix B, and such potential costs have not been accounted for in the Projections.

## H. Exit Financing

Although the Debtor currently is negotiating the terms of an exit financing facility in an amount of up to $10 million, the Debtor currently does not have a firm commitment from any lender to provide such financing. Funds from the exit facility will be used to support payments required to be made under the Plan, pay transaction costs, and fund working capital and other general corporate purposes of the Reorganized Debtor following the Effective Date. As disclosed in the Projections attached hereto as Appendix B, the Debtor's entry into an exit financing facility is necessary to enable the Debtor to effectuate its emergence from chapter 11.

## I. Competition

Like the Debtor, the Reorganized Debtor will face intense competition, which could harm its financial condition and results of operations. The Debtor must compete based on service quality, product variety and price, as well as location, service, convenience and store condition. The Reorganized Debtor's ability to respond to the entry of new competitors into its markets represents an additional risk factor.

## J. Environmental and Other Regulations

The Debtor is not aware of any environmental condition at any of its properties that it considers material. However, it is possible that the environmental investigations of its properties might not have revealed all potential environmental liabilities or might have underestimated certain potential environmental issues. It is also possible that future environmental laws and regulations, or new interpretations of existing environmental laws, will impose material environmental liabilities on the Debtor, or that current environmental conditions of properties that the Debtor owns or operates will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties. The costs to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities, or respond to changed environmental conditions could have a material adverse effect on the Debtor's financial condition and operating results.

### K.    Litigation

The Reorganized Debtor will be subject to various claims and legal actions arising in the ordinary course of its business. The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtor.

While the Debtor believes that the AB 7 Litigation is meritorious, the claims are sharply disputed and the Debtor cannot make any prediction regarding the ultimate outcome of such litigation. If AB 7 prevails in the AB 7 Litigation, the AB 7 Claim may be Allowed in the full Face Amount of $43,994,044.12. Although the Debtor believes that this outcome is unlikely, if the AB 7 Claim were allowed in its full Face Amount, it would comprise approximately 70% of the dollar amount of Unsecured Claims, thereby significantly diluting any recovery to Unsecured Creditors. ~~Moreover, the full or partial allowance of the AB 7 Claim ultimately may trigger a default under the Creditor Notes and the distribution of the New Common Stock to Holders of Allowed Unsecured Claims.~~

### L.    Adverse Publicity

Adverse publicity or news coverage relating to the Reorganized Debtor, including but not limited to publicity or news coverage in connection with the Chapter 11 Case, may negatively impact the Reorganized Debtor's efforts to establish and promote name recognition and a positive image after the Effective Date.

### M.    Certain Tax Considerations

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article VIII of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and the Reorganized Debtor and to certain Holders of Claims who are entitled to vote to accept or reject the Plan.

## VIII.   CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Generally

A description of the United States federal income tax consequences of the Plan is provided below. This description is based on the Internal Revenue Code, Treasury Regulations issued thereunder, judicial decisions and Internal Revenue Service administrative determinations, all as in effect on the date of this Disclosure Statement and all subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below.

The United States federal income tax consequences of the Plan are complex and in important respects uncertain. No ruling has been requested from the Internal Revenue

Service; no opinion has been requested from the Debtor's or Creditors Committee's counsel concerning any tax consequence of the Plan; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtor or holders of Claims or Interests. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers. In addition, the description does not discuss state, local or non-U.S. tax consequences.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim or Interest. Holders of Claims or Interests are urged to consult with their own tax advisors regarding the federal, state, local and non-United States tax consequences of the Plan.

**B.      United States Federal Income Tax Consequences
of Payment of Allowed Claims Pursuant to Plan**

The United States federal income tax consequences of Plan implementation to the holders of Allowed Claims will depend on, among other things, the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's Claim is allowed or disputed at the Effective Date, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

1.      Recognition of Gain or Loss

(a)      Generally

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, its deduction of the loss may be subject to limitation. The holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.

(b)      Post-Effective Date Cash Distributions

Because certain holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as imputed interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the

90

year of the initial distribution, any loss or a portion of any gain, as the case may be, that is realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

(c)     Bad Debt or Loss Deduction

Under certain circumstances, a holder of an Allowed Claim may recognize ordinary income to the extent that such holder is deemed to have received consideration for such Claim that represents a recovery of a prior bad debt or loss deduction. This recognition may occur regardless of whether such income would have otherwise been realized or recognized by such holder upon Confirmation of the Plan. Holders of Allowed Claims who have taken a bad debt or loss deduction with respect to their Claims should consult their own tax advisors as to the effect of such deductions in light of their particular circumstances.

## C.     Certain Other Tax Consequences for Holders of Claims

1.     Receipt of Pre-Effective Date Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that all distributions to a holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any prepetition accrued interest included in such Claim. There is no assurance, however, that the Internal Revenue Service will respect this treatment and will not determine that all or a portion of amounts distributed to holders of Allowed Claims are properly allocable to prepetition interest. Each such holder is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility or inclusion in income of any accrued but unpaid interest for federal income tax purposes.

2.     Installment Method

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Internal Revenue Code.

3.     Information Reporting and Withholding

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder is exempt (corporations are generally exempt) and,

91

when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

### D. Tax Consequences of the Plan to the Debtor

The Debtor may have had net operating losses ("NOL's") for the most recent taxable year. These potential NOL's may be available to offset taxable income or gain, if any, that may arise as a result of consummation of the Plan. Accordingly, the Debtor may not incur a substantial tax liability as a result of the implementation of the Plan. To the extent the Debtor does not have sufficient available NOL's to offset any income that may arise as a result of implementation of the Plan, the Debtor may be required to pay income tax with respect to income realized as a result of implementation of the Plan.

Since the acquisition of the Debtor by GRL Capital Advisors LLC in June 2009, the Debtor has generated NOL's of approximately $10 million. Loss of the ability to utilize these NOL's could result in a larger federal income tax liability for the Reorganized Debtor. As indicated on the Projections attached hereto as Appendix B, projected net operating profits for the period through 2014 is approximately $5.4 million.

### E. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The above discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances. Accordingly, holders are urged to consult with their tax advisors about federal, state, local and non-United States tax consequences of the Plan.

**IRS CIRCULAR 230 DISCLOSURE:** TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (AND ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (AND ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## IX. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A. Feasibility of the Plan

92

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support their belief in the feasibility of the Plan, the Debtor has relied upon the Projections, which are annexed to this Disclosure Statement as Appendix B.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to pay and service its debt obligations and to fund its operations. Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Debtor will be required to adopt "fresh start" accounting upon its emergence from chapter 11, and the adjustments for "fresh start" accounting that the Debtor may be required to adopt upon emergence may materially alter the Projections attached hereto (i.e., the Projections do not reflect "fresh start" accounting adjustments). The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors or any other Person that the Projections can or will be achieved.

The Projections should be read together with the information in Article VII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

The Debtor does not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from chapter 11, including but not limited to the following: the Debtor's ability to improve profitability and continue positive operating cash flow; the Debtor's response to the entry of new competitors into its markets; the Debtor's continuing ability to reduce the level of operating losses experienced in recent years; the Debtor's ability to implement effective pricing and promotional programs; changes in federal, state or local laws or regulations; general economic conditions in the Debtor's operating regions; stability of product costs; increases in labor and employee benefit costs, such as health care and pension expenses; and changes in accounting standards, taxation requirements and bankruptcy laws.

## B. Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims votes to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes 3a, 3b and 3c will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C. Best Interests Test

With respect to each Impaired Class of Claims and Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Claims and Interests in each Impaired Class would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered Cash, if any, held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation.

The Debtor's costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtor during the pendency of the Chapter 11 Case. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Debtor and the Creditors Committee during the Chapter 11 Case such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtor's unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors and Interest Holders in the Chapter 11 Case, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

The Debtor's Liquidation Analysis is attached hereto as Appendix C. The information set forth in Appendix C provides a summary of the liquidation values of the Debtor's assets assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's estate. The Liquidation Analysis was prepared by the Debtor with the assistance of PricewaterhouseCoopers LLP.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtor were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of 6 months, allowing for, among other things, the (i) discontinuation of the Debtor's operations, (ii) sale of assets and (iii) collection of receivables.

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to

liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests is set forth in the Liquidation Analysis attached as Appendix C to this Disclosure Statement. For the reasons described above, the Debtor believes that the distributions generated by a liquidation under chapter 7 of the Bankruptcy Code would be significantly lower than distributions to be made to creditors under the Plan.

**D.    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with any specificity the value each Holder of an Unsecured Claim will receive as a percentage of its Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and projections contained in this Disclosure Statement imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**E.    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In view of the deemed rejection by Holders of Classes 4, 5 and 6, the Debtor will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. The Debtor further reserves the right to seek a "cramdown" confirmation of the Plan with respect to the Claims in Classes 3a, 3b and 3c in the event the Holders of such Claims vote to reject the Plan. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the Debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtor believes the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 4, 5 and 6. Such Classes include Claims or Interests that are subordinated to, or may be subject to subordination to, other Claims under section 510(b) or (c) of the Bankruptcy Code or section 726(a)(2)(C), (a)(3), (a)(4) or (a)(5) of the Bankruptcy Code as incorporated into section 1129(a)(7) of the Bankruptcy Code, or are otherwise not entitled to payment under the absolute priority rule until all other Creditors have been paid in full. Because all Holders of Claims and Interests in Classes 4, 5 and 6 are similarly treated, there is no unfair discrimination with respect to such Holders of Claims and Interests.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (i) that each holder of a claim included in the rejecting class receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the

067920.1001

allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtor believes that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Classes 4 and 6 and Holders of Interests in Class 5 in that no holders of junior claims or interests will receive Distributions under the Plan.

As to Classes 3a, 3b and 3c, and in the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtor will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes.

~~AB 7 asserts that it will not accept the Plan and, as a result, the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code. AB 7 asserts that Mr. Langberg's employment agreement violates the "absolute priority rule" embodied in section 1129(b) by permitting Mr. Langberg to acquire 100% of the New Common Stock before unsecured creditors are paid in full. As a result, AB 7 asserts that the Plan is not fair and equitable with respect to Class 3c (the AB 7 Claim).~~

## X.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Holders of Claims in Classes 3a, 3b and 3c the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) a sale of substantially all of the Debtor's assets; (b) formulation of an alternative plan or plans of reorganization; or (c) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.  Sale of Substantially All of the Debtor's Assets

In late July 2009, the Debtor in consultation with the Creditors Committee began a process to test the market for interest in a possible transaction that would result in the sale of substantially all or any other potential subset or combination of the Debtor's assets. This sale process included, without limitation, developing materials to provide to prospective purchasers, causing confidentiality agreements to be executed with interested parties, developing an electronic and/or physical data room, responding to inquiries from prospective purchasers, and all other steps necessary to fully explore the sale of substantially all (or a subset thereof) of the

97

Debtor's assets. The Creditors Committee provided input with regard to, and was kept apprised of, significant aspects of the sale process, subject to the confidentiality agreement previously executed by the Creditors Committee members and its professionals. PricewaterhouseCoopers was involved in all significant aspects of the sale process and the Creditors Committee had direct access to PwC's professionals involved in the sale process.

In connection with the sale process, marketing materials were provided to over 1,150 prospective parties in interest and approximately 16 parties signed confidentiality agreements.

As the sale process unfolded, it became apparent to the Debtor and the Creditors Committee that the process would not yield a result that was acceptable to the Debtor and Creditors Committee. As a result, the Debtor and Creditors Committee entered into substantive discussions and negotiations regarding a plan of reorganization, and the results of those negotiations are memorialized in the Plan. In short, the Plan Proponents already have determined that a sale of substantially all of the Debtor's assets is not a viable alternative to the Plan.

## B.      Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets.

The Debtor believes that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

## C.      Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtor's case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtor.

The Debtor believes that in a liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee would cause a substantial diminution in the value of the Debtor's estate. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets. More importantly, conversion to chapter 7 liquidation would likely result in the immediate cessation of the Debtor's business, as most chapter 7 trustees are unwilling or unable to continue operations.

98

The Debtor could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtor's assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtor's business incurs operating losses, the Debtor's efforts to liquidate its assets over a longer period of time theoretically could result in a lower net distribution to Creditors than they would receive through chapter 7 liquidation. Nevertheless, because there would be no need to appoint a chapter 7 trustee and to hire new professionals, chapter 11 liquidation might be less costly than chapter 7 liquidation and thus provide larger net distributions to Creditors than in chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain.

Although preferable to a chapter 7 liquidation, the Debtor believes that any alternative liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan. Most significantly, in a liquidation under chapter 11, the Debtor would lose the going concern value of its business.

## XI. THE SOLICITATION; VOTING PROCEDURES

### A. Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest and (b) the claim or interest is "impaired" by the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B. Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Classes 3a, 3b and 3c are entitled to vote to accept or reject the Plan. By operation of law, each unimpaired Class of Claims is deemed to have accepted the Plan and each impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1 and 2 are deemed to have accepted the Plan and Classes 4, 5 and 6 are deemed to have rejected the Plan;

99

and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

### C.      Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtor (in consultation with the Creditors Committee) in its sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtor (in consultation with the Creditors Committee) reserves the absolute right to contest the validity of any such withdrawal. The Debtor also reserves the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor (in consultation with the Creditors Committee) further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D.      Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by the Voting Agent in a timely manner at Autobacs Strauss Inc. Ballot Processing; c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017. The Debtor intends to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtor (in consultation with the Creditors Committee) expressly reserves the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

### E. Voting Objection Deadline

Pursuant to Bankruptcy Rule 3018(a), the deadline for the Debtor to file and serve any objections to Claims (each a "Voting Objection") to temporarily allow a Claim for purposes of voting on the Plan in a different class or different amount than is set forth in the Proof of Claim timely filed by the Claims Bar Date will be ~~May 28,~~July____, 2010 at 4:00 p.m. (Eastern) (the "Voting Objection Deadline"). Any party with a response to a Voting Objection may be heard at the Confirmation Hearing. Responses to any Voting Objection may be filed with the Court up to and including the Confirmation Hearing Date. If, and to the extent that, the Debtor and such party are unable to resolve the issues raised by the Voting Objection on or prior to the Confirmation Hearing Date, any such Voting Objection will be heard at the Confirmation Hearing.

### F. Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10017
TELEPHONE: (646) 282-2400

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor and the Creditors Committee believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor and the Creditors Committee urge all Holders of Claims in Classes 3a, 3b and 3c to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before 5:00 p.m. Eastern Time on the Voting Deadline.

Dated: ~~April~~ June 11, 2010

---

Glenn R. Langberg
Chief Executive Officer
AUTOBACS STRAUSS INC.
9A Brick Plant Road
South River, New Jersey 08882
Telephone: (732) 390-9000 (Ext. 5501)
Facsimile: (732) 651-3104

*Autobacs Strauss Inc.*

# APPENDIX A

# PLAN OF REORGANIZATION OF AUTOBACS STRAUSS INC.

# APPENDIX B

# PRO FORMA FINANCIAL PROJECTIONS

# APPENDIX C

# LIQUIDATION ANALYSIS

APPENDIX D

**<u>PROPOSED LANGBERG EMPLOYMENT AGREEMENT</u>**

# EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (this "Agreement") is entered into as of _____, 2010 (the "Effective Date") by and between Autobacs Strauss Inc., a Delaware corporation (the "Company"), and Glenn R. Langberg ("Executive"), and as limited on the signature page hereto, the ABS Liquidating Stock Trust, a Delaware trust (the "Stock Trust"). Capitalized terms used but not defined in.

## W I T N E S S E T H:

WHEREAS, this Agreement shall have the meanings given to such terms in is pursuant to the Amended Joint Plan of Reorganization Proposed by Autobacs Strauss Inc. and the Official Committee of Unsecured Creditors, dated April ___, 2010 (as amended, modified and supplemented from time to time, the "Plan").

W I T N E S S E T H: WHEREAS, Autobacs Strauss Inc. and The Official Committee of Unsecured Creditors have proposed and filed the dated March 25, 2010 (the "Plan");

WHEREAS, the Company is engaged in the retail automotive products business and automotive service business (the "Business");

WHEREAS, Executive is currently employed by the Company as Chief Executive Officer and Chief Financial Officer and has detailed knowledge of confidential and proprietary information of the Company;

WHEREAS, the Company desires to retain the services of Executive as of the Effective Date, and Executive desires to be employed by the Company as of the Effective Date, on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Company and Executive hereby agree as follows:

Section 1.    Duties and Scope of Employment.

(a)    Position and Duties of Employment.  As of the Effective Date and through the period of Executive's employment with the Company, Executive will serve as the Chief Executive Officer and Chief Financial Officer of the Company, except as provided below. Executive will assume and discharge such responsibilities as are commensurate with such position and as the Company's Board of Directors (the "Board") may direct from time to time.

(b)    Location of Employment.  Executive's location of employment shall be South River, New Jersey, or such other location as the parties may agree upon from time to time.

(c)    Term of Agreement and Employment.  The term of this Agreement shall commence on the Effective Date and continue for a period of two five (2 5) years and Executive's employment shall continue during such term of this Agreement, subject to the rights and corresponding obligations of the parties to shorten or extend the term of this Agreement and the

period of Executive's employment as provided below. The term of this Agreement and the period of Executive's employment shall be automatically extended for an additional one year period after the initial ~~two~~five-year period, or each one-year extension thereof, unless either party provides a minimum of ~~one~~sixty (~~1~~60) ~~months~~days written notice to the other that it intends to terminate Executive's employment at the end of the initial ~~two~~five-year period or one -year renewal period, as applicable. The period of Executive's employment under this Agreement is referred to herein as the "Employment Term."

(d) Obligations. During the Employment Term, Executive shall devote ~~his full~~as much time~~,~~ as necessary, along with his business efforts, skill, and attention to his duties and responsibilities and shall expend his best efforts to perform his duties faithfully, diligently, and competently. In addition, Executive shall comply with and be bound by the operating policies, procedures, and practices of the Company in effect from time to time during his employment, as well as all applicable federal, state, and local laws, regulations, or ordinances. Executive shall act in the best interest of the Company at all times. For the duration of the Employment Term, Executive agrees not to actively engage in any other employment, occupation, or consulting activity that would materially conflict with ~~Executive's services herewith for any direct or indirect remuneration (including membership on a board of directors)~~the Business without the prior written approval of the Board; provided, however, that Executive may, without the approval of the Board or based upon reliance of prior Board approval, (i) serve in any capacity with any civic, educational, ~~or~~ charitable, or non-profit organization, (ii) ~~advise and participate in, from time to time, for-profit organizations that are not primarily~~serve in any capacity with any for-profit company, provided such company is not engaged or involved in the Business ~~of the Company~~, and (iii) engage ~~certain~~employees of the Company to work on Executive's personal real estate matters for a de-minimus amount of time, provided such services do not interfere with Executive's obligations to the Company~~.~~

~~Section 2.   At-Will Employment.   Notwithstanding the Employment Term set forth in Section 1(c) above, Executive and the Company agree that Executive's employment with the Company may be terminated at any time, upon written notice to the other party, with or without good Cause (as defined below) or for any or no Cause, at the option either of the Company or Executive.   However, as described in this Agreement, Executive may be entitled to severance benefits depending upon the circumstances of Executive's termination of employment prior to the end of the term of this Agreement.~~

Section 2.   ~~Section 3.~~Compensation.[1]

(a) Base Salary. As of the Effective Date, the Company will pay Executive an annual salary of ~~$280,000~~Three Hundred Twenty-Five Thousand and 00/100 Dollars ($325,000.00) as compensation for Executive's services (the "Base Salary"). The Base Salary will be paid periodically in accordance with the Company's normal payroll practices (but no less frequently than once per month) and be subject to the usual~~,~~ required withholding. Executive's salary will be subject to annual review, and adjustments will be made based upon the Company's standard practices or the discretion of the Board~~.~~, but in no event shall the Base Salary be decreased.

---

[1] Terms not defined in this Agreement shall have the meaning ascribed to them in the Debtor's most recent Plan and Disclosure Statement.

(b)     Bonus ("Bonuses").

(i)     Milestone Bonus.  Executive shall earn a milestone bonus based on achievement of the following targeted objectives:  $100,000 upon the effective date of the confirmed Plan.

(ii)    EBITDA Bonus.  Executive shall earn EBITDA[2] bonus payments based on achievement of targeted goals and objectives, which are as follows, along with the corresponding bonus payment:

- $100,000 annually, beginning with calendar year 2011, if the EBITDA projection set forth in the most recent Disclosure Statement (the "EBITDA Projection") is achieved as of the end of that calendar year (the "Base Bonus");

- Plus an additional annual payment at the end of a calendar year of 15% of any EBITDA (after taking into account the Base Bonus) that exceeds the EBITDA Projection for that calendar year (the "Incremental Bonus"); and

(iii)   Payment.  The Base Bonus and Incremental Bonus shall (i) be earned when the applicable goal is achieved and then payable within 90 days after the Company's financial results are complete and such bonus calculations are approved by the Board; (ii) not include in the calculations thereof any of the Net AB 7 Litigation Proceeds; (iii) shall only be payable if the Creditor Trust has actually received all amounts due and owing to it for the applicable calendar year; and (iv) shall begin with calendar year 2011.  In order to receive the Base Bonus or the Incremental Bonus, Executive must be employed by the Company at the time each Bonus is due and payable as described in this paragraph, except as provided in Section 5 (b-c).

(iv)    (b) Bonus.  Executive will be eligible to earn an annual bonus based on achievement of objective or subjective targeted goals and objectives, which shall be determined by the Board in its sole and absolute discretion Annual Bonus.  The Board shall have discretion to pay an additional discretionary bonus, on an annual basis, to Executive.  The bonus for a fiscal year will be paid after the Company's books for that the applicable year have been closed and will be paid only if Executive is employed by the Company at the time of payment.  The determinations of the Board with respect to Executive's bonus these annual bonuses, including whether Executive is to receive a an annual bonus, will be final and binding.  Use of the term "Board" in this Agreement shall

_____

[2] "EBITDA" is defined as the Company's operating profit before deducting interest, tax, depreciation, and amortization and also before: (1) reorganization expenses due to bankruptcy; (ii) gain on discharge of prepetition obligations and fresh-start adjustments; (iii) restructuring expenses; (iv) conversion costs; (v) any gain or loss on investments; (vi) out of the ordinary course of business asset write offs (including those related to inventory owned prior to the Effective Date); (vii) other income (expense) not related to business operations; and (viii) extraordinary items (as defined by GAAP).  Notwithstanding anything to the contrary herein, the Net AB 7 Litigation Proceeds shall not be part of the EBITDA calculation.

~~refer to the Board of Directors of the Reorganized Debtor, which shall exclude the Executive in matters pertaining to the Executive.~~

~~(c)    Stock Option.   Subject to Section 6(a) below, upon the timely payment in full of the 45% Creditor Note ("Satisfaction"), Executive shall have the option to purchase from the Stock Trust 100% of the New Common Stock of the Company for $300,000 (the "Stock Option Purchase Price") for one hundred twenty (120) days from the Satisfaction date on which all amounts due to the Creditor Trust under the 45% Creditor Note are timely paid in full (the "Stock Option").   To complete the exercise and purchase of the New Common Stock under the Stock Option, Executive must deliver written notice of such exercise together with a certified check in the amount of the Stock Option Purchase Price to the Stock Trust within such 120-day period.~~

Section 3.    ~~Section 4. Employee~~Executive Benefits.

(a)    Benefit Plans.   During the Employment Term, Executive will be eligible to participate in accordance with the terms of all_of the Company employee benefit plans, policies, and arrangements that are applicable to other senior executives of the Company, as such plans, policies, and arrangements may exist from time to time.   A summary of Executive's employee benefit plans, policies, and arrangements as of the Effective Date is set forth on Schedule A.   The Company shall establish and provide reasonable supplemental executive benefits to Executive as set forth on Schedule B.   All benefits Executive is eligible for or that are provided for herein are collectively referred to as "Benefits."

(b)    Vacation.   Executive shall be eligible to accrue twenty-eight (28) days of paid vacation during each year of employment.   Vacation will be earned on a pro-rata basis each month.   Executive will continue to accrue vacation until such time as he has accrued fifty-six (56) days of vacation.   Once Executive reaches the accrual maximum, no additional vacation will be earned until such time as Executive uses some vacation to bring the vacation accrual below the permitted maximum.   Executive agrees that he will not take vacation at times that would be detrimental to the interests of_the Company.

(c)    Monthly Car Allowance.   Executive shall be entitled to a monthly car allowance consistent with current company practices.

Section 4.    ~~Section 5.~~ Business Expenses.   The Company will reimburse Executive for reasonable~~,~~ out-of-pocket expenses actually incurred by Executive in the furtherance of the performance of Executive's duties hereunder, including, but not limited to, Executive's reasonable attorneys' fees (up to a maximum of $100,000) incurred in connection with the Company's chapter 11 case.   To obtain reimbursement, expenses must be submitted promptly with appropriate supporting documentation in accordance with the Company's expense reimbursement policy as in effect from time to time.

Section 5.    ~~Section 6.~~ Termination and Severance.

(a)    This Agreement and Executive's employment may be terminated only under any of the following circumstances:

(i)     At the end of the Employment Term in accordance with the provisions of paragraphs 1(c) above.

(ii)     By Executive:

(1)     in the event the Company is in material breach of this Agreement, provided Executive must first deliver to the Company written notice of such breach, and the termination shall become effective upon the Company's failure to cure the breach within thirty (30) days of receipt of such notice;

(2)     for Good Reason;

(3)     if there is a Change of Control; or

(4)     without cause, upon not less than three (3) months' written notice to the Company by Executive.

(iii)     By the Company.

(1)     if there is a Change of Control; or

(2)     with Cause, provided the Company must first deliver to Executive written notice of such alleged Cause and the termination shall become effective upon the Executive's failure to cure the alleged Cause within thirty (30) days of receipt of such notice.

(iv)     Automatically in the event of death of Executive.

(v)     If, as a result of the incapacity of Executive due to mental or physical illness, Executive is unable to perform substantially and continuously the duties assigned to him hereunder for a period of more than three (3) consecutive months or for more than a nonconsecutive period of six (6) months during the Employment Term, the Company may terminate his employment for "Disability" upon sixty (60) days' prior written notice to Executive.

(b)     In the event of termination by Executive under subparagraphs (a)(ii)(1), (a)(ii)(2), (a)(ii)(3), or by the Company under subparagraphs (a)(iii)(1) above, Executive shall terminate all duties and responsibilities, but shall be paid all compensation earned through the effective date of termination, including Base Salary, accrued vacation and all other Benefits, including Bonuses, such as any Base Bonus or Incremental Bonus if the applicable goal was achieved prior to the termination date, and Employee shall continue to be paid, in substantially equal bi-weekly installments, his Base Salary commencing on the next payroll date immediately following Executive's termination of employment through one and a half (1.5) years from the effective date of termination. At the conclusion of the severance period, Executive shall maintain his rights under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Further, the Executive shall be entitled to carry over twenty-eight (28) days of vacation earned pursuant to subparagraph

3(b) and the Monthly Car Allowance described in subparagraph 3(c) shall cease as of the effective date of termination.

(c)     In the event of termination by the Company under subparagraphs (a)(i), (a)(iii)(2), or (a)(iv), the Company shall have no financial obligation to Executive or his estate except to pay him all compensation earned through the effective date of termination, including Base Salary, accrued vacation, other Benefits, and any Base Bonus or Incremental Bonus if the applicable goal was achieved prior to the termination date. .

(d)     In the event of termination by reason of Disability of Executive under subparagraph (a)(v), Executive will be entitled to receive through the notice period all compensation earned, including Base Salary, accrued vacation, and other Benefits, including Bonuses, and the Company shall pay in a lump sum Executive six (6) months of Base Salary at the then-current Base Salary rate; provided; however, if Executive qualifies for long-term disability under the Company's then applicable long-term disability plans, policies, and arrangements, then the Company shall be entitled to a credit for any amounts paid to Executive through such plan, policy, or arrangement.

(e)     ~~(a)   Termination of Employment.   Upon the termination of Executive's employment with the Company for any reason, (i) other than as set forth under Sections 6(b) and (c) below, Executive will be entitled to payment of all accrued but unpaid vacation, expense reimbursements, and other benefits due to Executive through Executive's termination date under any Company-provided or paid plans, policies, and arrangements; and (ii) the Stock Option shall automatically terminate, except as expressly provided in the immediately following sentence. All other Company and Stock Trust obligations to Executive pursuant to this Agreement will automatically terminate as of the termination date except if the Stock Option exercise period has been triggered prior to the termination date Executive shall still have the right to exercise the Stock Option and complete the purchase of the New Common Stock within such 120 day period.~~ Executive agrees to resign from all positions that Executive holds with the Company, immediately following the termination of Executive's employment if ~~the~~ the Company so requests.

(b)     ~~Termination Prior to Expiration of Term of Agreement and Prior to a Change in Control.   If the Company terminates Executive's employment prior to the expiration of the Employment Term of this Agreement for any reason other than Cause (as defined below) or if Executive resigns for Good Reason (as defined below) then the Company or the successor will (i) continue to pay Executive's Base Salary at the rate in effect at the time of Executive's resignation or termination of employment for a period of twelve (12) months from the date of Executive's resignation or termination of employment (or, if less the remaining period of the term of this Agreement including any extension elected by the parties but not less than six (6) months), less any applicable state and federal required withholding amounts and other lawful deductions, and (ii) if Executive elects to continue health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for himself and his covered dependents under the Company's group health plans following such termination or resignation of employment, pay, to the extent permitted, the monthly premium until the earliest of (A) the close of the twelve (12) month period following the termination of Executive's employment, (B) the expiration of the continuation coverage under COBRA, or (C) the date when Executive becomes eligible for~~

substantially equivalent health insurance coverage in connection with new employment or self-employment.

(e) Termination Prior to Expiration of Term of Agreement and Following a Change in Control. If the Company or a successor terminates Executive's employment prior to the expiration of the Employment Term of this Agreement for any reason other than Cause or if Executive resigns for Good Reason within one month prior to execution of an agreement for a Change of Control (as defined below) which closes and at any time following a Change in Control, then the Company or the successor will (i) pay Executive a cash lump sum payment in an amount equal to one and one-half (1.5) times the sum of Executive's annual Base Salary at the rates in effect at the time of Executive's resignation or termination of employment, less any applicable state and federal required withholding amounts and other lawful deductions, and (ii) if Executive elects to continue health insurance coverage under COBRA for himself and his covered dependents under the Company's group health plans following such termination or resignation of employment, pay the same portion of the monthly premium under COBRA as it pays for active executive employees or, if greater, the amount which the Company paid to the Executive prior to the termination, until the earliest of (A) the close of the twelve (12) month period following the termination of Executive's employment, (B) the expiration of the continuation coverage under COBRA, or (C) the date when Executive becomes eligible for substantially equivalent health insurance coverage in connection with new employment or self-employment.

(f) (d) Conditions on the Payment of Severance. All wages and benefits set forth in Sections 6 5(b) and 6 (e d) are collectively referred to as "Severance." Severance will only be paid to Executive if, and provided, Executive complies with all surviving provisions of this Agreement and executes a confidential severance agreement and general release of all claims in a form provided by the Company.

(g) (e) Definitions.

(i) For purposes of this Agreement, "Cause" means any of the following: (i) Executive's intentional violation of any applicable law or regulation respecting the business of the Company that is materially injurious to the Company; (ii) Executive's commission of a felony or commission of a crime involving moral turpitude; (iii) Executive's conduct involving willful misconduct, dishonesty with respect to the business of the Company, or fraud, embezzlement, or misappropriation against the Company, each of which must be materially injurious to the Company; (iv) Executive's deliberate violation of the rules or policies of the Company that is materially injurious to the Company; (v) Executive's refusal to perform, or substantial disregard of, duties properly assigned to Executive by the Company, that is materially injurious to the Company; (vi) Executive's breach of the duty of loyalty to the Company or any of its affiliates, that is materially injurious to the Company; (vii) Executive's breach of the terms of any agreement between Executive and the Company, that is materially injurious to the Company; (viii) the intentional and unauthorized disclosure by the Executive of any trade secrets or confidential information of the Company that is materially injurious to the

Company; or (ix) Executive's breach of a fiduciary duty that is materially injurious to the Company.

(ii)    For purposes of this section, "Cause" shall be deemed to exist if the Board, by a majority vote of at least two-thirds (2/3) of the entire Board, makes a decision in good faith that causeCause exists, after an investigation reasonable in the circumstances. Prior to the Board making a determination whether or not "Cause" exists, Executive shall be entitled to make a presentation, either in person, in writing, or through counsel, to the Board, and to provide any information that Executive wishes the Board to consider in making its determination. Executive shall have a period of at least fiveseven (7) business days in order to prepare and make such a presentation. The Board may, at its election, relieve Executive of his duties during the fiveseven-day period, but Executive's salaryBase Salary and employee benefitsBenefits shall continue during that period.

(iii)    For purposes of this Agreement, "Good Reason" means (1) without Executive's prior written consent, provided that Executive provides the Company is given a period of fifteen (15) calendar days to rescind an unintentional action or omission, (i) a material reduction in, or failure to pay, Executive's annual base salaryBase Salary or bonusBonuses as then in effect; (ii) a reduction in the employee benefitsBenefits provided to Executive except if part of a reduction that is provided to all employees of the Company; (iii) if Executive's title, operating responsibilities, reporting obligations and authority are diminished in a material way, (iv; (iv) Executive is removed as a full voting member of the Board; (v) the relocation of Executive's principal place of employment to a location that is more than twenty (20) miles further from his current residence; or (vvi) the refusal of a successor or acquiring company to assume the obligations of the Company under the employment agreementthis Agreement.

(iv)    For purposes of this Agreement, "Change in Control" means either: (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger (including, but not limited to, a reverse triangular merger) or consolidation, or stock transfer, but excluding any such transaction effected primarily for the purpose of changing the domicile of the Company), unless the Company's stockholders of record immediately prior to such transaction or series of related transactions hold, immediately after such transaction or series of related transactions, at least 50% of the voting power of the surviving or acquiring entity (provided that the sale by the Company of its securities in a bona fide financing transaction shall not constitute a Change of Control hereunder); or (ii) a sale or lease of all or substantially all of the assets of the Company.

(f)    Termination due to Death or Disability. If, as a result of the incapacity of Executive due to mental or physical illness, Executive is unable to perform substantially and continuously the duties assigned to him hereunder for a period of three (3) consecutive months or for a non-consecutive period of six (6) months during the Employment Term, the Company may terminate his employment for "Disability" upon thirty (30) days prior written notice to Executive. If Executive's employment terminates by reason of death or Disability, or Executive otherwise qualifies for long-term disability under the Company's then applicable long-term disability plans, policies, and arrangements, then Executive will be entitled to receive all compensation earned,

~~including accrued vacation and other benefits only in accordance with the Company's then applicable plans, policies, and arrangements. Thereafter, the Company shall have no further obligation to Employee under this Agreement.~~

(h)    ~~(g)~~ Golden Parachute Excise Tax. If the benefits provided for in this Agreement (or under any other arrangement between the Company and Executive) payable to Executive constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), and ~~but~~ for this Section ~~7~~5(~~i~~h) would be subject to the excise tax imposed by Section 4999 of the Code, then, at the discretion of Executive, Executive's severance benefits hereunder will be (i) delivered in full, or (ii) delivered ~~as~~to such lesser extent ~~which~~has would result in no portion of such severance benefits being subject to the excise tax under ~~section~~Section 4999 of the Code. If Executive elects to have his parachute payments reduced to avoid the application of ~~sections~~Sections 280G and 4999 of the Code, Executive shall determine which components of the parachute payments shall be reduced. Unless the Company and Executive otherwise agree in writing, any determination required under this Section ~~7~~5(~~i~~h) will be made in writing in good faith by the accounting firm serving as the Company's independent public accountants immediately prior to the Change in Control (the "Accountants"). For purposes of making the calculations required by this Section ~~7(i).~~5, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Executive shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this section.

Section 6.    ~~Section 7.~~ Indemnification and Insurance. Executive will be covered under the Company's insurance policies and, subject to applicable law, will be provided indemnification to the maximum extent permitted by the Company's bylaws, Certificate of Incorporation, and standard form of Indemnification Agreement, with such insurance coverage and indemnification to be in accordance with the Company's standard practices for senior executive officers and directors but on terms no less favorable than provided to any other Company senior executive officer or director, now or hereafter.

Section 7.    ~~Section 8.~~ ~~Non-Competition~~Noncompetition, No Interference, and Nonsolicitation.

(a)    Non-Competition. In exchange for the confidential information and other consideration described herein, Executive agrees that for the period ending ~~on~~ (1) year after Executive's last day of employment with the Company (the "~~Non-competition~~Noncompetition Period"), Executive shall not, ~~anywhere in the world~~in any state in the United States that the Company operates its Business, directly or indirectly, without the express prior written consent of the Company, engage in any business or activity, whether as an employee, consultant, partner, principal, agent, representative, equity holder, or in any other individual, corporate, or representative capacity (without limitation by specific enumeration of the foregoing), or render any services or provide any advice to any business, activity, or ~~Person~~person involving, to any significant extent, competitive activities of the Business, if Executive knows or reasonably should know that such business, activity, or ~~Person~~person engages, to any significant extent, in competitive activities with the Business. Notwithstanding the foregoing, Executive may own,

directly or indirectly, up to one percent (1%) of any class of "publicly- traded securities" of any Person ~~which~~that owns or operates a business involving the Business. For the purposes of this Section ~~8~~7(a), "publicly- traded securities" shall mean securities that are traded on a national securities exchange of the United States or any European Union member country.

~~(b) No Interference with the Business; Nonsolicitation. Executive agrees that during the Non-competition Period, at any time or for any reason, Executive shall not, directly or indirectly:~~

(b)     ~~(i)~~ No Interference with the Business; Nonsolicitation. Executive agrees that during the Noncompetition Period, at any time or for any reason, Executive shall not, directly or indirectly, with respect to the Business, solicit or divert any business or clients or customers, made known to Executive during his employment by the Company, away from the Company and its affiliates~~;~~

~~(ii)     induce customers, clients, suppliers, agents or other Persons under contract or otherwise associated or doing business with the Company and its affiliates, made known to Executive during his employment by the Company, to reduce or alter any such association or business with the Company and its affiliates; and~~

~~(iii)     knowingly solicit any Person in the employment of the Company and its affiliates to (a) terminate such employment, and/or (b) accept employment, or enter into any consulting arrangement, with any Person other than the Company and its affiliates.~~

Section 8.     ~~Section 9.~~ Confidential Information.

(a)     Company Information. Executive will be provided with and have access to confidential information of the Company by and through his position at the Company. Executive will not, at any time, whether during or subsequent to Executive's employment hereunder, directly or indirectly, disclose or furnish to any other person, firm, or corporation, or use on behalf of himself/herself or any other person, firm, or corporation, any confidential or proprietary information acquired by Executive in the course of Executive's employment with the Company, including, without limiting the generality of the foregoing, contractual details relating to current Company clients, buying habits of present and prospective customers of the Company, pricing and sales policy, techniques and concepts, the names of customers or prospective customers of the Company or of any person, firm or corporation who or which have or shall have treated or dealt with the Company or any of its subsidiaries or affiliated companies, any other information acquired by Executive regarding the methods of conducting the business of the Company and any of its subsidiaries and/or affiliates, any information regarding the ~~company~~Company's methods of obtaining business, of providing or advertising products or services, or of obtaining customers, trade secrets, and other confidential information concerning the business operations of the Company or any company and/or entity affiliated with the Company, except to the extent that such information is already generally known in the public domain or Executive was aware of such information prior to working for the Company through other business dealings.

(b)     Third -Party Information. Executive recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information

subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Executive agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm, or corporation or to use it except as necessary in carrying out work for the Company consistent with the Company's agreement with such third party.

(c)    Return of Company Documents. Executive agrees that, at the time of leaving the employ of the Company, Executive will deliver to the Company (and will not keep in ~~my~~his possession, recreate, or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, materials, equipment, other documents, or property, or reproductions of any aforementioned items used by Executive pursuant to Executive's employment with the Company or otherwise belonging to the Company, its successors, or assigns.

Section 9.    ~~Section 10.~~ Remedies and Arbitration.

(a)    Remedies. The parties to this Agreement agree that (i) if Executive materially breaches ~~Section~~Sections 7 or 8 of this Agreement, the damage to the Company may be substantial, although difficult to ascertain, and money damages will not afford the Company an adequate remedy, and (ii) if Executive is in material breach of any provision of this Agreement, or threatens a breach of ~~Section~~Sections 7 or 8 of this Agreement, the Company shall be entitled, in addition to all other rights and remedies as may be provided by law, to seek specific performance and injunctive and other equitable relief to prevent or restrain a breach of any provision of this Agreement, notwithstanding Sections ~~10(b) - (f)~~9 of this Agreement.

~~(b)    Agreement to Arbitrate. To the fullest extent permitted by law, Executive and the Company agree to arbitrate any controversy, claim or dispute between them arising out of or in any way related to this Agreement, the employment relationship between the Company and Executive and any disputes upon termination of employment, including but not limited to breach of contract, tort, discrimination, harassment, wrongful termination, demotion, discipline, failure to accommodate, family and medical leave, compensation or benefits claims, intellectual property claims, constitutional claims; and any claims for violation of any local, state or federal law, statute, regulation or ordinance or common law. For the purpose of this agreement to arbitrate, references to the "Company" include all parent, subsidiary or related entities and their employees, supervisors, officers, directors, agents, pension or benefit plans, pension or benefit plan sponsors, fiduciaries, administrators, affiliates and all successors and assigns of any of them, and this Agreement shall apply to them to the extent Executive's claims arise out of or relate to their actions on behalf of Company. By executing this Agreement, Executive and the Company are both waiving the right to a jury trial with respect to any such disputes.~~

~~(c)    Initiation of Arbitration. Either party may exercise the right to arbitrate by providing the other party with written notice of any and all claims forming the basis of such right in sufficient detail to inform the other party of the substance of such claims. In no event shall the request for arbitration be made after the date when institution of legal or equitable proceedings based on such claims would be barred by the applicable statute of limitations.~~

~~(d)     Arbitration Procedure.  The arbitration will be conducted in New Jersey by a single neutral arbitrator and in accordance with the then current rules for resolution of employment disputes of the American Arbitration Association ("AAA") (available on-line at www.adr.org) or JAMS (available on-line at www.jamsadr.com).  The parties are entitled to representation by an attorney or other representative of their choosing.  The arbitrator shall have the power to enter any award that could be entered by a judge of the trial court of the State of New Jersey, and only such power, and shall follow the law.  The parties agree to abide by and perform any award rendered by the arbitrator, and any award made by such arbitrator shall be final, binding and conclusive on the parties for all purposes.  The arbitrator shall issue the award in writing and therein state the essential findings and conclusions on which the award is based. Judgment on the award may be entered in any court having jurisdiction thereof.~~

~~(e)     Costs of Arbitration.  Each party shall bear its own costs (including attorneys' fees) of any such arbitration proceedings.  For the avoidance of doubt, Executive will not be responsible for the Company's attorneys' fees and the Company will not be responsible for Executive's attorneys' fees, and the arbitrator may not award attorneys' fees unless a statute or contract at issue specifically authorizes such an award.~~

(b)     ~~(f)~~ Waiver of Jury Trial.  Each of the Company and Executive hereby expressly waives its or his respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement or any transaction contemplated by this Agreement or any other dealings between them relating to the subject matter of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that ~~related~~relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims.  Each of the Company and Executive further warrants and represents that each has reviewed this waiver with its legal counsel~~;~~ and that each voluntarily waives its jury trial rights following consultation with legal counsel.  This waiver is irrevocable and may only be modified in amendments, renewals, supplements, or modifications to this Agreement~~,~~ and any other transaction documents.  In the event of litigation, this Agreement may be filed as a written consent to trial (without a jury) by the court.

(c)     ~~(g)~~Acknowledgment.  EXECUTIVE HAS READ AND UNDERSTANDS THIS SECTION ~~10.~~9.  WHICH DISCUSSES REMEDIES, ~~ARBITRATION,~~ CONFLICT RESOLUTION, AND WAIVER OF JURY TRIAL.  EXECUTIVE UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, ~~HE AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF TO ARBITRATION, AND~~ THAT THIS CLAUSE CONSTITUTES A WAIVER OF HIS RIGHT TO A JURY TRIAL.

Section 10.     ~~Section 11.~~ Independent Review and Advice.  Executive represents and warrants that he has carefully read this Agreement; that he executes this Agreement with full knowledge of the contents of this Agreement, the legal consequences thereof, and any and all rights ~~which~~that each party may have with respect to one another; that he has had the opportunity to receive independent legal advice with respect to the matters set forth in this Agreement and with respect to the rights and asserted rights arising out of such

matters,; and that he is entering into this Agreement of his own free will. Executive expressly agrees that there are no exceptions contrary to the Agreement, and no usage of trade or regular practice in the industry shall be used to modify the Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in interpreting this Agreement. The parties agree that this Agreement shall not be construed for or against either party in any interpretation thereof.

**Section 11.**   Code Section 409A.

(i)    This Agreement is intended to meet the requirements of Section 409A of the Code, and shall be interpreted and construed consistently with that intent.

(ii)   Notwithstanding any other provision of this Agreement, to the extent that the right to any payment (including the provision of benefits) hereunder provides for the "deferral of compensation" within the meaning of Section 409A(d)(1) of the Code, the payment shall be paid (or provided) in accordance with the following:

(1)    If the Executive is a "Specified Employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code on the date of the Executive's Separation from Service (the "Separation Date"), then no such payment shall be made or commence during the period beginning on the Separation Date and ending on the date that is six months following the Separation Date or, if earlier, on the date of the Executive's death. The amount of any payment that would otherwise be paid to the Executive during this period shall instead be paid to the Executive on the first day of the first calendar month following the end of the period.

(2)    Payments with respect to reimbursements of expenses or benefits or provision of fringe or other in-kind benefits shall be made on or before the last day of the calendar year following the calendar year in which the relevant expense or benefit is incurred. The amount of expenses or benefits eligible for reimbursement, payment or provision during a calendar year shall not affect the expenses or benefits eligible for reimbursement, payment or provisions in any other calendar year.

Section 12.   Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such party may be entitled at law or in equity.

Section 13.   Assignment. This Agreement will be binding upon and inure to the benefit of (a) the heirs, executors, and legal representatives of Executive upon Executive's death and (b) any successor of the Company. Any such successor of the Company will be deemed substituted for the Company under the terms of this Agreement for all purposes. For this

purpose, "successor" means any person, firm, corporation, or other business entity ~~which~~that at any time, whether by purchase, merger, or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Company. None of the rights of Executive to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance, or other disposition of Executive's right to compensation or other benefits will be null and void.

Section 14. Notices. All notices, requests, demands, and other communications called for hereunder will be in writing and will be deemed given (a) on the date of delivery if delivered personally, (b) one day after being sent by a well -established commercial overnight service, or (c) four days after being mailed by registered or certified mail, return receipt requested, prepaid and addressed to the parties or their successors at the following addresses, or at such other addresses as the parties may later designate in writing:

If to the Company:

Autobacs Strauss Inc.
c/o R&S Parts and Service, Inc.
9A Brick Plant Road
South River, New Jersey 08882
Attention: _____
Tel: 732.390.9000

If to Executive:

Glenn R. Langberg
50 Farley Road
Short Hills, New Jersey 07078
Tel. 973-921-1028
Fax 973-921-1029

or at the last residential address known by the Company as provided by Executive in writing.

Section 15. Severability. If any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, this Agreement will continue in full force and effect without said provision.

Section 16. Integration. This Agreement represents the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements, whether written or oral. No waiver, alteration, or modification of any of the provisions of this Agreement will be binding unless in a writing that specifically references this Section and is signed by duly authorized representatives of the parties hereto.

Section 17.    Waiver of Breach.  The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

Section 18.    Headings.  All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

Section 19.    Tax Withholding.  All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

Section 20.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of ~~New Jersey~~Delaware (without giving effect to the choice of law principles thereof). Executive and the Company hereby irrevocably and unconditionally: (i) submits for himself or itself, as applicable, and his or its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of Delaware; (ii) consents that any such action or proceeding shall be brought in such  courts, and waives any objection that it or he may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same; and (iii) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, at their address listed in Section 14 above.

Section 21.    Survival of Operative Sections.  Upon any termination of Executive's employment, the provisions of Sections 5, 6, 7, 8, ~~9~~and ~~10~~9 of this Agreement shall survive to the extent necessary to give effect to the provisions thereof.

Section 22.    Acknowledgment.  Executive acknowledges that Executive has had the opportunity to discuss this matter with and obtain advice from Executive's private attorney, has had sufficient time to~~,~~ read and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

Section 23.    Counterparts.  This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*[Signature page follows.]*

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by a duly authorized officer, as of the day and year written below.

THE COMPANY:

AUTOBACS STRAUSS INC.


By:_____
   Name:
   Title:


EXECUTIVE:


_____
Glenn Langberg


~~STOCK TRUST:~~
~~ABS LIQUIDATING STOCK TRUST,~~
~~a Delaware Trust~~


~~By:_____~~
~~   Name:~~
~~   Title: Trustee~~
~~(Only for the purpose of agreeing to the Stock Option)~~

## SUMMARY OF EXECUTIVE'S

## EMPLOYEE BENEFIT PLANS, POLICIES, AND ARRANGEMENTS

DB02:9414423.3YCST01:9781540.2                                    067920.1001

## SUPPLEMENTAL EXECUTIVE BENEFITS

**Life & ADD**     3x's salary (Max $~~840~~975K)
$1M Additional Policy approx $2-3K/ yr

**LTD**     60% of Salary (Max ~~14~~16.5K per Month)

APPENDIX E

**PROPOSED CATALANO EMPLOYMENT AGREEMENT**

# Blacklined

## Executive Employment Agreement

This Executive Employment Agreement (this "Agreement") is entered into as of _____, 2010 (the "Effective Date") by and between Autobacs Strauss Inc., a Delaware corporation (the "Company"), and Joseph Catalano ("Executive").

### WITNESSETH:

WHEREAS, Autobacs Strauss Inc. and The Official Committee of Unsecured Creditors have proposed and filed a joint plan of reorganization with respect to the Company (the "Plan");

WHEREAS, the Company is engaged in the retail automotive products business and automotive service business (the "Business").

WHEREAS, Executive is currently employed by the Company as President and Chief Operating Officer and has detailed knowledge of confidential and proprietary information of the Company.

WHEREAS, the Company desires to retain the services of Executive as of the Effective Date, and Executive desires to be employed by the Company as of the Effective Date, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Company and Executive hereby agree as follows:

Section 1.    Duties and Scope of Employment.

(a)    Position and Duties of Employment.  As of the Effective Date and through the period of Executive's employment with the Company, Executive will serve as the President and Chief Operating Officer of the Company, and shall report directly to the Chief Executive Officer of the Company, except as provided below.  Executive will assume and discharge such responsibilities as are commensurate with such position and as the Company's Board of Directors (the "Board") may direct from time to time.

(b)    Location of Employment.  Executive's location of employment shall be South River, New Jersey, or such other location as the parties may agree upon from time to time.

(c)    Term of Agreement and Employment.  The term of this Agreement shall commence on the Effective Date and continue for a period of two (2) years and Executive's employment shall continue during such term of this Agreement, subject to the rights of the parties to shorten or extend the term of this Agreement and the period of Executive's employment as provided below.  The term of this Agreement and the period of Executive's employment shall be automatically extended for an additional one year period after the initial two-year period or each one-year extension thereof, unless either party provides a minimum of one (1) month written notice to the other that it intends to terminate Executive's employment at the end of the initial two-year period or

one year renewal period, as applicable. The period of Executive's employment under this Agreement is referred to herein as the "Employment Term."

(d)     Obligations. During the Employment Term, Executive shall devote his full time, business efforts, skill and attention to his duties and responsibilities and shall expend his best efforts to perform his duties faithfully, diligently and competently. In addition, Executive shall comply with and be bound by the operating policies, procedures and practices of Company in effect from time to time during his employment, as well as all applicable federal, state and local laws, regulations or ordinances. Executive shall act in the best interest of Company at all times. For the duration of the Employment Term, Executive agrees not to actively engage in any other employment, occupation, or consulting activity that would materially conflict with Executive's services herewith for any direct or indirect remuneration (including membership on a board of directors) without the prior written approval of the Board; provided, however, that Executive may, without the approval of the Board or based upon reliance of prior Board approval, (i) serve in any capacity with any civic, educational, or charitable organization, or (ii) advise and participate in, from time to time, for-profit organizations that are not primarily engaged in the Business of the Company, provided such services do not interfere with Executive's obligations to Company.

Section 2.     At-Will Employment. Notwithstanding the Employment Term set forth in Section 1(c) above, Executive and the Company agree that Executive's employment with the Company may be terminated at any time, upon written notice to the other party, with or without good Cause (as defined below) or for any or no Cause, at the option either of the Company or Executive. However, as described in this Agreement, Executive may be entitled to severance benefits depending upon the circumstances of Executive's termination of employment prior to the end of the term of this Agreement.

Section 3.     Compensation.

(a)     Base Salary. As of the Effective Date, the Company will pay Executive an annual salary of $~~250,000~~265,000 as compensation for Executive's services (the "Base Salary"). The Base Salary will be paid periodically in accordance with the Company's normal payroll practices (but no less frequently than once per month) and be subject to the usual, required withholding. Executive's salary will be subject to annual review, and adjustments will be made based upon the Company's standard practices or the discretion of the Board.

(b)     Bonus. Executive will be eligible to earn an annual bonus based on achievement of objective or subjective targeted goals and objectives, which shall be determined by the Board in its sole and absolute discretion. The Board shall have discretion to pay an additional discretionary bonus to Executive. The bonus for a fiscal year will be paid after the Company's books for that year have been closed and will be paid only if Executive is employed by the Company at the time of payment. The determinations of the Board with respect to Executive's bonus, including whether Executive is to receive a bonus, will be final and binding.

Section 4.     Employee Benefits.

(a)     Benefit Plans. During the Employment Term, Executive will be eligible to participate in accordance with the terms of all Company employee benefit plans, policies, and

2

arrangements that are applicable to other senior executives of the Company, as such plans, policies, and arrangements may exist from time to time. A summary of Executive's employee benefit plans, policies, and arrangements as of the Effective Date is set forth on Schedule A. The Company shall establish and provide reasonable supplemental executive benefits to Executive as set forth on Schedule B.

(b) Vacation. Executive shall be eligible to accrue twenty-eight (28) days of paid vacation during each year of employment. Vacation will be earned on a pro-rata basis each month. Executive will continue to accrue vacation until such time as he has accrued fifty-six (56) days of vacation. Once Executive reaches the accrual maximum, no additional vacation will be earned until such time as Executive uses some vacation to bring the vacation accrual below the permitted maximum. Executive agrees that he will not take vacation at times that would be detrimental to the interests of Company.

(c) Monthly Car Allowance. Executive shall be entitled to use of a vehicle provided by the Company consistent with current company practices.

Section 5. Business Expenses. The Company will reimburse Executive for reasonable, out-of-pocket expenses actually incurred by Executive in the furtherance of the performance of Executive's duties hereunder. To obtain reimbursement, expenses must be submitted promptly with appropriate supporting documentation in accordance with the Company's expense reimbursement policy as in effect from time to time.

Section 6. Termination and Severance.

(a) Termination of Employment. Upon the termination of Executive's employment with the Company for any reason, other than as set forth under Sections 6(b) and (c) below, Executive will be entitled to payment of all accrued but unpaid vacation, expense reimbursements, and other benefits due to Executive through Executive's termination date under any Company-provided or paid plans, policies, and arrangements. All other Company obligations to Executive pursuant to this Agreement will automatically terminate as of the termination date. Executive agrees to resign from all positions that Executive holds with the Company immediately following the termination of Executive's employment if Company so requests.

(b) Termination Prior to Expiration of Term of Agreement and Prior to a Change in Control. If the Company terminates Executive's employment prior to the expiration of the Employment Term of this Agreement for any reason other than Cause (as defined below) or if Executive resigns for Good Reason (as defined below) then the Company or the successor will (i) continue to pay Executive's Base Salary at the rate in effect at the time of Executive's resignation or termination of employment for a period of twelve (12) months from the date of Executive's resignation or termination of employment (or, if less the remaining period of the term of this Agreement including any extension elected by the parties but not less than six (6) months), less any applicable state and federal required withholding amounts and other lawful deductions, and (ii) if Executive elects to continue health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for himself and his covered dependents under the Company's group health plans following such termination or resignation of employment, pay, to the extent permitted, the monthly premium until the earliest of (A) the close of the twelve (12) month period following the

DB02:9410590.3 YCST01:9410590.4

termination of Executive's employment, (B) the expiration of the continuation coverage under COBRA, or (C) the date when Executive becomes eligible for substantially equivalent health insurance coverage in connection with new employment or self-employment.

(c)     Termination Prior to Expiration of Term of Agreement and Following a Change in Control. If the Company or a successor terminates Executive's employment prior to the expiration of the Employment Term of this Agreement for any reason other than Cause or if Executive resigns for Good Reason within one month prior to execution of an agreement for a Change of Control (as defined below) which closes and at any time following a Change in Control, then the Company or the successor will (i) pay Executive a cash lump sum payment in an amount equal to one and one-half (1.5) times the sum of Executive's annual Base Salary at the rates in effect at the time of Executive's resignation or termination of employment, less any applicable state and federal required withholding amounts and other lawful deductions, and (ii) if Executive elects to continue health insurance coverage under COBRA for himself and his covered dependents under the Company's group health plans following such termination or resignation of employment, pay the same portion of the monthly premium under COBRA as it pays for active executive employees or, if greater, the amount which the Company paid to the Executive prior to the termination, until the earliest of (A) the close of the twelve (12) month period following the termination of Executive's employment, (B) the expiration of the continuation coverage under COBRA, or (C) the date when Executive becomes eligible for substantially equivalent health insurance coverage in connection with new employment or self-employment.

(d)     Conditions on the Payment of Severance. All benefits set forth in Sections 6(b) and 6(c) are collectively referred to as "Severance." Severance will only be paid to Executive if, and provided, Executive complies with all surviving provisions of this Agreement and executes a confidential severance agreement and general release of all claims in a form provided by Company.

(e)     Definitions.

(i)     For purposes of this Agreement, "Cause" means any of the following: (i) Executive's intentional violation of any applicable law or regulation respecting the business of the Company that is materially injurious to the Company; (ii) Executive's commission of a felony or commission of a crime involving moral turpitude, (iii) Executive's conduct involving willful misconduct, dishonesty with respect to the business of the Company, or fraud, embezzlement or misappropriation against the Company, each of which must be injurious to the Company, (iv) Executive's deliberate violation of the rules or policies of the Company that is injurious to the Company, (v) Executive's refusal to perform, or substantial disregard of duties properly assigned to Executive by the Company, that is injurious to the Company, (vi) Executive's breach of the duty of loyalty to the Company or any of its affiliates, that is injurious to the Company, (vii) Executive's breach of the terms of any agreement between Executive and the Company, that is injurious to the Company, (viii) the intentional and unauthorized disclosure by the Executive of any trade secrets or confidential information of the Company that is injurious to the Company; or (ix) Executive's breach of a fiduciary duty that is injurious to the Company.

(ii)     For purposes of this section, "Cause" shall be deemed to exist if the Board makes a decision in good faith that cause exists, after an investigation reasonable in

the circumstances. Prior to the Board making a determination whether or not "Cause" exists, Executive shall be entitled to make a presentation, either in person, in writing or through counsel, to the Board, and to provide any information that Executive wishes the Board to consider in making its determination. Executive shall have a period of at least five business days in order to prepare and make such a presentation. The Board may, at its election, relieve Executive of his duties during the five-day period but Executive's salary and employee benefits shall continue during that period.

(iii)     For purposes of this Agreement, "Good Reason" means without Executive's prior written consent provided that the Company is given a period of fifteen (15) calendar days to rescind an unintentional action or omission, (i) a material reduction in, or failure to pay, Executive's annual base salary or bonus as then in effect, (ii) a reduction in the employee benefits provided to Executive except if part of a reduction that is provided to all employees of the Company; (iii) if Executive's title, operating responsibilities, reporting obligations and authority are diminished in a material way, (iv) the relocation of Executive's principal place of employment to a location that is more than twenty (20) miles further from his current residence, or (v) the refusal of a successor or acquiring company to assume the obligations of the Company under the employment agreement.

(iv)     For purposes of this Agreement, "Change in Control" means either: (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger (including, but not limited to, a reverse triangular merger) or consolidation or stock transfer, but excluding any such transaction effected primarily for the purpose of changing the domicile of the Company), unless the Company's stockholders of record immediately prior to such transaction or series of related transactions hold, immediately after such transaction or series of related transactions, at least 50% of the voting power of the surviving or acquiring entity (provided that the sale by the Company of its securities in a bona fide financing transaction shall not constitute a Change of Control hereunder); or (ii) a sale or lease of all or substantially all of the assets of the Company.

(f)     Termination due to Death or Disability.  If, as a result of the incapacity of Executive due to mental or physical illness, Executive is unable to perform substantially and continuously the duties assigned to him hereunder for a period of three (3) consecutive months or for a non-consecutive period of six (6) months during the Employment Term, the Company may terminate his employment for "Disability" upon thirty (30) days prior written notice to Executive. If Executive's employment terminates by reason of death or Disability, or Executive otherwise qualifies for long term disability under the Company's then applicable long term disability plans, policies, and arrangements, then Executive will be entitled to receive all compensation earned, including accrued vacation and other benefits only in accordance with the Company's then applicable plans, policies, and arrangements.   Thereafter, the Company shall have no further obligation to Employee under this Agreement.

(g)     Golden Parachute Excise Tax.  If the benefits provided for in this Agreement (or under any other arrangement between the Company and Executive) payable to Executive constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code") and but for this Section 7(i) would be subject to the excise tax

5

imposed by Section 4999 of the Code, then, at the discretion of Executive, Executive's severance benefits hereunder will be (i) delivered in full, or (ii) delivered as to such lesser extent which would result in no portion of such severance benefits being subject to the excise tax under section 4999 of the Code. If Executive elects to have his parachute payments reduced to avoid the application of sections 280G and 4999 of the Code, Executive shall determine which components of the parachute payments shall be reduced. Unless the Company and Executive otherwise agree in writing, any determination required under this Section 7(i) will be made in writing in good faith by the accounting firm serving as the Company's independent public accountants immediately prior to the Change in Control (the "Accountants"). For purposes of making the calculations required by this Section 7(i), the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Executive shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this section.

Section 7.    <u>Indemnification and Insurance</u>.  Executive will be covered under the Company's insurance policies and, subject to applicable law, will be provided indemnification to the maximum extent permitted by the Company's bylaws, Certificate of Incorporation, and standard form of Indemnification Agreement, with such insurance coverage and indemnification to be in accordance with the Company's standard practices for senior executive officers and directors but on terms no less favorable than provided to any other Company senior executive officer or director, now or hereafter.

Section 8.    <u>Non-Competition, No Interference and Nonsolicitation</u>.

(a)    <u>Non-Competition</u>.  Executive agrees that for the period ending on one (1) year after Executive's last day of employment with the Company (the "<u>Non-competition Period</u>"), Executive shall not, anywhere in the world, directly or indirectly, without the express prior written consent of the Company, engage in any business or activity, whether as an employee, consultant, partner, principal, agent, representative, equity holder or in any other individual, corporate or representative capacity (without limitation by specific enumeration of the foregoing), or render any services or provide any advice to any business, activity or Person involving, to any significant extent, competitive activities of the Business, if Executive knows or reasonably should know that such business, activity or Person engages, to any significant extent, in competitive activities with the Business. Notwithstanding the foregoing, Executive may own, directly or indirectly, up to one percent (1%) of any class of "publicly-traded securities" of any Person which owns or operates a business involving the Business. For the purposes of this Section 8(a), "publicly-traded securities" shall mean securities that are traded on a national securities exchange of the United States or any European Union member country.

(b)    <u>No Interference with the Business; Nonsolicitation</u>.  Executive agrees that during the Non-competition Period, at any time or for any reason, Executive shall not, directly or indirectly:

(i)    with respect to the Business, solicit or divert any business or clients or customers, made known to Executive during his employment by the Company, away from the Company and its affiliates;

6

(ii)    induce customers, clients, suppliers, agents or other Persons under contract or otherwise associated or doing business with the Company and its affiliates, made known to Executive during his employment by the Company, to reduce or alter any such association or business with the Company and its affiliates; and

(iii)    knowingly solicit any Person in the employment of the Company and its affiliates to (a) terminate such employment, and/or (b) accept employment, or enter into any consulting arrangement, with any Person other than the Company and its affiliates.

Section 9.    Confidential Information.

(a)    Company Information.  Executive will not, at any time, whether during or subsequent to Executive's employment hereunder, directly or indirectly, disclose or furnish to any other person, firm or corporation, or use on behalf of himself/herself or any other person, firm or corporation, any confidential or proprietary information acquired by Executive in the course of Executive's employment with the Company, including, without limiting the generality of the foregoing, contractual details relating to current Company clients, buying habits of present and prospective customers of the Company, pricing and sales policy, techniques and concepts, the names of customers or prospective customers of Company or of any person, firm or corporation who or which have or shall have treated or dealt with Company or any of its subsidiaries or affiliated companies, any other information acquired by Executive regarding the methods of conducting the business of Company and any of its subsidiaries and/or affiliates, any information regarding the company's methods of obtaining business, of providing or advertising products or services, or of obtaining customers, trade secrets and other confidential information concerning the business operations of Company or any company and/or entity affiliated with Company, except to the extent that such information is already generally known in the public domain.

(b)    Third Party Information.  Executive recognizes that Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  Executive agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out work for the Company consistent with Company's agreement with such third party.

(c)    Return of Company Documents.  Executive agrees that, at the time of leaving the employ of Company, Executive will deliver to Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, materials, equipment, other documents or property, or reproductions of any aforementioned items used by Executive pursuant to Executive's employment with Company or otherwise belonging to Company, its successors or assigns.

Section 10.    Remedies and Arbitration.

(a)    Remedies.  The parties to this Agreement agree that (i) if Executive materially breaches Section 8 of this Agreement, the damage to the Company may be substantial, although difficult to ascertain, and money damages will not afford the Company an adequate remedy, and (ii)

if Executive is in material breach of any provision of this Agreement, or threatens a breach of Section 8 of this Agreement, the Company shall be entitled, in addition to all other rights and remedies as may be provided by law, to seek specific performance and injunctive and other equitable relief to prevent or restrain a breach of any provision of this Agreement, notwithstanding Sections 10(b)-(f) of this Agreement.

(b)     _Agreement to Arbitrate._  To the fullest extent permitted by law, Executive and the Company agree to arbitrate any controversy, claim or dispute between them arising out of or in any way related to this Agreement, the employment relationship between the Company and Executive and any disputes upon termination of employment, including but not limited to breach of contract, tort, discrimination, harassment, wrongful termination, demotion, discipline, failure to accommodate, family and medical leave, compensation or benefits claims, intellectual property claims, constitutional claims; and any claims for violation of any local, state or federal law, statute, regulation or ordinance or common law.  For the purpose of this agreement to arbitrate, references to the "Company" include all parent, subsidiary or related entities and their employees, supervisors, officers, directors, agents, pension or benefit plans, pension or benefit plan sponsors, fiduciaries, administrators, affiliates and all successors and assigns of any of them, and this Agreement shall apply to them to the extent Executive's claims arise out of or relate to their actions on behalf of Company.  By executing this Agreement, Executive and the Company are both waiving the right to a jury trial with respect to any such disputes.

(c)     _Initiation of Arbitration._  Either party may exercise the right to arbitrate by providing the other party with written notice of any and all claims forming the basis of such right in sufficient detail to inform the other party of the substance of such claims.  In no event shall the request for arbitration be made after the date when institution of legal or equitable proceedings based on such claims would be barred by the applicable statute of limitations.

(d)     _Arbitration Procedure._  The arbitration will be conducted in New Jersey by a single neutral arbitrator and in accordance with the then current rules for resolution of employment disputes of the American Arbitration Association ("AAA") (available on-line at www.adr.org) or JAMS (available on-line at www.jamsadr.com).  The parties are entitled to representation by an attorney or other representative of their choosing.  The arbitrator shall have the power to enter any award that could be entered by a judge of the trial court of the State of New Jersey, and only such power, and shall follow the law.  The parties agree to abide by and perform any award rendered by the arbitrator, and any award made by such arbitrator shall be final, binding and conclusive on the parties for all purposes.  The arbitrator shall issue the award in writing and therein state the essential findings and conclusions on which the award is based.  Judgment on the award may be entered in any court having jurisdiction thereof.

(e)     _Costs of Arbitration._  Each party shall bear its own costs (including attorneys' fees) of any such arbitration proceedings.  For the avoidance of doubt, Executive will not be responsible for the Company's attorneys' fees and the Company will not be responsible for Executive's attorneys' fees), and the arbitrator may not award attorneys' fees unless a statute or contract at issue specifically authorizes such an award.

(f)     _Waiver of Jury Trial._  Each of the Company and Executive hereby expressly waives its or his respective rights to a jury trial of any claim or cause of action based upon or arising

DB02:9410590.3YCST01:9410590.4                                                                                                          067920.1001

out of this Agreement or any transaction contemplated by this Agreement or any other dealings between them relating to the subject matter of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that related to the subject matter of this transaction, including without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Each of the Company and Executive further warrants and represents that each has reviewed this waiver with its legal counsel; and that each voluntarily waives its jury trial rights following consultation with legal counsel. This waiver is irrevocable and may only be modified in amendments, renewals, supplements or modifications to this Agreement, and any other transaction documents. In the event of litigation, this Agreement may be filed as a written consent to trial (without a jury) by the court.

(g)     Acknowledgment. EXECUTIVE HAS READ AND UNDERSTANDS THIS SECTION 10, WHICH DISCUSSES REMEDIES, ARBITRATION, CONFLICT RESOLUTION AND WAIVER OF JURY TRIAL. EXECUTIVE UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, HE AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF TO ARBITRATION, AND THAT THIS CLAUSE CONSTITUTES A WAIVER OF HIS RIGHT TO A JURY TRIAL.

Section 11.     Independent Review and Advice. Executive represents and warrants that he has carefully read this Agreement; that he executes this Agreement with full knowledge of the contents of this Agreement, the legal consequences thereof, and any and all rights which each party may have with respect to one another; that he has had the opportunity to receive independent legal advice with respect to the matters set forth in this Agreement and with respect to the rights and asserted rights arising out of such matters, and that he is entering into this Agreement of his own free will. Executive expressly agrees that there are no exceptions contrary to the Agreement and no usage of trade or regular practice in the industry shall be used to modify the Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in interpreting this Agreement. The parties agree that this Agreement shall not be construed for or against either party in any interpretation thereof.

Section 12.     Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such party may be entitled at law or in equity.

Section 13.     Assignment. This Agreement will be binding upon and inure to the benefit of (a) the heirs, executors, and legal representatives of Executive upon Executive's death and (b) any successor of the Company. Any such successor of the Company will be deemed substituted for the Company under the terms of this Agreement for all purposes. For this purpose, "successor" means any person, firm, corporation, or other business entity which at any time, whether by purchase, merger, or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Company. None of the rights of Executive to receive any form of compensation

DB02:9410590.3YCST01:9410590.4

payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance, or other disposition of Executive's right to compensation or other benefits will be null and void.

Section 14. <u>Notices</u>. All notices, requests, demands, and other communications called for hereunder will be in writing and will be deemed given (a) on the date of delivery if delivered personally, (b) one day after being sent by a well established commercial overnight service, or (c) four days after being mailed by registered or certified mail, return receipt requested, prepaid and addressed to the parties or their successors at the following addresses, or at such other addresses as the parties may later designate in writing:

If to the Company:

Autobacs Strauss Inc.
9A Brick Plant Road
South River, New Jersey 08882
Attention:
Tel: 732.390.9000

If to Executive:

Joseph Catalano
419 Essex Ave.
Bloomfield, NJ 07003
Tel: 973.429.9115

or at the last residential address known by the Company as provided by Executive in writing.

Section 15. <u>Severability</u>. If any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, this Agreement will continue in full force and effect without said provision.

Section 16. <u>Integration</u>. This Agreement represents the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. No waiver, alteration, or modification of any of the provisions of this Agreement will be binding unless in a writing that specifically references this Section and is signed by duly authorized representatives of the parties hereto.

Section 17. <u>Waiver of Breach</u>. The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

Section 18. <u>Headings</u>. All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

~~DB02:9410590.3~~YCST01:9410590.4

067920.1001

Section 19.    <u>Tax Withholding</u>.  All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

Section 20.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without giving effect to the choice of law principles thereof).

Section 21.    <u>Survival of Operative Sections</u>.  Upon any termination of Executive's employment, the provisions of Sections 8, 9 and 10 of this Agreement  shall survive to the extent necessary to give effect to the provisions thereof.

Section 22.    <u>Acknowledgment</u>.  Executive acknowledges that Executive has had the opportunity to discuss this matter with and obtain advice from Executive's private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

Section 23.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*[Signature page follows.]*

~~DB02:9410590.3~~YCST01:9410590.4

067920.1001

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by a duly authorized officer, as of the day and year written below.

THE COMPANY:

AUTOBACS STRAUSS INC.

By: _____
   Name:
   Title:

EXECUTIVE:

_____

Joseph Catalano

DB02:9410590.3YCST01:9410590.4

067920.1001

SUMMARY OF EXECUTIVE'S

EMPLOYEE BENEFIT PLANS, POLICIES, AND ARRANGEMENTS

### Supplemental Executive Benefits

**Life & ADD**  3x's salary (Max $~~750~~795K)

**LTD**  60% of Salary (Max 14K per Month)